## No. 10,794.

### THE STATE EX REL. JOHN A. MORRIS VS. L. F. MASON, SECRETARY OF STATE.

1. When the charge in the return of a respondent in a *mandamus* proceeding is, that on account of certain unauthorized amendments, alterations and interpolations in what are tendered and offered in evidence as official journals of legislative proceedings, same can not be so received and considered—the objection goes to the effect of the evidence, and not to its admissibility.

2. The Constitution requires that each House of the General Assembly shall keep a journal of its proceedings and cause the same to be published immediately after the close of the session. It also declares that the original journal shall be preserved, after publication, in the office of the Secretary of State, and no other record shall be required. When legislative journals are thus published and preserved they shall constitute the ultimate proof of the verity of those proceedings.

3. Such official journals import absolute verity, and form conclusive proof of the proceedings themselves when considered with reference to *other* evidence of such proceedings, but proof is admissible to show that they have not been made the *actual* repository of the proceedings of the General Assembly as they transpired. No *extrinsic* proof is admissible for the purpose of contradicting the *facts* therein recited; but proof is admissible to show that, through an improper exercise of judgment on the part of a public official, or State agent or representative, *intrinsic* error exists.

4. The right of the Secretary of State, under the provisions of Article 2567 of the Constitution, and in his return to a *mandamus* proceeding, to raise issues, *exclusively* appertaining to the *inherent* illegality of a proposed constitutional amendment, is very questionable, indeed, and consideration of them must be restricted to such as are *apparent* and *glaring*.

5. It is not contemplated by Article 256 of the Constitution that a proposition for the amendment thereof shall be submitted to the Governor for his approval. That is unnecessary.

6. A fair test of whether a proposed amendment contains legislative provisions which have the effect of degenerating it into an ordinary statutory enactment is to consider whether the alleged legislative matter could stand as an independent statute if approved, and if the amendments were to be held invalid because of it not having been legally enacted by the General Assembly. Provisions contained in a proposed amendment which are only auxiliary to or adjuratory thereof can not be given that effect.

7. Whether a proposed amendment contains provisions which can not be submitted as *one* amendment must be construed and determined by a comparison thereof with the one-object article of the Constitution.

APPEAL from the Seventeenth District Court, Parish of East Baton Rouge. *Buckner, J.*

*Thos. J. Semmes* for the Relator and Appellant:

1. The duty imposed on the Secretary of State is purely ministerial; hence mandamus will lie. 76 Va. 884; 79 Id. 269; 40 An. 395.

2. The State is not a party to this suit; any citizen could have instituted it to compel performance of a public duty. 11 An. 140; 91 U. S. 355.

3. The Secretary of State refused to publish the amendment on the sole ground that it had not been presented to the Governor for his approval. He is confined to that ground and can not shift his position. 96 U. S. 267.

A proposed amendment to the Constitution is subject to no formality; it may be made by bill or by joint resolution; it must be read three separate days, but it need not be read in full on any day; the reading in full is unnecessary because the Constitution requires it to be entered on the journal; that is to say, spread, or written in full on the journal, together with the yeas and nays thereon. The framers of the Constitution understood well the difference between reading and reading in full. Article 37 provides: "Every bill shall be read on three different days, and no bill shall be considered for final passage unless it has been once read in full."

Article 39 says: "When a bill has been passed by both houses, and placed in possession of the house in which it originated, the title shall be read, and at the request of five members the bill shall be read in full," but it can only be required in the house in which the bill originated. It is not required to be done in the other house.

The Constitution of 1812, Article 2, Section 24, provided "that no bill shall have the force of law until, on three several days, it be read over and free discussion allowed thereon." The Constitution of 1845 is the same as that of 1812 in this respect; it requires a bill to be read over on three several days (Title 2, Article 31). So does the Constitution of 1852 (Title 2, Section 20). "A bill must be read over" (Title 3, Section 27).

The Constitution of 1868 introduced a change; it provides that no bill shall become a law until on three several days it be "read" in each house. The word "over" is omitted.

In 1879 the framers of the Constitution knew well how bills had been passed under the Constitution of 1868, and went back to the old rule, with this modification. The old Constitution required three readings in full, for that is the meaning of the words "read over," whereas the convention of 1879 adopted Article 37, which required only one reading in full. Hence when the Constitution of 1879 omits the words in full when speaking of parliamentary readings, it clearly means an ordinary parliamentary reading, unless the words in full are expressly used.

Therefore, a proposal to amend the Constitution need not be read "in full" at all, although it must undergo the three parliamentary readings on three several days; but it must be entered "in full" on the journals. A parliamentary reading is a parliamentary act of a parliamentary body, but the entry on the journal is the duty to be performed by a person who keeps the journal, in pursuance of a constitutional injunction to that effect.

A proposal to amend the Constitution may be made at any session of the Legislature, extra or regular. Article 256 is express on this point. It need not be submitted to the Governor for his approval, for the Constitution does not say so; nor need it be enrolled or signed by the officers of either house; no such requirement is mentioned in the Constitution. The passage of the proposal, after three readings, by a two-thirds vote in each house, and the entry of the proposal on the journals with the yeas and nays thereon, perfects the proposal. Nothing is left to be done but to publish and submit it.

In Hollingsworth vs. Virginia, 3 Dallas, 381, Mr. Lee in argument said: "The case of an amendment is evidently a substantive act, unconnected with the ordinary business of legislation, and not within the policy or terms of investing the President with a qualified negative on acts and resolutions of Congress." And Mr. Justice Chase said: "There can surely be no necessity to answer that argument; the negative of the President applies only to ordinary cases of legislation; he has nothing to do with the proposition or the adoption of the amendments to the Constitution." The Reporter says: "The court was unanimously of the opinion that the amendment had been constitutionally adopted." This decision had reference to the 11th Amendment to the Constitution of the United States in regard to the judicial power, which was proposed by Congress in 1793, and was subsequently adopted by the States. The language of the Constitution of the United States is: "That every order, resolution or vote, to which the concurrence of the Senate and House of Representatives may be necessary (except on the question of adjournment) shall be presented to the President of the United States," etc. The language used in the Constitution of the United States seems to have been copied in all our State Constitutions from 1812 to 1879. The only difference is that all our Constitutions prior to 1879 merely excepted the question of adjournment, whereas the Constitution of 1879 enlarges the exceptions, and adds to the adjournment the following: "Or on matters of parliamentary proceedings, or an address for a removal from office."

When Sheriff Hufty was removed from office by an address in 1856, there was some doubt in the minds of the members of the Legislature whether the approval of the Governor was required to the address for the removal of the sheriff. It was considered prudent to obtain the Governor's signature. The framers of the Constitution of 1879 intended to settle that question, and expressly provided for the subject of an address. See Hufty's case reported in the 11th An. 367.

With the decision in the third of Dallas, that amendments to the Constitution did not require the President's approval, the framers of the Constitution of 1845 were familiar, for in that Constitution there is an express provision that amendments to the Constitution may be proposed, if the same be agreed to, by two-fifths of the members elected to each house, and approved by the Governor. Article 140.

In the journal of the convention of 1852 the following entry is found on page 45: Mr. Todd, on behalf of the committee on amendments to the Constitution, reported that the modes of amendment provided by the present Constitution were unnecessarily restrictive, and therefore recommended the following as a substitute for the article as it now stands:

"Any amendment, or amendments, to this Constitution may be proposed in the Senate or House of Representatives, if the same shall be agreed to by two-thirds of the members elected to each house and approved by the Governor," etc.

Mr. Taliaferro moved to strike out the words " approved by the Governor."
The motion was laid on the table, and the amendment adopted as reported.
(Journal, page 52.)

At a later day Mr. Todd moved, by general consent, that the Convention should
reconsider the vote on the adoption of Title 9 of the Constitution, under the
head of " Mode of Revising the Constitution," which motion prevailed. The
article being before the Convention, Mr. Todd moved to strike out of the same
the words "and approved by the Governor," which motion prevailed, and the
article as amended was readopted.

If any authority on the subject were required after such a clear manifestation
of purpose on the part of the framers of the Constitutions of 1864, and 1868 and
1879, to follow the footsteps of the Convention of 1852, the cases cited in the
argument, from the 14th and 15th Northwestern Reporter, *ex parte* Wren, 63 Miss.
536, and the case in the 3 Dallas, would suffice. In the case in the 63 Miss. the
court say: " The Constitution provides for its amendment, and contains specific
provisions on the subject. This is aside from the 'ordinary business of legisla-
tion; it is not legislation; it is a proposal of two-thirds of each house to amend
the Constitution; it is not called a bill by the Constitution, for a bill is a pro-
posed law; it is only a proposition, originated as provided, to the qualified
voters for them to vote on, and does not require to be signed by the President
of the Senate and the Speaker of the House of Representatives, for the provi-
sion on that subject relates to bills for the enactment of laws. A proposed
amendment to the Constitution is not required to be presented to the Governor;
he has nothing to do with a proposal to amend the Constitution; only such
bills are to be presented to him as he may make laws by his approval and sign-
ing, or by not returning them. As to a proposal to amend the Constitution, the
journals of the two houses are, by the Constitution, made the only evidence of
the proposal of the required number of each branch, and they should show
what the Constitution prescribes as to these."

5. As to the oneness of the amendment. The objection, that it contains divers
appropriations, can not destroy its oneness, for if it did, every general appro-
priation act of the State would be void. For although the State Constitution
requires a certain class of appropriations of money to be made in separate bills,
that clause does not apply to the general appropriation bills; but the general
article of the Constitution, that every law shall have but one object, and that
shall be expressed in its title, applies to the general appropriation laws, as well
as to any other laws, and therefore, if two or three appropriations in a general
appropriation law destroyed the oneness of the act, it is clear that no general
appropriation law could be constitutional. The test, therefore, of oneness is to
be found, not in the fact that there are several appropriations contained in the
proposed amendment, but in the object or purpose for which the amendment
is proposed. The argument that log-rolling was intended to be avoided by the
constitutional requirement that when several amendments should be submitted
at the same time, they should be so submitted as to enable the elector to vote
on each amendment separately, is inapplicable, because the Constitution itself
contemplates that many amendments may be proposed at the same time, and
many amendments may be submitted to the electors at the same election, and
if so, it is clear that log-rolling was not intended to be avoided by the require-
ment that the people should have an opportunity of voting on each amendment
separately; because many amendments voted on at the same time would afford
a full opportunity for all the log-rolling contemplated in argument.

38

The test to be applied to ascertain the oneness of the amendment to be found in the Article 29 of the Constitution, which provides that every law enacted by the General Assembly shall express but one object, and that shall be expressed in the title, and the oneness of a law, under that title, is tested by the oneness of the object which the law has in view; and that is the test to be applied to the oneness of an amendment. The decisions are that when a law has but one general object, which is indicated by its title, every means or end necessary to accomplish the object is embraced in the title. (Cooly Const. Limit., p. 172.) The generality of the title is no objection to the law so long as it is not made to cover incongruous legislation. The title of the act need not be a synopsis of its contents. Am. Printing House vs. Dupuy, 37 An. 189; State vs. Butt, 31 An. 163.

6. But it is urged that the bill which contains the proposed amendment also contains matters of proposed legislation, which legislation has been defeated by the veto of the Governor, and that the proposed amendment being mingled with the proposed defeated legislation must suffer the same fate which the proposed legislation has met with. Even if the proposed legislation could not be considered a part of the amendment, for it refers exclusively to the method in which the amendment shall be voted on, the only effect of the veto of the Governor is to defeat the legislative part of the amendment, leaving the amendment itself intact. In other words, the amendment, in so far as it is the proposal of an amendment, stands valid as a proposal without the Governor's veto; the legislative part of the amendment in so far as it is legislation and no part of the amendment, is null and void; and it is a common principle of law that even a law which is separable in its provisions may be good in part and bad in part. Berry vs. Baltimore Railroad Company, 4 Md. 464; Moor vs. N. O., 32 An. 72; 32 An. 253; 33 An. 1141; 41 An. 944.

7. The passage of the proposed amendment in the manner indicated by the Constitution must be shown affirmatively by the relator. It is conceded that the fact of its passage in a constitutional manner must be shown by the journals of the Senate and House of Representatives; no other evidence can be resorted to for that purpose.

The relator has offered in evidence certain printed books styled the journals of the House of Representatives and of the Senate, which he says are the journals of the two houses, and which he says were delivered to the Secretary of State as the journals of the two houses, printed by the public printer, which the Secretary of State, as the custodian of the journals under the Constitution, has received into his possession for distribution, pursuant to law; and he is now daily distributing them in conformity to the duty imposed on him by law. That the Secretary of State has in his possession no other journal, written or printed, than these printed journals, and that he knows of no other journals of the two houses than those which he has been distributing in the manner already indicated.

The 28th Article of the Constitution provides that " each house shall keep a journal of its proceedings, and cause the same to be published immediately after the close of the session. When practicable, the minutes of each day's session shall be printed and placed in the hands of the members on the day following. The original journal shall be preserved, after publication, in the office of the Secretary of State, but there shall be required no other record thereof." It is manifest that the Secretary of State is the constitutional guardian of the original journal. It is manifest that the delivery of the journal to the Secretary

NEW ORLEANS, MAY, 1891.    595

State ex rel. Morris vs. Secretary of State.    ·

of State is the record thereof in his office, because the Constitution declares that no other record shall be required, except the delivery of the original into the possession of the Secretary of State. The original journal is the printed journal, which the printer is required to deliver to the Secretary of State for distribution. It never has been the practice since 1881 to deliver to the Secretary of State any other journal than the printed journals which the public printer is required to deposit with the Secretary of State for distribution. If those printed journals be not the journals of the Senate and House of Representatives, we have none now, and have not had any since 1881. Should the Court refuse to receive these printed journals thus deposited with the Secretary of State, pursuant to law, as the journals of the two houses of the General Assembly, the effect would be to nullify all of the constitutional amendments adopted since 1881. Among them are the "State Debt Amendment," July 1, 1882; the "Judiciary Amendment," July 2, 1882; the "Amendment to Article 146 of the Constitution," July, 1882: the "Division of the State into Levee Districts," July, 1884; the "Tulane University Amendment," of July, 1884; the "Amendment in regard to the New Basin Canal," of 1886; the "Amendment in regard to the terms of the District Courts," in 1886; the "Amendment in regard to the Bonded Debt of the City of New Orleans," in 1890.

Indeed, the Constitution declares that no bill shall have the force of law unless it is passed by a majority of all the members elected to each branch of the Legislature, to be evidenced by the yeas and nays taken thereon recorded in the journals; and if there be no journals since 1881, all the legislation for the last nine years may be obliterated from the statute book at the instance of any individual who chooses to question the validity of any law. At all events, can this Secretary of State question the genuineness of the journals which he had received into his official custody without objection, which in his official capacity he is daily distributing as the journals of the two houses, and which he has in every manner recognized and sanctioned by his official authority? If ever there were a case which invited the application of the doctrine of estoppel, it seems to me this is one.

Can the Secretary of State be allowed to say: "The journals in my custody, and which I distribute under my official authority, as the journals of the two houses, are not, in fact, such journals; I have no other journals than these in my possession; but there are some other printed or written matters in the possession of some other person, and which were never in my possession, that are the journals of the two houses of the General Assembly." Does the Secretary of State pretend that the printed journals which he has in his possession do not contain the truth? Does he pretend by his answer to attack the printed journals in his possession, on the ground of fraud or error? There is no such pretence, and if the evidence on the subject is admissible, it establishes beyond controversy that there was no fraud or error. The evidence establishes this simple · fact, that the proposed amendment, which it was the duty of both officers, under the Constitution, to have entered on the journals after it had been passed by the requisite number of yeas and nays, was not so entered, and that the omission was an error on the part of the printer; that so far as the Senate is concerned, the Senate itself ordered the omission to be supplied; that so far as the House is concerned, when the printed slip was examined by the clerk of the House he discovered the omission of the printer; that he immediately sent for the business manager of the Baton Rouge *Advocate*, while the House was still in session, requested him to correct the omission, and furnished him for

that purpose the printed copy of the proposed amendment; that then, on the next day, he examined the journal, as it was printed in the Baton Rouge *Advocate*, and discovered that the omission had not been supplied as requested by him. He sent again for the printer, who assured him that the error would and should be corrected; so that it is clear the omission was the omission of the printer, and it was discovered while the House was in session and repeated orders were given to correct it. Trezevant, p. 192; Journal, pp. 226–7.

An entry on the journal of the proposed amendment, as required by the Constitution, is not a proceeding of the House, but is a duty imposed by the Constitution itself on the Clerk of the House and Secretary of the Senate. The journal which is kept under Article 28 of the Constitution is a journal of proceedings, whereas, a proposed amendment, when passed upon by the requisite majority of the respective houses on three separate days, with the yeas and nays thereon, is no longer a subject of proceeding; all that is left to be done is for the Clerk to enter it in the journal; the proceeding, so far as the action of the House is concerned, or of the Senate, has ceased and is at an end. The ministerial duty of entering it on the journal is imposed by the Constitution on the officer who keeps the journal, and therefore he may supply any omission made by him in that respect. In fact, in supplying such omission he is making no alteration of the proceedings of the two houses, but he is merely placing on the journal that which he ought to have done and which was required of him.

But our contention is that the court can not look beyond the printed journals deposited with the Secretary of State, aside from the fact that the Secretary of State can not question his own journals. It is not competent for the court to question the records of the State, deposited under the Constitution with the Secretary of State, evidencing the action of the legislative department of the government and sent to this court itself for its guidance.

In this case the court is asked to question these very journals which the party before the court has transmitted to it as authentic and genuine, and which in this suit he admits to be authentic, and therefore his mouth is closed to assert the contrary.

In Perkins vs. Ottawa, 94 U. S. 363, the Supreme Court says: "The journal is the evidence of the action of the House, and by it the act must stand or fall; it is in the power of the Legislature at the same or a subsequent session to correct its own journals by amendments, which show the true facts as they actually occurred, and the court may take judicial notice of the journals if the journals must show the passage of a law, or of a proposed amendment."

The authorities on this subject are abundant, for in the case of Koehler vs. Hill, 60 Iowa, 543, to be found in the 14th and 15th Northwestern Reporter; and in the case of Wise vs. Bigger 79 Va., 269; the Attorney General vs. Rice, 64 Mich. 385; Berry vs. Baltimore R. R. Co., 41 Md. 463, it is the settled doctrine that an entry in the legislative journals, if in compliance with the constitutional requirement, is the best evidence and can not be contradicted.

In the case of Attorney General vs. Rice, 64 Michigan 391, a piece of blank paper was endorsed with a title, as if it were the title of an act written on the reverse of the paper. The journals showed that a bill by that title was introduced; the court refused to receive evidence to show that no such bill was in fact introduced, and that the paper on which the endorsement of the title was made was a blank sheet. The court in that case says: "The testimony of an individual can not be received to contradict a statute, and, if not, why receive it to contradict a journal?"

State ex rel. Morris vs. Secretary of State.

And in the case already cited of Koehler vs. Hill, the court says: "When a fact is to be established in a particular way, no other evidence can be resorted to. An entry on the journal of the two houses is the best and the primary evidence.' And there they would not allow evidence to prove the journals untrue. As the value of statutes evidently depends upon journal entries, in this State, it is manifest that if a statute can not be attacked by oral evidence, the foundation of the statute, the journal, can not be attacked by parol testimony.

---

### *F. P. Poché* on the same side:

1. The published journals of the two houses of the General Assembly show that House bill No. 214 of the regular session of 1890, and known as the lottery amendment, which is a proposal to amend the Constitution by inserting therein an article on levees, etc., was agreed to by both houses after a strict compliance with all the requirements of Article 256 of the Constitution. Hence it is a valid constitutional amendment, and must be submitted to the electors for their approval or rejection.

2. Article 256 makes the journals of the two houses primary evidence of the proceedings which take place in the various stages of a constitutional amendment proposed by the General Assembly.

3. Article 28 of the Constitution and Act No. 6 of 1881 provide the only mode of publishing legislative journals, and both contemplate that the journals, published in book form and preserved in the office of the Secretary of State, are the only true and authentic journals of the two houses of the General Assembly.

4. Legislative journals, published by authority of the State, in compliance with constitutional and statutory provisions, import absolute and unquestioned verity, and hence they can not be impeached, and when they show that a proposal to amend the Constitution has been agreed to by both houses, conformably to constitutional requirements, the proof is conclusive, and it can not be impeached. 79 Va. 260; 14 N. W. Rep. 738; 15 Kans. 194; 15 N. W. Rep. 609; 40 An. 362; 70 Ill. 166, 659; 105 U. S. 667.

5. The verity of legislative journals can not be impeached, even through an admission in the pleadings that the recitals which they contain are inaccurate and untrue. 64 Mich. 385.

6. The existence of a law, or the validity of a proposed constitutional amendment, is a judicial question to be decided by the courts. 94 U. S. 260; 76 Va. 876; 6 Wal. 499; 79 Va. 269.

7. The writ of mandamus is the proper and the only adequate legal remedy to compel the Secretary of State to publish a proposed constitutional amendment, agreed to by the General Assembly in accordance with constitutional provisions. Code of Practice, Art. 834; High E. Deg. Remedies, 510; Wait's Actions and Defences, Vol. 4, p. 367; 76 Va. 876; 12 Peters 608; 92 U. S. 531; 17 An. 156; 32 An. 579.

8. It is the province and duty of the judiciary in mandamus proceedings to decide what is a ministerial or a discretionary duty. 33 An. 969; 11 Wal. 39; 12 Wheat 19; 7 Wal. 347; 9 Wal. 575.

9. House bill No. 214 of 1890 is not a legislative act, but a proposal to amend the Constitution. The General Assembly, in amending the Constitution in the mode prescribed, acts in the capacity of a constitutional convention, representing the sovereignty of the people; hence, it has the authority to make provisions to regulate the manner of publishing and of submitting a proposed amendment. Const. 256, 262; 3 English Reports 436.

State ex rel. Morris vs. Secretary of State.

10. A proposal to amend the Constitution is not legislation. Hence, the Governor's approval is not essential, and his veto of the same does not affect its validity. 3 Dallas 378; 3 Eng. Rep. 436; 63 Vt. 536; 14 N. W. Rep. 739; 35 U. S. 68; 35 An. 1143; 30 An. 457; 40 An. 142; 41 An. 824.

11. House bill No. 214 of 1890 contains the proposal of only one amendment, and must be submitted to the electors as a single amendment. 11 N. W. Rep. 785.

### Walter H. Rogers, Attorney General, for Defendant and Appellee:

Courts are established to declare whether what is claimed to be law is a binding enactment, and to ascertain whether a constitutional exigency for their passage and promulgation has or not been observed; to that end they may inquire behind the facts or eventually they may ascertain, in the same way, the legislative intent.

Op. Chief Justice Bermudez in application for writ of prohibition McCuen O'Hara et als. vs. Judge Civil District Court.

The court may go back of the enrolled act, duly authenticated by the signatures of the presiding officers of the two houses and the Governor, and filed with the Secretary of State, and examine the legislative journals as sources of information touching the regularity of its enactment for the purpose of determining its validity as a statute.

Alabama—Collier vs. Frierson, 24 Ala. 109; Moody vs. State, 48 Ala. 115; Jones vs. Hutchinson, 43 Ala. 721; Moog vs. Randolph, 77 Ala. 597; Sawyer vs. Pollard, 7 Ala. 608; Stein vs. Leeper, 78 Ala. 521.

Arkansas—Wothen vs. Budgett, 32 Ark. 496; Smithee vs. Campbell, 41 Ark. 471; Smithee vs. Garth, 33 Ark. 17; Barr vs. Ross, 19 Ark. 250.

Colorado—In re Roberts, 5 Col. 525.

California—Paving Co. vs. Hilton, 11 Pacific R. 3; Fowler vs. Pierce, 2 Cal. 165.

Florida—Boyd vs. Deal, 4 So. Rep. 899.

Iowa—Koehl vs. Lange, 60 Iowa, 543; Koehl vs. Hill, 15 N. W. 629.

Indiana—May vs. Rice, 91 Ind. 546.

Illinois—Spangler vs. Jacoby, 14 Ill. 298; People vs. Steare, 35 Ill. 121; People vs. DeWolf, 62 Ill. 253; Ryan vs. Lynch, 68 Ill. 160; Prescott vs. Trustees, 19 Ill. 227; Miller vs. Goodwyn, 70 Ill. 661.

Kansas—State vs. Francis, 26 Kan. 724.

Louisiana—City vs. Brooks, 36 An. 641.

Maryland—Berry vs. Drum, 41 Md. 440; Legg vs. Mayer, 42 Md. 203.

Michigan—People vs. Mahaney, 13 Mich. 481; Stewart vs. Benev. Society, 41 Mich. 67; Rode vs. Phelps, 45 N. W. 496.

Minnesota—Supervisors vs. Heenan, 2 Minn. 330 (Gill. 281).

Missouri—State vs. Meade, 71 Mo. 266.

New York—Purdy vs. The People, 4 Hell 384; DeBow vs. People, 1 Denio, 11.

New Hampshire—Opinion of Judges, 52 N. H. 622.

Nebraska—State vs. McClelland, 25 N. W. 77; State vs. Stevenson, 25 N. W. 585; State vs. Robinson & Pool, 25 N. W. 246; Merach vs. Down, 25 N. W. 412.

Nevada—State ex rel. vs. Tuffley, 12 Pacific 835

Ohio—Fordyce vs. Goodman, 20 O. St. 1; State vs. Moffitt, 5 O. 363.

Pennsylvania—Bank vs. Commonwealth, 26 Pa. St. 446.

South Carolina—State vs. Platt, 2 So. Ca. 150.

Vermont—In re Wellman, 20 Ver. 656.

West Virginia—Osbourne vs. Staley, 5 W. Va. 85

State ex rel. Morris vs. Secretary of State.

Supreme Court of the United States—Gardner vs. Collector, 6 Wallace 499; Ottawa vs. Perkins, 49 U. S. 260; Post vs. Supervisors, 105 U. S. 667; Watkins vs. Holman, 16 Peters 25, 55, 56; Bryan vs. Forsyth, 19 How. 394; Gregg vs. Forsyth, 24 How. 179.

Commentators—Cooley Constitutional Limitations, pp. 135, 136; Sedgwick Construction of Statutory and Constitutional Law, p. 55, note (a); 1 Greenleaf on Evidence, Sec. 491; Cushing's Leg: Assemblies, Sec. 2, 211 et seq.; Southérland on Statutory Construction, p. 48; Story on the Constitution.

SEC. 839. The next clause is, "Each House shall keep a journal of its proceedings, and from time to time publish the same."

SEC. 840. The object of the whole clause is to insure publicity to the proceedings of the Legislature, and a correspondent responsibility of the members to their constituents. And it is founded in sound policy and deep political foresight. Intrigue and cabal are thus deprived of some of their main resources, by plotting and devising measures in secrecy. The public mind is enlightened by an attentive examination of public measures; patriotism and integrity and wisdom obtain their due reward; and votes are ascertained, not by vague conjecture, but by positive facts.

SEC. 841. When the people become indifferent to the acts of their representatives, they will have ceased to take much interest in the preservation of their liberties. When the journals shall excite no public interest, it will not be a matter of surprise if the Constitution itself is silently forgotten or deliberately violated. Ex. Cong. Record, Dec. 12, folio 370.

The original journals are alone to be preserved in the office of the Secretary of State. Art. 28, Const. 1879.

The bound or pamphlet journal is only a published copy. *Id.*

They must be published from copy of originals deposited with the Secretary of State and delivered by the Secretary of this State to the State printer, and not by the Clerk of the House or the Secretary of the Senate. Acts of 1881, No. 6 Sec. 10.

They should be authenticated by the Secretary of State as a true copy—then bound journals do not even show this.

If there is a discrepancy between the printed and manuscript journals the latter will prevail. County of Santa Clara vs. So. Pac. R. R., 18 Fed. Rep. 427; Chicot Co. vs. Davies, 40 Ark. 200.

The provisions of the Constitution are mandatory—the rules laid down in that instrument must be pursued. 15 N. W. 629.

The mode constitutes the measure of power and must be pursued. City vs Brooks, 36 An. 641; Collie vs. Frierson, 24 Ala., 109; Ryan vs. Lynch, 68 Ill. 160; Sutherland on Statutory Construction, 48.

The journals of the General Assembly can not be changed or corrected except by authority of the houses comprising the Assembly. McCulloch vs. State, 11 Ind. 424.

When measures pass from the possession or dominion of either the Senate or the House, no vote or motion changing action upon such measures can be made or entertained by either house, certainly not changes by a subordinate officer. Rule 27 of Senate of Louisiana.

Public records are preserved to perpetuate the truth. Can not be corrected or proved by parole. Neither can they be corrected or changed by a copy shown to have been altered and which differs from the original. State vs. Doyle, 72 An. 641; Attorney General vs. Lazarus. 39 An. 173; Green vs. Reagan, 32 An. 974; Taylor vs. Jones, 3 An. 621; Ford vs. Brooks, 35 An. 154.

600     SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

Acts in contravention of public policy are null, whether the law declares the nullity or not. C. C., Art. 19; 6 Rob. 116.

The public policy of the State is settled by the provisions of the Constitution.

The Legislature is without authority to fix either by declaratory law, or tacitly by a series of enactments, a construction of the Constitution which shall be binding upon the judiciary. 5 Rob. 116.

It can not be shown by parole or *aliunde* that that which was necessary to be done and fixed *ab initio*, could be done at another time and under different circumstances.

Neither may you separate the form and the testimony—for the form, character and nature of the evidence are so intimately connected with the thing to be proved by it as to be one and inseparable.

The civil law furnishes numerous illustrations of this principle—*e. g.*, the renunciation of married women under private signature; the last will by nuncupative act.

That which the law shall, when it passes the House and Senate, be entered upon the journal, does not mean it may be entered at some future date—particularly by subordinate officers or employés.

Although the act be of a public character and it confers private rights on a special and particular private individual or corporation—*quoad* that individual or corporation it is a private statute, and the private pecuniary interest must be alleged and proved. Not so with the State, because the measure is one in which the public has an interest independent of the private interests involved.

A measure to become part of a constitution when adopted, must be absolute—not independent on the will or interest of a private person—who has it in his power thus to nullify even the will of the people when expressed at the ballot box.

*Mandamus* will not issue to a public officer to do an unreasonable thing or perform a doubtful duty. People vs. Hatch, 33 Ill. 9; State vs. Deslonde, 27 An. 71; Mecheam on Public Officers, Sec. 958.

*H. N. Sherburne*, District Attorney, on the same side.

*White & Saunders* on the same side:

1. Where the Constitution prescribes a particular mode to be followed by the Legislature in formulating and submitting proposals of amendment, the Legislature is, by implication, restricted to the mode prescribed, although other modes are not expressly prohibited, and is absolutely without authority to propose amendments in any other mode. Cooley Constitution Limitations, pp. 93 and 94; 6 Cush., p. ——; Koehler vs. Hill. 15 N. W. 609; State ex rel. Stevenson vs. Tufler, 12 Pacific Reporter, 836; Collier vs. Frierson, 24 Ala. 108; Hunt vs. State, 3 S. W. (Texas) 235; State vs. Timme, 11 N. W. 799; Jamieson, Constitutional Conventions, p. 581, Sec. 551.

2. Where in such cases the Legislature disregards the requirements of the constitutionally prescribed mode, its action being in excess or violation of the limited authority conferred upon it in this matter, is null, and no more than an unconstitutional law would, does it bind, either the Secretary of State to promulgate, or any private citizen to obey or regard it. High on Mandamus, Secs. 9 to 13, and authorities there cited; State vs. Brewer, 64 Ala. 287; Pulaski vs. State, 42 Ark. 118; Attorney General vs. Marr, 55 Mich. 445.

NEW ORLEANS, MAY, 1891.                601

State ex rel. Morris vs. Secretary of State.

3.  What is known as the lottery amendment of 1890 was not constitutionally formu-
lated and adopted by the Legislature and can not be constitutionally submitted
to the people, inasmuch as, although, it contains more than one amendment
to be voted on at the same time, yet these amendments were and are submitted
as one, and are to be voted on as one and not separately, as is required by Article
256 of the Constitution.  Art. 256 of the Constitution, Art. 29 and Art. 53; State vs.
Timme, 11 N. W. 790; Kline vs. State Treasurer, 42 An. 172.

## *Don Caffrey* on the same side :

The Legislature is without power to submit to the people the proposed amend-
ment to the Constitution, chartering a lottery company for twenty-five years
and making the annual payment by it of $1,250,000 a permanent State revenue.
Such an amendment is *ultra vires* of the General Assembly attempting to enact
it.  The Legislature exceeded its jurisdiction, and the proposition is a gross
insult to the intelligent people of the State.

1.  It nullifies the whole public policy of the State, especially Article 172 of the
Constitution of 1879, declaring gambling to be a vice and directing the General
Assembly to enact laws for its suppression.

2.  The Legislature in submitting amendments, " ought to be confined * * * to
changes which are simple or formal, and therefore of comparatively small im-
portance.  For a general revision of the Constitution, or even for single proposi-
tions involving radical changes * * * the employment of this mode is im-
practicable or of doubtful expediency." Jameson's Constitutional Conventions
p. 562, Sec. 540, p. 612.

In proposing amendments the Legislature does not act as a constitutional conven-
tion, and hence can not destroy the fundamenal principles underlying the Con-
stitution itself and upon which the superstructure of the government reposes.
See Eason vs. State, 6 English (Ark.) F. 481 (expressly overruling State vs. Cox,
3 English (Ark.) 436—relied upon by relator), where it was held that " the Legis-
lature, by amendment, could not repeal the bill of rights contained in the
Constitution."

3.  Lotteries are the worst form of gambling (2 Yerger, Tenn. 272; 8 Howard, 168;
101 U. S. 817), injurious to the public morals; they " weaken the State by dis-
couraging patient industry, and have always been found to exert mischievous
influence upon the people." (See authorities collated in appendix filed with
this brief.)  At the common law they are public nuisances. Wood on Nuisance,
Sec. 33.

4.  The Legislature is without power to submit an amendment to the people legal-
izing vice and immorality.  It is questionable whether even a constitutional
convention, much less a legislature, is not confined " within the limits imposed
by the moral law." Jameson's Constitutional Conventions, Sec. 572.  Could the
Legislature submit an amendment declaring that " there is no God, and who-
ever believes in the existence of a supreme being shall be ineligible to any
office in this State?" Could it by a constitutional amendment grant to one
corporation a charter and give it the exclusive privilege of carrying on the
" social evil," and to another the right of dealing in " obscene books and lasci-
vious pictures?" Could polygamy be established in this State by an amend-
ment to the Constitution? Assuredly not, for " the organization of a community
for the spread and practice of polygamy is, in a measure, a return to barbarism.

It is contrary to the spirit of Christianity and to the civilization which Christianity has produced in the Western World." Mormon Church vs. United States, 136 U. S. 49.

Indeed, in a republic there would seem to be a peculiar propriety in viewing the Christian religion as the great basis on which it must rest for its support and permanence. It may be regarded as above all others as the religion of liberty. Montesquie has remarked that the Christian religion is a stranger to mere despotic power. Story on the Constitution, Vol. 3, 4th Ed., Section 1875.

5. It is no answer to these propositions to say that fifty or one hundred years ago "lotteries were used to raise money for the erection of public buildings; making public improvements, and not unfrequently for educational and religious purposes." In those days human slavery was tolerated and protected by the State; witchcraft was punished as a crime; the torture of persons accused of crime; the torture of persons accused of crime, in order to extort confessions of guilt from them, was considered legitimate, and wife beating (*manus mollitur imposuit*) defended by law. Blackstone's Commentaries, Book 1.) [443.] We have discarded all these vestiges of barbarism, and it is high time that their twin companion, lotteries, should also be consigned to a merited oblivion. They are no longer tolerated in any other State of the Federal Union, and the American Congress has recently, by a unanimous vote in both houses, excluded from the mails, along with "green goods," gamblers' and burglars' tools, obscene books and lascivious pictures. Nor is the fact that they are still employed by some of the effete monarchies of continental Europe, to replenish their bankrupt treasuries, entitled to any weight in a republican government like ours among a people deriving liberties from the mother country, whose settled policy has always been to suppress, rather than regulate, vice and immorality.

6. "The wages of sin are not proper subjects of revenue." "Thou shalt not covenant to do iniquity" is a great moral prohibition, applicable alike to Legislatures as well as to individuals. It is contrary to our system of government to derive the necessary revenues of the State from gambling, as they do in the principalities of Monaco, and thereby exempt the citizen from the payment of his just contribution to the government for protecting his life, liberty and property.

7. The declaration contained in Article 167 of the Constitution of 1879—recognizing the charter of the Louisiana State Lottery Company as a contract—was a grave mistake, superinduced by the decision rendered by Judge Billings, of the United States Supreme Court, in the case of Morris vs. Fitzpatrick et al. (3 Woods), before the case of Stone vs. Mississippi was decided. At all events the public policy of the State was even in this article plainly decided against lotteries, and their existence expressly prohibited after 1895. In the same manner the French convention in April, 1832, suppressed the Royal Lottery after January 1, 1836, or four years subsequent to the enactment of the law. See Levolee-Cyclopædia of Political Science, Political Economy and History of the United States. Verbo lottery.

8. The power of a General Assembly to propose constitutional amendments has to be found by special grant in the Constitution itself, and if not found there does not exist.

If found in the Constitution the power has to be construed by and limited by the other articles of the Constitution and by the fundamental principles and policy ordained and announced in the Constitution itself.

State ex rel. Morris vs. Secretary of State.

The people of Louisiana having by their direct vote established and ordained as their fundamental policy that all lotteries shall cease after 1895, and having not only declared in the Constitution that gambling is a vice, but imposed upon the Legislature the mandatory duty of suppressing the same by affirmative action on its part—this mandatory injunction to take action in the way of suppression is by necessary implication a withdrawal from the Legislature of any power whatsoever to take initiative action in a different direction.

If the people of Louisiana desire to reverse their fundamental policy as to gambling and lotteries it can only be done in a constitutional convention. The initial step to a change is not to be taken by a body charged under the Constitution and under the constitutional oaths of members with taking repressive action. The so-called constitutional amendment is an attempt by the General Assembly, under and through a mere change of form and name, to confer a lottery charter by legislative action upon John A. Morris and six unknown and uncertain parties, in direct violation of the Constitution, and to have this unconstitutionality cured by submitting the same to a popular vote.

*J. N. Luce* on the same side.

The opinion of the court was delivered by

WATKINS, J.    Alleging himself to have a personal interest therein, John A. Morris, as relator, represents that on the 9th of June, 1890, during a regular session of the General Assembly of the State of Louisiana, there was introduced in the House of Representatives a measure proposing an amendment to the Constitution of the State, known and designated therein as "House Bill No. 214," for submission to the electors of the State for their ratification or rejection; it being entitled "an article on levees, schools, charities, pensions, drainage and lotteries." That the main purpose of said amendment was, and is, under certain terms and conditions therein stipulated, to authorize and empower the relator, his heirs, agents and assigns, to prepare schemes of lotteries, to sell lottery tickets and to draw and conduct lotteries in this State for a term of twenty-five years ensuing on January 1, 1895.

"That after said proposed amendment had been read on three separate days in the House of Representatives and in the Senate, respectively, two-thirds of all the members elected to each house concurred therein by a final vote taken in each house, respectively, on the 1st of July, 1890, and that said proposed amendment, together with the yeas and nays thereon taken, was duly entered on the journal of each house." That said proposed amendment having been

adopted by the General Assembly, it was and became the duty of the respondent, Secretary of State for the State of Louisiana, under the provisions of the 256th article of the Constitution to cause the same to be published in two newspapers published in the parish of Orleans, and in one newspaper published in each other parish of the State in which a newspaper is published, "for three months preceding the next election for representatives;" and "under the terms of the second section of said proposed amendment it is made the duty of the Secretary of State to make such publication within ninety days after the first day of January, 1891."

That, upon due demand made by the relator upon the Secretary of State to comply with the constitutional mandate and publish said proposed constitutional amendment, he declined to do so, and he avers that through said refusal he apprehends great and irreparable injury; and, averring the duty of the respondent in this regard to be a purely ministerial one, he alleges himself to be entitled to and prays for the issuance of a peremptory *mandamus* to him, compelling his performance thereof.

The following is the full text of the proposed constitutional amendment, as it finally passed the two houses of the General Assembly, viz:

House bill No. 214—

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage, lotteries, and general fund."

SECTION 1. *Be it enacted by the General Assembly of the State of Louisiana,* That the following amendment to the Constitution of the State be submitted to the electors for approval or rejection, as provided in Article 256 of the Constitution, and if adopted, the amendment shall read as follows:

ARTICLE ON LEVEES, SCHOOLS, CHARITIES, PENSIONS, DRAINAGE, LOTTERIES AND GEN-
ERAL FUND.

In aid of the levees, schools, charities, pensions, drainage and general fund here-inafter named the following contract is now made: In consideration of the sum of thirty-one million two hundred and fifty thousand dollars, to be fully secured and paid as hereinafter provided, John A. Morris, his heirs, agents and assigns are hereby authorized and empowered, for the term of twenty-five years ensuing the first day of January, 1894, to prepare schemes of lotteries, to sell lottery tickets and to draw and conduct lotteries in this State; said sum shall be paid to the Treasurer of the State by the persons conducting the business pursuant to this contract in one hundred equal instalments, whereof each instalment shall be paid on or before the first days of January, April, July and October in each and every year during said term; and the Treasurer, upon the receipt of each of said instalments shall apply the same as follows:

To the Public Schools of the State—Three hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, which sum shall be distributed to each parish in the proportion prescribed by Article 224 of the Constitution.

To Levees—Three hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, which sum shall be distributed among the levee districts of the State or applied to levee purposes in the proportions and in the manner provided by law for the distribution and application of the one mill tax levied under Article 213 of the Constitution.

To Charities—One hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, of which sum $80,000 shall be applied to the hospitals established by the State; $40,000 to State insane asylums; $25,000 to State institutions for the deaf, dumb and blind; $5000 to the Soldier's Home.

To Pensions—Fifty thousand dollars annually, payable quarterly in advance, as above provided, to the pensioning of disabled, infirm, or indigent Confederate soldiers, citizens resident in Louisiana.

To the City of New Orleans for Drainage and other Sanitary Purposes—One hundred thousand dollars annually, payable quarterly in advance, as above provided, the expenditure of said sum and the management and control of the same to be determined by the General Assembly, which is hereby directed to carry into effect this provision by appropriate legislation.

To the General Fund—Two hundred and fifty thousand dollars annually, payable quarterly in advance.

The several sums of money above specified shall be devoted to the objects and purposes hereinbefore stated, and the General Assembly is hereby directed to carry into effect this provision by appropriate legislation. Said John A. Morris, his heirs or agents, shall, within twenty days from the date of the adoption of this article, file in the office of the Secretary of State a written acceptance by him or them of this contract. And for the protection of the State and the security of the public, this contract is made upon the express condition that said John A. Morris, his heirs or agents, shall, within thirty days from the date of the adoption of this article, file in the office of the Secretary of State a declaration in writing, signed by him or them and six other persons, signifying their consent to form the corporation hereinafter named; and the said John A. Morris shall file therewith his bond, with good and solvent sureties, residents of this State, in the sum of $5,000,000 said bond to be in favor of and accepted by the Auditor of State; the condition of the said bond shall be that the said Morris, his agents or assigns, shall pay to the State of Louisiana the said sum of $31,250,000 at the dates and in the manner herein set out, and shall faithfully perform all obligations herein contained; and thereupon the persons signing the said declaration shall be thereby constituted a corporation under the name and title of "The Louisiana Lottery Company," whereof the capital stock shall be $5,000,000, represented by 50,000 shares of $100 each, at least 20 per cent. thereof to be forthwith fully paid up, and which corporation shall be and continue during the period of this contract, and shall have all the rights and powers possessed by corporations generally, as defined by the present Civil Code of the State, and shall be liable for the moneys herein directed to be paid to the Treasurer of the State, and for all prizes to be drawn in said lotteries and shall be entitled to receive semi-annually from the persons conducting the business under this contract 50 per cent. of the net profits of said business. And in consideration of the payment of said sum of $31,250,000, in instalments as aforesaid, said corporation and the shares of stock therein and the business

authorized by this contract and the revenues and receipts thereof, shall be exempt from all taxes, dues, assessments, impositions and licenses of any kind whatever, whether State, parish, municipal or otherwise. The power of said corporation shall be vested in a board of directors, to consist of seven persons, who may make and establish rules and by-laws for the proper management and regulation of its affairs. The persons signing said declaration shall constitute the first board of directors and shall serve for the term of one year from the time of the filing of said declaration and until their successors are duly appointed. All lotteries other than those authorized by this article are prohibited in this State, unless by similar amendment to this Constitution and for not less than $1,250,000 per annum. All provisions of the Constitution and laws of this State inconsistent or in any way conflicting with this article are declared to be superseded hereby.

SEC. 2. *Be it further enacted,* That it shall be the duty of the Secretary of State to publish the foregoing proposed amendment in accordance with the provisions of Article 256 of the Constitution within ninety days after the 1st day of January, in the year 1891.

SEC. 3. *Be it further enacted,* That at the next general election all electors who desire to vote for said amendment shall write or print upon their ballots the words "For levees, schools, charities, pensions, drainage, lotteries and general fund amendment," and all electors who desire to vote at said election against said amendment shall write or print upon their ballots the words, "Against the levees, schools, charities, pensions, drainage, lotteries and general fund amendment."

SEC. 4. *Be it further enacted,* That all officers charged with elections or the conduct of returns thereof under the general election laws shall at the time they give notice of the said general election also give notice of the election herein ordered for the adoption or rejection of the proposed amendment, and shall without other direction or authority than is herein contained make due returns of said election in conformity with the general election laws in so far as they are not inconsistent with or in conflict with this act.

The bill was signed by the Speaker of the House, in open session, in duplicate, was taken to the Senate by the clerk, and was signed by the Lieutenant Governor and President, and taken by the clerk of the House to the Governor and Secretary of State.

A certified copy thereof is annexed to and made a part of the relator's petition.

The respondent's return is *in extenso*, and his objections and defences are quite numerous, and the statement of them is quite elaborate, and we can not do better than to incorporate them at length. The following is his return, viz:

"And Walter H. Rogers, Attorney General of the State of Louisiana, for return and answer to the alternative writ of mandamus, says:

"That the said petition sets forth and discloses no legal cause of action; that he denies there is any power or authority in this honorable court, or in any other, to mandamus him in relation to matters or things declared on in the petition of relator. Respondent avers that all his duties, in reference to the matters and things in said

petition averred, involve the exercise by respondent, as aforesaid, of powers of judgment, finding and discretion vested in respondent under his oath of office, and that said powers can not be compelled by the writ of mandamus. Respondent denies that any valid amendment to the Constitution of the State was adopted for sub-mission by the General Assembly at its last session thereof, as alleged in relator's petition:

" 1. Because no such proposed amendment to the Constitution as is alleged in relator's petition was read on three separate days, in full, in the respective houses of the General Assembly; nor in either of them, as provided in the Constitution of the State. That, by the Constitution, such reading is essential to the submission of an amendment.

" 2. Respondent denies that such amendment to the Constitution, for submission to the electors of this State, was entered on the jour-nals of the respective houses, or either of them, in compliance with the Constitution; and not only denying, but respondent avers that no such entry was made, in conformity to the Constitution of this State; and, therefore, that respondent can not be compelled to make the promulgation for which relator prays.

" 3. That by Article 28 of the Constitution of 1879 of this State it is provided that each house shall keep a journal of its proceedings. Your respondent avers that said journal is the minutes of proceed-ings of each day of legislative session, and is enjoined, when prac-ticable, to be printed each day and placed in the hands of the mem-bers of each house on the day following. Your respondent avers that such printing was practicable and was actually done, and that said minutes after being so printed, placed in the hands of the mem-bers, and after approval of said houses, were duly promulgated and published as such official journal of both houses, at the seat of gov-ernment in the city of Baton Rouge. That said minutes, printed and published as aforesaid, constituted and were the official jour-nals of the respective houses, and not subject to any change or alter-ation whatever; and your respondent avers that the truth of the non-reading in the respective houses, and the non-entry in full on the journals there of the proposed constitutional amendment as claimed in relator's petition appears and is ascertained from said original journals as aforesaid.

" 4. Your respondent avers that alterations and changes have been

608          SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

made in the journals of the respective houses without authority, both before and after the adjournment of the General Assembly in July, 1890—that said changes are in acts of commission by inserting, adding to and changing material parts and words, and by omission in failing to publish and incorporate proceedings of certain days, and more particularly in this, to-wit: In the journal of the House of Representatives by inserting and spreading at length said House bill No. 214 on July 1, 1890, when, in fact, said bill was read only by title; by omitting from the promulgated original journal all House proceedings after recess of July 9, 1890, and others, which will appear from said original journals, and also in the Senate journal on said first day of July, 1890, as duly printed and published on July 2, 1890, unauthorized changes and alterations were made, as will fully appear from said original journal, made part hereof.

"5. Respondent avers that he is especially charged under the duties of his oath of office to examine and determine said facts, and not acting through caprice, malice or design, or through fear or favor, he has determined that the said proposed amendment, known as House bill No. 214, can not be promulgated by him, and that his decision can not be overruled by said writ of mandamus. That the Supreme Court of this State has decided in all matters of enactment· of laws under the Constitution—that 'the mode constitutes the measure of power and is to be pursued.'

"And respondent further denies that any constitutional amendment, as such, was proposed for adoption and adopted for submission to the electors, as alleged in relator's petition, for this:

"6. That the legislative act, to which relator refers, being House bill No. 214 and the amendments thereto, never acquired the force or effect of law, because the same was vetoed by the executive, and the said bill failed to pass over the veto, as required by the Constitution and laws of the State, in order to make it operative. That said House bill No. 214 is a measure of pure and simple ordinary legislation and a proper subject of executive veto—that it was introduced as a bill, entitled a bill, acted upon as a bill, in both houses, enrolled as a bill, sent to the executive as a bill for his approval; and, after veto, was taken up and considered and passed over said veto in one house, and failed in the other house, to-wit, in the Senate. That even if a proposed amendment, as alleged by the relator, it was subject to executive veto.

"7. Respondent further charges that even if the introduction of said House bill No. 214, as a House bill, its passage as a bill, its sending by the House to the executive as a bill for approval and the attempt to pass it over his veto as a bill, did not make it the subject matter of a veto, that said bill as passed was the proper subject matter of a veto, even if no power existed· in the executive to veto a constitutional amendment, which is denied, because said bill contained provisions, confessedly matters of legislation, subject to veto, and which legislative provisions being incorporated in and interwoven with the bill as a whole, made the bill, as a whole, the subject matter of executive veto, and the failure to pass the same over the veto has rendered the whole inoperative and without effect.

"Respondent further charges that should the foregoing matters and things, set up by him as aforesaid, be found not good in law and fact, which is denied, respondent further denies that the said bill alleged on relator's petition, being House bill No. 214, constitutes an amendment validly submitted to the electors of the State, and which it is relator's duty to promulgate, for the following reasons, to-wit:

"Because defendant denies that the matters and things contained in said bill could legally or validly constitute the subject matter of an amendment to the Constitution, as in form, manner and substance proposed; that the Legislature of this State was without power or capacity, and is prohibited by the Constitution of this State from submitting to the electors of this State as a constitutional amendment the matters and things contained in the alleged House bill No. 214 declared on in relator's petition.

"Because, even if the matters and things contained in said House bill No. 214, as alleged in relator's petition, could validly be the subject matter of a constitutional amendment, said matters and things as embraced in said House bill No. 214, even if an amendment, which is denied, constitutes more than one amendment, and the said House bill No. 214 submits the same, if the same was validly submitted, which is denied, as one amendment, in violation of the provisions of Article 256 of the Constitution, and that the form of such submission is deceptive and illegal.

"That the provisions of said House bill No. 214 embrace the subject matter of many amendments, which have been grouped into one in violation of the terms of the Constitution; the result of which, if not the object and purpose, being to frustrate the free choice of the

39

electors, depriving them of the untrammeled right of selection secured to them by the Constitution of the State. That the very terms of submission provide that the electors shall vote for or against many distinct objects or suject matters of legislation, without giving to the electors the right of selection provided for in the Constitution. That by its terms and provisions it submits to the electors not the question of ratifying or rejecting the amendment, but the question of voting for or against distinct objects of public importance and public concern, in violation of the letter and spirit of the Constitution.

"Respondent, reiterating and charging again all the foregoing matters alleged herein in answer and return, asserts his actions to be in accordance with the law as the same is known and understood by him, and are within the legitimate and constitutional scope of his duty and power. And he asks to be hence dismissed with judgment in his favor, with all costs and general relief."

On the foregoing pleadings a trial was had, testimony introduced, and judgment rendered rejecting the relator's demand. It is from that judgment that he prosecutes this appeal. The judge *a quo* did not reduce to writing and file in the record the reasons he entertained for the judgment pronounced; we are, therefore, deprived of the benefit of his views, and must deal with the issues involved as of first instance, and avail ourselves, as far as practicable, of the suggestions and argument, both oral and printed, of learned counsel in the case, in our effort to ascertain the truth of the matters in controversy and apply the law thereto.

I.

As a preliminary to the treatment of the questions involved we must ascertain what constitute and are the official journals of the Senate and House of Representatives, for on that issue depends the verity and validity, to a greater or less degree, of the proceedings of the General Assembly in reference to the proposed constitutional amendment under consideration.

In the opening of the evidence in this case relator's counsel offered to file what he termed " the published journals of the House of Representatives," to which the Attorney General, for the respondent, objected on the ground " that same does not constitute a true and correct journal of the said House of Representatives   *   *   *   on the ground that the same has been altered and changed without

authority, and that the same is so charged and averred in the answer, and that said printed volume does not constitute and make of itself evidence."

A similar offering was made of "the published journals of the Senate," to which the same objection was urged.

The judge *a quo* admitted them in evidence over the respondent's objection on the ground that the objection went to the effect and not to the admissibility of the testimony, and his counsel reserved a bill of exceptions.

In the opening of the respondent's evidence, Mr. Caffrey, Secretary of the Senate, was sworn as a witness, and to him the Attorney General propounded the following question, viz: "I hand you a document which I call your attention to, by stating that it is headed 'Official journal of the Senate of the State of Louisiana; fortieth day's proceedings. Senate Chamber, Baton Rouge, La., Tuesday, July 1st, 1890.' Please examine that, Mr. Caffrey."

To this piece of evidence the counsel for the relator objected on the ground that it was "a collateral attack on the verity of the Senate journal, as published and printed by authority of the Senate, under the provisions of Article 28 of the Constitution; and that the verity of such journals can not be attacked by the testimony of the Secretary himself, who, by his official signature, attests the verity of the published journal in book form."

These objections were overruled by the judge *a quo*, and the relator's counsel retained a bill of exceptions.

The paper offered in evidence in connection with the evidence of the Secretary was a print on one side of a sheet of paper, and purports to be a printed copy of the minutes of the proceedings of the Senate of the date mentioned in the offering, and in keeping with the *third* paragraph of the return, that is, such as are printed daily "and placed in the hands of the members of each house on the day following."

In addition there were offered quite a number of such printed sheets or slips of paper thus headed as applicable to the proceedings of the Senate and House of Representatives respectively, to which same objection was urged and which was likewise overruled.

Hence, we have an issue raised as to which is the journal of the proceedings of the two houses of the General Assembly. It is well to observe at the outstart that the printed volumes were not objected

to on the ground that same were copies and not originals; nor on the ground that the printed minutes offered on the part of the respondent were the *true* official journals; nor on the ground that the printed volumes were not duly authenticated and published by authority; nor that same had not been printed from the proper journal matter; nor on the ground that same had not been duly delivered by the State printer to the Secretary of State for custody and safe keeping and by him furnished to the counsel for the relator.

The objection that was urged is that the printed volumes offered in evidence as official journals can not be received as such, because " the same have been altered and changed without authority," as averred in the respondent's return, and therefore they do not constitute evidence.

This is a negative averment, pregnant with an affirmative averment; that is, the respondent assumes the burden of proving that alterations and changes were made without authority, in the matter of which the published volumes should have been an exact reproduction; otherwise said printed volumes could be received and treated as the official journals of the proceedings of the two houses of the General Assembly.

No parol or other confirmatory proof was offered in support of the printed journals and they were filed in evidence without further objection. Not so of the printed documents offered by respondent's counsel. Same not having been attested by the official signatures of the Clerk of the House of Representatives and the Secretary of the Senate, additional proof was required of their authenticity and it was made.

Therefore, we must accept the *prima facie* showing made, and act upon it, in determining the correctness of the judge's ruling.    And in doing so we think his view was undoubtedly correct; because the alleged alterations and corrections are non-apparent from a simple inspection of the printed volumes; and to disclose them extraneous proof was required.    And, of course, the judge below had no warrant of authority to assume, on the *statement* in the return, that changes and alterations had been made in them.    We think he correctly admitted the printed volumes in evidence, subject to whatever right the respondent had of impeaching or invalidating them. We think he correctly admitted the printed volumes in evidence, sub-

ject to whatever right the respondent had of impeaching or invalidating them by any *legal* evidence.

Nor can we see the impropriety of the judge admitting the papers that were offered by the respondent. They were at least of a *quasi*-official character, and will evidently aid us in determining the true character and value of the published volumes, which purport to be official journals.

The following is the text of Article 28 of the Constitution, viz:

Each house shall keep a journal of its proceedings, and cause the same to be published immediately after the close of the session; when practicable, the minutes of each day's session shall be printed and placed in the hands of members on the day following. The original journal shall be preserved, after publication, in the office of Secretary of State, but there shall be required no other record thereof.

In pursuance of that article the Legislature enacted Act No. 6, approved December 24, 1881, from which we make the following extracts, as applicable to this case, viz:

SEC 10. *Be it further enacted, etc.,* That the State Printer shall supply each house of the General Assembly with proof sheets of its official journal, containing the proceedings of the previous day of meeting; that within two days after the journal of each house shall have been approved, the State Printer shall publish the same, as so approved, once in the official journal of the State, and the same matter so published shall be made up in book form, as provided in Paragraph 2 of Section 13 of this act. *   *   *   *   *   *   *   *   *   *

SEC. 13: Paragraph 2—The journals of each house shall be printed in the English language in book form, in minion type, and made up from the journal matter as published in the official newspaper, the pages to be forty-five ems pica in length, including head and foot lines, and two columns in width, the book to be stitched and covered with colored paper and delivered to the Secretary of State within the time fixed by law, for which there shall be allowed not more than one dollar and twenty-five cents per page for two hundred and fifty copies, and for each additional hundred copies, or fraction thereof, not more than thirty-five cents per page, the required number of copies to be ordered at one time.

In these extracts we have all the law applicable to the printing and publication of the proceedings of the General Assembly in newspapers and journals. Considerable testimony was taken on the part of the respondent, with the view of establishing the fact that the papers he had introduced were the proper repository of legislative proceedings. He introduced not only the Secretary of the Senate and the Clerk of the House of Representatives, but the State Printer and the members of his staff, for that purpose.

From the testimony of the clerk and secretary it appears that minutes in a rough and abbreviated form are taken by a minute

614          SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

clerk in each house of each day's proceedings as they take place. After each day's adjournment the abbreviated minutes are written out and sent to the State printer.

On the following day the printer furnishes printed copies thereof to the proper officer of each of the two houses, by whom they are distributed and placed upon the desks of the members of the two houses.

From the testimony of the foreman, manager and other staff officers of the State gazette, it appears that after corrections have been noted thereon, same are returned by the secretary and clerk to the printer, and he causes the corrections to be entered in the type, and this matter is then printed in the official newspaper.

When this has been completed the type is made up into book form and printed. The sheets are immediately afterward folded and put away and the type distributed. After the close of the legislative session these folded papers are sent to the binder and bound in book form.

It appears from all the evidence that from two to four days invariably and necessarily elapse between the date on which the proof sheets are printed and placed on the members' desks and that on which the corrected minutes appear in the journal form in the State gazette. That is in exact conformity with the provisions of Section 10 of Act No. 6 of 1881—the State printing statute now in full force.

It thus appears that in practice as well as in law, constitutional and statutory—a clear distinction is taken between journals of the proceedings of the two houses of the General Assembly, and "the official journal of the State;" and, also, between the minutes of a daily session, and the journals of the Senate or House of Representatives; and, also, between the journals, and proof-sheets of the daily minutes of the two houses of the General Assembly.

Conclusive proof of the bound volumes in evidence being the official journals is furnished by the testimony to that effect of the Clerk of the House and Secretary of the Senate.

The managing editor of the official newspaper states that they are the official journals; that same were by him printed and published by authority, under his contract with the State, and that he delivered them to the Secretary of State for custody and safe-keeping.

The Secretary of State recognizes them as the official journals of the two houses of the General Assembly, and states that the State

printer delivered them to him; that he kept them on file and furnished them to relator's counsel.

It is equally well established that the papers introduced in evidence on the part of the respondent are proof-sheets, and were never, at any time, in the custody of the Secretary of State, and that same were not furnished by him to the Attorney General for use in this case.

Such proof-sheets or "minutes of each day's session," are not required, either by the Constitution or the printing law, to be preserved or published. They do not constitute "a record." The Constitution declares that "each house shall *keep* a journal of its proceedings, and cause the same to be *published immediately after the close of the session.* * * * The original journal shall be *preserved after publication*, in the office of the Secretary of State, *but there shall be required no other record thereof.*" Art. 28.

It is difficult to conceive of language that could be clearer or could have been more carefully selected for the purpose that was intended by the framers of this important precept of the organic law, which is that published journals of legislative proceedings shall be the *ultimate* proof of their verity; and such we take the bound volumes which are filed in evidence to be.

## II.

The next question for determination is whether the official journals of the proceedings of the General Assembly constitute *conclusive* proof of their contents and import *absolute* verity; or are they open to proof of the charges made by the respondent in his return?

While readily subscribing to the doctrine announced in Wise vs. Bigger, 79 Va. 269, and Koehler vs. Hill, 60 Iowa 739, with regard to the ultimate and conclusive proof afforded by printed journals of the General Assembly, we are of opinion that the objections propounded by the return do not constitute, strictly speaking, an *attack* upon or an effort to contradict the *facts* disclosed therein by *adversary* proof.

Respondent's object evidently is to show that, as matter of fact, through error of judgment on the part of the Clerk of the House and the Secretary of the Senate, certain unauthorized interpolations, alterations, changes and amendments were made in the official journals, which destroy their effect and authenticity; and it is for

this purpose that his evidence was offered, and not for the purpose of
contradicting the acts or proceedings of the General Assembly.

Of course, the official journals import absolute verity and form
conclusive proof as to the proceedings themselves, when considered
in reference to any *other* evidence of such proceedings; but the ques-
tion here is as to what *constitutes the journals*, and whether the
printed journals have been made the *actual* repository of the pro-
ceedings of the two houses of assembly, *as they transpired.*

Do they truthfully represent what proceedings did take place, or
do they contain misrepresentations of fact?

It is quite clear to our minds that we should most certainly assume
much too great and too grave a responsibility, and extend the doc-
trine of legal presumptions much too far, if we were to venture the
assertion that legislatve journals formed *conclusive* proof of legislative
proceedings, and decline to entertain and consider evidence of
unauthorized alterations and interpolations in the journals, whereby
it could be made to appear that they did not faithfully and truthfully
recite the proceedings as they *did* transpire.

The true distinction to be taken, in our opinion, is that no *extrinsic*
proof is admissible to contradict the *facts* which are established by
the journals; but fraud, error, mistake, or the improper exercise of
judgment, on the part of a State agent or representative, existing
*intrinsically*, may be shown.

This is not a question of what proof is furnished by the journals as
contradistinguished from *other* proof of a given state of facts; but it
is a question of the journals being, in themselves, a correct expo-
sition of the facts as they happened.

We think that for such a purpose the evidence is admissible and
was properly admitted.

### III.

But, before proceeding to examine and discuss the question of
alleged error, mistake and alterations of the official journals, it is
well to refer to the plea of no cause of action that is contained in the
respondent's return.

In effect it is that, because of the *existence* of alleged errors, altera-
tions, *etc.*, his duties involve "the exercise of power of judgment,
finding and discretion," vested in him under his oath of office, and
which can not be compelled by *mandamus.*

If that be a correct proposition, it is difficult to imagine a case in which *mandamus* would be an effectual remedy, for what official or individual could be coerced to the performance of a duty imposed by law?

Of course, if the facts be found as the respondent represents them to be, and his conclusions of law deduced therefrom are correct, *mandamus* could not be made peremptory; not because it was not the appropriate remedy, but because the evidence did not justify the relief.

Before proceeding to discuss the facts found in the record, as appertaining to the alleged errors, omissions and alterations in the journals, it will be necessary for us to make a brief synoptical statement of the proceedings of each of the two houses on *House Bill 214*—and for convenience of expression we will adopt this phrase— and thus facilitate a comparison with the *data* and testimonial proofs of the respondent. Accordingly we make the following extracts from the official journal of the proceedings of the House of Representatives of the regular session of the General Assembly for the year 1890; and from the official journal of the proceedings of the Senate of same session:

*First, from House journal.*

On Monday, June 9, 1890, House Bill 214 was thus introduced, p. 232):

By Mr. Shattuck:

House Bill No. 214—

An act providing for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein "An article on levees, schools, charities, pensions, drainage and lotteries."

On Tuesday, June 10, 1890, House Bill 214 was on second reading referred " to Special Committee on Lands, Levees and Lotteries,"- etc. (p. 251).

On Tuesday, June 17, 1890, the Special Committee on Lands, Levees and Lotteries, etc., made a majority and minority report on House Bill 214, which is accompanied by the following summary statement by the chairman, viz:

SPECIAL COMMITTEE ON LEVEES, PENSIONS, CHARITIES, LOTTERIES, ETC.

*To the Honorable Speaker and Members of the House of Representatives of the State of . Louisiana:*

The undersigned, as chairman of the special committee to whom was referred House Bill No. 214, by Mr. Shattuck, entitled " An act providing for the submission

State ex rel. Morris vs. Secretary of State.

to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein ' an article on levees, schools, charities, pensions, drainage and lotteries,' " beg leave to report favorably thereon, for reasons fully set forth in majority report of our said committee, herewith attached and made a part hereof.

BERNARD C. SHIELDS, *Chairman.*

On the same legislative day, and without any previous adjournment, the majority and minority reports were, on motion, ordered to be printed in the journal, and thereupon the reading of the bill was called for (p. 323).

Mr. Shields called for the reading of the bill, whereupon

House Bill No. 214—

By Mr. Shattuck:

An act providing for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

*Was read in full.*

On Thursday, June 19, 1890, House Bill 214 was taken up on favorable report of committee, as follows (pp. 369 and 370) :

By Mr. Shattuck:

House Bill No 214—

An act providing for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

Was taken up under the favorable report of. the Special Committee on Levees, Schools, Charities, Pensions, Drainage and Lotteries.

*The bill was read in full.*

Mr. Shattuck moved that the bill be ordered engrossed and passed to its third reading.

  *    *    *    *    *    *    *    *

Mr. Shattuck moved that the House now resolve itself into a committee of the whole for the purpose of amending the bill and recommending its passage.

Mr. Allain made the point of order, under rule 60 of the House, that the motion of Mr. Shattuck was in order.

The chair ruled the point of order well taken.

The question recurred on the motion of Mr. Shattuck. that the House now resolve itself into a committee of the whole for the purpose of considering the bill and amendments.

The motion was agreed to.

And the House immediately resolved itself into a committee of the whole. Mr Land in the chair.

House business resumed, Speaker Henry in the chair.

The committee having risen, the chairman, Mr. Land, reported to the House that the committee of the whole had had under consideration House Bill No. 214—

An act providing for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

And report same with the following amendments, and recommend its passage as amended."

The amendments need not be recited. When the question was put, it was agreed to by a vote of the majority.

On Friday, June 20, 1890, House Bill No. 214 was taken up on third reading (p. 379).

By Mr. Shattuck, House Bill No. 214—

An act providing for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein "an article on levees, schools, charities, pensions, drainage and lotteries."

Was taken up on third reading.

*The bill was read in full as follows:*

House Bill No. 214—

By Mr. Shattuck:

An act providing for the submission to the electors of the State by inserting therein "an article on levees, schools, charities, pensions, drainage and lotteries."

SECTION 1. Be it enacted by the General Assembly of the State of Louisiana, That the following amendment to the, etc.

And the remainder of the proposed amendment was *spread in full* upon the journal (pp. 380, 381, 382).

Pending consideration of the bill, the House adjourned until Saturday, June 21, 1890, at 10 A. M. (p. 382).

On that day, House Bill No. 214 being under consideration, further consideration was postponed until Thursday, June 24, at 2 o'clock P. M. (p. 387).

On Tuesday, June 24, 1890, the House decided at 4 o'clock P. M. to take a recess " until to-morrow at 10 o'clock A. M." (p. 401).

On the same day and date House Bill No. 214 was at 2 o'clock taken up, and made a " *special order of the day* for Wednesday, June 25, 1890, at 10:30 A. M., *after the recess of this legislative day and session* " (p. 407).

" The hour of 4 P. M. having been reached, in accordance with the resolution previously passed this day, the Speaker declared a recess until 10 A. M., June 25 " (p. 410).

When follows this recital, viz:

### AFTER RECESS.

" *10 a. m., Thursday, June 24, 1890,*" (p. 410).

" Special order of the day, House Bill 214 was taken up at 10:30 A. M., ' and ' was made a special order of the day at 11:30 A. M." (p. 412).

At 11:30 A. M. House Bill 214 was " made a special order of the day at 2 o'clock P. M." (p. 415).

When the hour of 2 o'clock had arrived (p. 429).

State ex rel. Morris vs. Secretary of State.

SPECIAL ORDER OF THE DAY.

Was taken up at 2 o'clock P. M.

House Bill No. 214—

By Mr. Shattuck:

An act providing for the submission to the electors of the State for adoption o rejection an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

Mr. Jackson moved that the House do now resolve itself into a committee of the whole to consider the bill for the purpose of amending it, which motion was agreed to, and the House immediately resolved itself into a committee of the whole, Mr. Land in the chair.

House business resumed. Speaker Henry in the chair.

The committee having risen, the chairman, Mr. Land, reported to the House that the committee of the whole had had under consideration House Bill No. 214—

Aa act to provide for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

And report favorably, and recommend its passage with the following amendment:

In section 1, page 6, line 17, after the word " State " insert the following:

"Unless by similar amendment to this Constitution, and for not less than one million of dollars per annum."

Mr. Shattuck moved the adoption of the amendments.

By a rising vote of ayes 46 and nays 24, the amendments were adopted.

Mr. Shattuck called for the reading of the bill.

*The bill was read in full, as follows:*

House Bill No 214—By Mr. Shattuck:

An act providing for the submission to    †    *    *    *    *    *    *

Then follows the full text of the proposed amendment, which is *spread in full* on the journal (pp. 430, 431, 432).

The previous question was then called, and "the roll was called on final passage of the bill, and resulted as follows: *yeas*   *   *   *   *66*, and *nays*   *   *   *   *29*, absent 3; " total number 98 (p. 422).

A title for the bill was adopted, and the House adjourned until Thursday, June 26, 1890, at 11 A. M. (p. 413).

(It thus appears that all proceedings that were taken in the House on the *calendar* day, *Wednesday, June 25,* 1890, take date of the *legislative* day, *Tuesday,* June 24, 1890.)

Thus closed the proceedings in the House of Representatives on Tuesday, June 24, 1890.

SENATE JOURNAL.

On Wednesday, June 25, 1890, *after recess*, the Senate was called to order at *10 o'clock a. m.*, Wednesday, June 26, 1890 (p. 254).

On that morning (though a continuation of the *legislative day of Wednesday, June 25, 1890*) the following communication was received

in the Senate, informing that body that the House of Representatives had passed and asks concurrence in House Bill 214 (p. 259).

MESSAGE FROM THE HOUSE.

The following message was received from the House of Representatives:

HOUSE OF REPRESENTATIVES, STATE OF LOUISIANA—SESSION OF 1890,<br>BATON ROUGE, La., June 25, 1890.

*To the Honorable, the Senate of the State of Louisiana:*

I am directed to inform your honorable body that the House of Representatives has passed and asks your concurrence in the following entitled House bill:

House Bill No. 214—

By Mr. Shattuck:

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein "an article on levees, schools, charities, pensions, drainage and lotteries."

Very respectfully,

PETER J. TREZEVANT, *Clerk.*

On *legislative* day, Thursday, June 26, 1890, House Bill 214 was read by title and placed on the calendar (p. 268).

On Friday, June 27, 1890, House Bill 214 was referred to thus (p. 283):

HOUSE BILLS ON SECOND READING REFERRED TO COMMITTEES.

House Bill No. 214—

By Mr. Shattuck:

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting "an article on levees, schools, charities, pensions, drainage and lotteries."

*Was read in full.*

On motion of Mr. Goldthwaite, this bill was referred to the Committee on Health, Quarantine, Drainage and Charitable Institutions.

On Saturday, June 28, 1890, House Bill 214 was favorably reported by a majority of the committee, as follows, viz (p. 288):

Mr. Augustin, chairman of the health and quarantine committee, submitted the following report, which was read:

SENATE CHAMBER, STATE OF LOUISIANA,<br>BATON ROUGE, June 28, 1890.

*To the Honorable, the Senate of the State of Louisiana:*

The majority of the Committee on Health, Quarantine, Drainage and Charitable Institutions report favorably with amendments on House Bill No. 214. We consider that it is unnecessary to advance argument in support of the views of the majority at this time or in this report, the question submitted having become a public question of serious importance throughout the State, and having been already argued elsewhere. It will no doubt be fully discussed before this body.

Respectfully submitted,                                    J. NUMA AUGUSTIN, *Chairman.*

IVEY I. DAVIS,<br>WM. ROBSON,<br>C. C. DUSON,<br>K. A. CROSS,<br>E. A. O'SULLIVAN,<br>RICHARD SIMS.

On Monday, June 30, 1890, House Bill No. 214, on second reading, was adopted with amendments (pp. 309, 310).

House Bill No. 214—

By Mr. Shattuck:

An act to provide for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

*The bill was read in full.*

Reported by the Committee on Health and Quarantine favorably, with the following amendments:

Amendment No. 1. In title, line 7, strike out the word "and" after the word "drainage."

No. 2. In same line of title, at the end of title, add the words " and general fund."

No. 3. In section 1, line 18, page 1, strike out the word " and " after the word "drainage," and after the word " lotteries," same line, add " and general fund."

No. 4. In line 20 of same section and of same page, after the word " pensions," strike out the word " and," and after word " drainage," same line, insert the words " and general fund."

No. 5. In same section, lines 23 and 24, same page, strike out " twenty-five millions of," and insert in lieu thereof " thirty-one millions two hundred and fifty thousand."

No. 6. In Section 1, page 3, between the lines 29 and 30, insert a new paragraph in the following words: "To the general fund, two hundred and fifty thousand dollars in advance, as above provided."

No. 7. In same section, page 4, line 31, strike out the words " twenty-five million dollars," and insert in lieu thereof the words " thirty-one millions two hundred and fifty thousand."

No. 8. In same section, page 5, lines 27 and 28, strike out the words " twenty-five million," and insert in lieu thereof the words " thirty-one million two hundred and fifty thousand."

No. 9. In same section, page 6, line 14, strike out the words " one million of," and insert in lieu thereof " one million two hundred and fifty thousand."

No. 10. In Section 3, line 6, page 7, strike out the word " and."

No. 11. In line 7, same section and page, after the word, " lotteries " insert the words " and general fund."

No. 12. In line 12, same section and page, strike out the word " and."

No. 13. In line 13, same section and page, before the word " amendment" insert the words " and general fund."

Mr. Augustin moved the adoption of the amendment by the committee.

Mr. Provosty called for the yeas and nays.

On a call of the roll the following was the result.

On Monday, June 30, 1890, House Bill 214 was passed to its third reading (pp. 213, 214).

On Tuesday, July 1, 1890, House Bill 214 was *read in full* and *spread in full* on the journal (pp. 324, 325, 326, 327) and was finally passed, as follows, viz:

House Bill No. 214—

By Mr. Shattuck:

An act to provide for the submission to the electors of the State, for adoption or

State ex rel. Morris vs. Secretary of State.

rejection, an amendment to the Constitution of the State by inserting therein " an article on levees, school, charities, pensions, drainage and lotteries."

*Was read in full as follows:*

SECTION 1. Be it enacted by the General Assembly of the State of Louisiana, That the following amendment to the Constitution of the State be submitted to the electors for approval or rejection, as provided in Article two hundred and fifty-six of the Constitution, and if adopted, the said amendment shall read as follows:

ARTICLE ON LEVEES, SCHOOLS, CHARITIES, PENSIONS, DRAINAGE AND LOTTERIES.

In aid of the levees, schools, charities, pensions and drainage, hereinafter named, the following contract. is now made: In consideration of the sum of twenty-five millions of dollars, to be fully secured and paid as hereinafter provided, John A. Morris, his heirs, agents and assigns, are hereby authorized and empowered, for the term of twenty-five years ensuing the first day of January, 1894, to prepare schemes of lotteries, to sell lottery tickets and to draw and conduct lotteries in this State; said sum shall be paid to the Treasurer of the State by the persons conducting the business pursuant to this contract, in one hundred equal instalments, whereof each instalment shall be paid on or before the first days of January, April, July and October in each and every year during said term; and the Treasurer, upon the receipt of each of said instalments, shall apply the same as follows:

To the Public Schools of the State—Three hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, which sum shall be distributed to each parish in the proportion prescribed by Article 224 of the Constitution.

To Levees—Three hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, which sum shall be distributed among the levee districts of the State or applied to levee purposes in the proportions and in the manner provided by law for the distribution and application of the one-mill tax levied under Article 213 of the Constitution.

To Charities—One hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, of which sum $80,000 shall be applied to the hospitals established by the State; $40,000 to State insane asylums; $25,000 to State institutions for the deaf, dumb and blind; $5000 to to the Soldiers' Home.

To Pensions—Fifty thousand dollars annually, payable quarterly in advance, as above provided, to the pensioning of disabled, infirm or indigent Confederate soldiers, citizens resident in Louisiana.

To the City of New Orleans for Drainage and Other Sanitary Purposes—One hundred thousand dollars annually, payable quarterly in advance, as above provided, the expenditure of said sum and the management and control of the same to be determined by the General Assembly, which is hereby directed to carry into effect this provision by appropriate legislation. The several sums of money above specified shall be devoted to the objects and purposes hereinbefore stated, and the General Assembly is hereby directed to carry into effect this provision by appropriate legislation. Said John A. Morris, his heirs or agents, shall within twenty days from the date of the adoption of this article, file in the office of the Secretary of State a written acceptance by him or them of this contract. And for the protection of the State and the security of the public, this contract is made upon the express condition that said John A. Morris, his heirs or agents, shall within thirty days from the date of the adoption of this article file in the office of the Secretary of State a declaration in writing, signed by him or them and six other persons, signifying their consent to form the corporation hereinafter

State ex rel. Morris vs. Secretary of State.

named; and the said John A. Morris shall file there, with his bond, with good and solvent sureties, residents of this State, in the sum of $5,000,000, said bond to be in favor of and accepted by the Auditor of the State; the condition of said bond shall be that the said Morris, his agents and assigns, shall pay to the State of Louisiana the sum of $25,000,000 at the dates and in the manner herein let out, and shall faithfully perform all the obligations herein contained; and thereupon the persons signing the said declaration shall be thereby constituted a corporation under the name and title of " The Louisiana Lottery Company," whereof the capital stock shall be $5,000,000, represented by 50,000 shares of $100 each, at least 20 per cent. thereof to be forthwith fully paid up, and which corporation shall be and continue during the period of this contract, and shall have all the rights and powers possessed by corporations generally, as defined by the present Civil Code of the State, and shall be liable for the moneys herein directed to be paid to the Treasurer of the State, and for all prizes to be drawn in said lotteries, and shall be entitled to receive semi-annually from the persons conducting the business under this contract 50 per cent. of the net profits of the said business.

. And in consideration of the payment of the said sum of twenty-five million dollars in instalments as aforesaid, said corporation and the shares of stock therein and the business authorized by this contract, and the revenues and receipts thereof, shall be exempt from all taxes, dues, assessments, impositions and licenses of any kind whatever, whether State, parish, municipal or otherwise. The powers of said corporation shall be vested in a board of directors, to consist of seven persons, who may make and establish rules and by-laws for the proper management and regulation of its affairs. The persons signing said declaration shall constitute the first board of directors, and shall serve for the term of one year from the time of the filing of said declaration and until their successors are duly appointed. All lotteries other than those authorized by this article are prohibited in this State, unless by similar amendment to this Constitution, and for not less than one million of dollars per annum. All provisions of the Constitution and laws of this State inconsistent or in any way conflicting with this article are declared to be superseded hereby.

SEC. 2. Be it further enacted, That it shall be the duty of the Secretary of State to publish the foregoing proposed amendment in accordance with the provisions of article two hundred and fifty-six of the Constitution, within ninety days after the first day of January, in the year eighteen hundred and ninety-one.

SEC. 3. Be it further enacted, That at the next general election all electors who desire to vote for said amendment shall write or print upon their ballots the words " For the levees, schools, charities, pensions, drainage and lotteries amendment," and all electors who desire to vote at said election against said amendment shall write or print upon their ballots the words "Against the levees, schools, charities, pensions, drainage and lotteries amendment."

SEC. 4. Be it further enacted, That all officers charged with elections or the conduct of returns thereof under the general election laws, shall, at the time they give notice of the said general election, also give notice of the election herein ordered for the adoption or rejection of the proposed amendment, and shall without other direction or authority than is herein contained make due returns of said election in accordance with the general election laws, in so far as they are not inconsistent with or in conflict with this act.

SENATE AMENDMENTS TO HOUSE BILL NO. 214.

No. 1. In title, line 7, strike out the word " and " after the word " drainage."

No. 2. In same line of title, at the end of title, add the words " and general fund."

State ex rel. Morris vs. Secretary of State.

No. 3. In section 1, line 18, page 1, strike out the word " and" after the word "drainage," and after the word "lotteries," same line, add " and general fund."

No. 4. In line 20, of same section, of same page, after the word "pensions" strike out the word " and," and after the word " drainage," same line, insert the words " and general fund."

No. 5. In same section, in lines 23 and 24, same page, strike out " twenty-five millions of " and insert in lieu thereof " thirty-one millions two hundred and fifty thousand "

No. 6. In section 1, page 3, between lines 29 and 30, insert a new paragraph in the following words: " To the general fund, two hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided."

No. 7. In same section, page 4, line 31, strike out the words " twenty-five million dollars " and insert in lieu thereof the words " thirty-one million two hundred and fifty thousand dollars."

No. 8. In same section, page 5, lines 27 and 28, strike out the words " twenty-five million " and insert in lieu thereof the words " thirty-one million two hundred and fifty thousand."

No. 9. In same section, page 6, line 14, strike out the words " one million of " and insert in lieu thereof the words " one million two hundred and fifty thousand."

No. 10. In section 3, line 6, page 7, strike out the word " and."

No. 11. In line 7, same section and page, after the word " lotteries " insert the words " and general fund."

No. 12. In line 12, same section and page, strike out the word " and."

No. 13. In line 13, same section and page, before the word " amendment" insert the words " and general fund."

And the bill finally passed by a vote of 24 yeas to 12 nays (p. 324).

HOUSE JOURNAL.

On Thursday, July 1, 1890, *after recess*, at 4 o'clock P. M., an official communication was received in the House of Representatives, informing that body that the Senate had concurred in House Bill 214 with amendments (pp. 491, 492).

MESSAGE FROM THE SENATE.

SENATE CHAMBER, BATON ROUGE, La., July 1, 1890.

*To the Honorable Speaker and the Members of the House of Representatives:*

I am directed to inform your honorable body that the Senate has concurred in the following entitled House Bills:

\* \* \* \* \* \* \* \* \* \* \* \*

House Bill No. 214—

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

As amended.

Respectfully,

CHAS. D. CAFFERY, *Secretary of the Senate.*

With the amendments appended to the foregoing bill.

40

At this juncture the House took a recess until Wednesday, July 2, 1890, at 10 o'clock A. M. (p. 467).    At that hour the House convened (p. 523).

Mr. Shattuck asked for a suspension of the rules in order to take up House Bill No. 214, as amended by the Senate.

The request was granted, and the rules were suspended.

By Mr. Shattuck:

House Bill No. 214—

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein "an article on levees, schools, charities, pensions, drainage and lotteries."

Was taken up with the following Senate amendments:

Amendment No. 1. In title, line 7, strike out the word "and" after the word "drainage."

No. 2. In same line of title, at the end of title, add the words "and general fund."

No. 3. In Section 1, line 18, page 1, strike out the word "and" after the word "drainage," and after the word "lotteries," same line, add "and general fund."

No. 4. In line 20 of same section and page, after the word "pensions," strike out the word "and," and after the word "drainage," same line, insert the words "and general fund."

No. 5. In same section, lines 23 and 24, same page, strike out "twenty-five millions of" and insert in lieu thereof "thirty-one millions two hundred and fifty thousand."

No. 6. In section 1, page 3, between lines 29 and 30, insert a new paragraph in the following words: "To the general fund, two hundred and fifty thousand dollars in advance annually, payable quarterly in advance, as above provided."

No. 7. In same section, page 4, line 31, strike out the words "twenty-five million dollars" and insert in lieu thereof the words "thirty-one millions two hundred and fifty thousand."

No. 8. In same section, page 5, lines 27 and 28, strike out the words "twenty-five million" and insert in lieu thereof the words "thirty-one million, two hundred and fifty thousand."

No. 9. In same section, page 6, line 14, strike out the words "one million of" and insert in lieu thereof "one million two hundred and fifty thousand."

No. 10. In section 3, line 6, page 7, strike out the word "and."

No. 11. In line 7, same section and page, after the word "lotteries" insert the words "and general fund."

No. 12. In line 12, same section and page, strike out the word "and."

No. 13. In line 13, same section and page, before the word "amendment" insert the words "and general fund."

Mr. Shattuck moved that the House do now concur in the Senate amendments.

The roll being called on concurrence in the Senate amendments, resulted as follows: Yeas, 68; nays, 25; absent, 5; total, 98 (p. 525).

On same date the Enrolling Committee made the following report (p. 529):

State ex rel. Morris vs. Secretary of State.

ENROLLING ROOMS, HOUSE OF REPRESENTATIVES, STATE OF LOUISIANA, }
SESSION 1890, BATON ROUGE, La., July 2, 1890. }

*To the Honorable Speaker and Members of the House of Representatives:*

GENTLEMEN—I am instructed by the Committee on Enrollment to inform your honorable body that the following entitled House bill has been duly enrolled:

House Bill No. 214—

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein "an article on levees, schools, charities, pensions, drainage and lotteries," as amended.

Respectfully,

JOS. V. LEBLANC, *Chairman.*

Thereupon the enrolled House ,Bill 214 was *read as contained in the committee's report and was spread in full* on the journal (pp. 529, 530, 531).

The above entitled *House bill contained in the report was read:*

House bill No. 214—

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein "an article on levees, schools, charities, pensions, drainage, lotteries, and general fund."

SECTION 1. *Be it enacted by the General Assembly of the State of Louisiana,* That the following amendment to the Constitution of the State be submitted to the electors for approval or rejection, as provided in Article 256 of the Constitution, and if adopted, the amendment shall read as follows:

ARTICLE ON LEVEES, SCHOOLS, CHARITIES, PENSIONS, DRAINAGE, LOTTERIES AND GENERAL FUND.

In aid of the levees, schools, charities, pensions, drainage and general fund hereinafter named the following contract is now made: In consideration of the sum of thirty-one million two hundred and fifty thousand dollars, to be fully secured and paid as hereinafter provided, John A. Morris, his heirs, agents and assigns are hereby authorized and empowered, for the term of twenty-five years ensuing the first day of January, 1894, to prepare schemes of lotteries, to sell lottery tickets and to draw and conduct lotteries in this State; said sum shall be paid to the Treasurer of the State by the persons conducting the business pursuant to this contract in one hundred equal instalments, whereof each instalment shall be paid on or before the first days of January, April, July and October in each and every year during said term; and the Treasurer, upon the receipt of each of said instalmentss, hall apply the same as follows:

To the Public Schools of the State—Three hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, which sum shall be distributed to each parish in the proportion prescribed by Article 224 of the Constitution.

To Levees—Three hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, which sum shall be distributed among the levee districts of the State or applied to levee purposes in the proportions and in the manner provided by law for the distribution and application of the one mill tax levied under Article 213 of the Constitution.

To Charities—One hundred and fifty thousand dollars annually, payable quarterly in advance, as above provided, of which sum $80,000 shall be applied to the hospitals established by the State; $40,000 to State insane asylums; $25,000 to State institutions for the deaf, dumb and blind; $5000 to the Soldier's Home.

To Pensions—Fifty thousand dollars annually, payable quarterly in advance, as above provided, to the pensioning of disabled, infirm, or indigent Confederate soldiers, citizens resident in Louisiana.

To the City of New Orleans for Drainage and other Sanitary Purposes—One hundred thousand dollars annually, payable quarterly in advance, as above provided, the expenditure of said sum and the management and control of the same to be determined by the General Assembly, which is hereby directed to carry into effect this provision by appropriate legislation.

To the General Fund—Two hundred and fifty thousand dollars annually, payable quarterly in advance.

The several sums of money above specified shall be devoted to the objects and purposes hereinbefore stated, and the General Assembly is hereby directed to carry into effect this provision by appropriate legislation. Said John A. Morris, his heirs or agents, shall, within twenty days from the date of the adoption of this article, file in the office of the Secretary of State a written acceptance by him or them of this contract. And for the protection of the State and the security of the public, this contract is made upon the express condition that said John A. Morris, his heirs or agents, shall, within thirty days from the date of the adoption of this article, file in the office of the Secretary of State a declaration in writing, signed by him or them and six other persons, signifying their consent to form the corporation hereinafter named; and the said John A. Morris shall file therewith his bond, with good and solvent sureties, residents of this State, in the sum of $5,000,000, said bond to be in favor of and accepted by the Auditor of State; the condition of the said bond shall be that the said Morris, his agents or assigns, shall pay to the State of Louisiana the said sum of $31,250,000 at the dates and in the manner herein set out, and shall faithfully perform all obligations herein contained; and thereupon the persons signing the said declaration shall be thereby constituted a corporation under the name and title of "The Louisiana Lottery Company," whereof the capital stock shall be $5,000,000, represented by 50,000 shares of $100 each, at least 20 per cent. thereof to be forthwith fully paid up, and which corporation shall be and continue during the period of this contract, and shall have all the rights and powers possessed by corporations generally, as defined by the present Civil Code of the State, and shall be liable for the moneys herein directed to be paid to the Treasurer of the State, and for all prizes to be drawn in said lotteries and shall be entitled to receive semi-annually from the persons conducting the business under this contract 50 per cent. of the net profits of said business. And in consideration of the payment of said sum of $31,250,000, in instalments as aforesaid, said corporation and the shares of stock therein and the business authorized by this contract and the revenues and receipts thereof, shall be exempt from all taxes, dues, assessments, impositions and licenses of any kind whatever, whether State, parish, municipal or otherwise. The power of said corporation shall be vested in a board of directors, to consist of seven persons, who may make and establish rules and by-laws for the proper management and regulation of its affairs. The persons signing said declaration shall constitute the first board of directors and shall serve for the term of one year from the time of the filing of said declaration and until their successors are duly appointed. All lotteries other than those authorized by this article are prohibited in this State

State ex rel. Morris vs. Secretary of State.

• unless by similar amendment to this Constitution and for not less than $1,250,000 per annum. All provisions of the Constitution and laws of this State inconsistent or in any way conflicting with this article are declared to be superseded hereby.

SEC. 2. *Be it further enacted*, That it shall be the duty of the Secretary of State to publish the foregoing proposed amendment in accordance with the provisions of Article 256 of the Constitution within ninety days after the 1st day of January, in the year 1891.

SEC. 3. *Be it further enacted*, That at the next general election all electors who desire to vote for said amendment shall write or print upon their ballots the words " For levees, schools, charities, pensions, drainage, lotteries and general fund amendment," and all electors who desire to vote at said election against said amendment shall write or print upon their ballots the words, "Against the levees, schools, charities, pensions, drainage, lotteries and general fund amendment."

SEC. 4. *Be it further enacted*, That all officers charged with elections or the conduct of returns thereof under the general election laws shall at the time they give notice of the said general election also give notice of the election herein ordered for the adoption or rejection of the proposed amendment, and shall without other direction or authority than is herein contained make due returns of said election in conformity with the general election laws in so far as they are not inconsistent with or in conflict with this act.

The bill was signed by the Speaker of the House, in open session, in duplicate, was taken to the Senate by the clerk, and was signed by the Lieutenant Governor and President, and taken by the clerk of the House to the Governor and Secretary of State.

On Thursday, July 3, 1890, the Governor returned House Bill 214 with his *veto* (p. 568).

On the same day House Bill 214, with the Governor's veto message, was fixed for Tuesday, July 8 at 2 P. M., and was made a special order of the day at that time (p. 571).

On Tuesday, July 8, 1890, House Bill 214 and the executive veto were *read in full* and passed (p. 590).

Special order of the day.

Veto message of the Governor.

House Bill No. 214—

An act providing for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage, lotteries and general fund."

Which had been received from the Governor without his approval, with his objections thereto.

*       *       *       *       *       *       *       *       *       *       *       *       *

Mr. Shields called for the reading of the bill.

*The bill was read in full.*

Mr. Shattuck moved that the House on reconsideration do pass the bill, the veto of the Governor to the contrary notwithstanding, and called for the previous question.

The previous question was ordered.

The roll being called on the question. " Will the House, on reconsideration, pass

the bill, the veto of the Governor to the contrary notwithstanding "—yeas, 66; nays, 31; absent, 1; total, 98.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

And the Speaker declared that the House on reconsideration had passed the bill, the veto of the Governor to the contrary notwithstanding.

And the bill was immediately taken by the Clerk of the House to the Senate, and the Senate having adjourned for the day, the bill could not be delivered on this day.

### SENATE JOURNAL.

On Wednesday, July 9, 1890, a communication was received in the Senate informing that body that the Governor had returned House Bill 214 without his approval, and that the House had proceeded to reconsider the vote upon the passage of the bill and had by a vote of sixty-six yeas and thirty-one nays, determined that the bill become final, notwithstanding the Governor's veto (p. 412).

On the same day the Governor's veto message was called up and spread upon the journal of that day's proceedings (p. 413).

On the same day the veto message was referred to the Judiciary Committee for information as to whether House Bill 214 is of such a nature as to require the Governor's approval or disapproval, or whether it comes under the provisions of Article 256 of the Constitution, etc., and that said committee report within one hour (p. 423).

On the same date the Senate Judiciary Committee made the following report (p. 424):

Mr. Foster, chairman of the Committee on the Judiciary, submitted the following report:

*To the Honorable the President and Members of the Senate:*

I am instructed by the Judiciary Committee to submit the following report as the sense of the majority of the committee.

As a member of the committee I have signed the minority report.

     [Signed]    MURPHY J. FOSTER, *Chairman.*

Your committee to whom was submitted the question whether House Bill No. 214 is of such nature as to require the Governor's approval or disapproval, submit the following report:

That there is no necessity or propriety under the Constitution to submit a bill proposing a constitutional amendment to the executive for approval; but said bill having been passed by a vote of two-thirds of the members elected in both houses and spread on the journals thereof, it becomes the duty of the Secretary of State to submit the same for popular approval according to Article 256 of the Constitution; and that the only duty devolving on the Governor in connection therewith is to make known the result of such election by his proclamation, in accordance with the same article of the Constitution, and recommend the adoption of the following resolution, and make the resolution a part of this report:

Whereas, The Governor of the State of Louisiana has assumed an authority directly in violation of the Constitution of the State of Louisiana, and dangerous

State ex rel. Morris vs. Secretary of State.

to.the sacredness of the same, in having usurped to himself a pretended power to veto the House Bill No. 214, proposing an amendment to the Constitution; and

Whereas, Any infringement by the Executive of the Constitution is alive with great and distressing danger to the liberties of.our people, and if permitted may subordinate the Constitution of the State, the shield of our liberties, to the will and wishes of the Governor; and

Whereas, Article 256 of the Constitution in clear and unambiguous language minutely, and in emphatic words, declares and announces the mode and manner in which an amendment or amendments shall be passed by both houses of the General Assembly, and specially denominates and appoints the Secretary of State as the proper officer to promulgate the said amendment or amendments; and

Whereas, Under a distinct and especial heading the Constitution, in Article 256, names and provides that 'the Secretary of State is the proper and only officer clothed with authority to promulgate the same, ignoring and not mentioning the Governor in any way, directly or by implication, except so far as the promulgation of the result; and

Whereas, The assumption of power in a matter of this kind is without precedent in this State or elsewhere;

Therefore, Be it resolved by the Senate of the State of Louisiana, in General Assembly convened. That in vindication of the constitutional rights of the people of this State, and in keeping with the dignity of this Senate, a distinct and separate, though co-ordinate branch, of the Government, the veto of the Governor, which is without authority or right, be respectfully returned to the House of Representatives, and that the Clerk of this Senate be instructed to furnish his Excellency the Governor with a copy of this resolution.

|Signed|

E. A. O'SULLIVAN,
J. NUMA AUGUSTIN,
JNO. S. BOATNER,
CHAS. T. SONIAT,
J. B. BOATNER,
ALFRED GOLDTHWAITE,
K. A. CROSS,
LLOYD POSEY.

On the same date the majority report was adopted (p. 427).

After recess Wednesday, July 10, 1890, at 7:30 P. M., the following message was received in the House of Representatives, viz (p. 627):

MESSAGE FROM THE SENATE.

SENATE CHAMBER, BATON ROUGE, La., July 9, 1890.
*To the Honorable Speaker and Members of the House of Representatives:*

I am instructed to inform your honorable body that the Senate has adopted the resolutions and report of the Judiciary Committee, touching the subject matter of the veto by his Excellency the Governor of the State of Louisiana of House Bill No. 214—

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

Which said bill and the veto thereon are herewith returned.

Respectfully,
CHAS. D. CAFFERY, *Secretary of the Senate.*

The Senate resolution accompanying this communication was spread in full upon the journal of the House (pp. 627, 628), whereupon the following proceedings took place in the House (p. 628).

The rules were suspended, and message and papers accompanying same were taken up and read.

Mr. Dreyfous moved that the entire subject matter be referred to the Committee on the Judiciary.

Mr. Shields moved as a substitute that, the Senate having refused to consider the veto message of the Governor, on House Bill No. 214, which bill is an amendment to the Constitution, passed by the requisite two-thirds majority of all the members elected to both Houses, and as the action of the Senate denying the right or authority of the Governor to veto a constitutional amendment, is in entire accordance with the views of this House, I move that it is the sense of this House that we heartily agree and concur in the action of the Senate, and adopt their reasons as ours, and that the Clerk of the House be instructed to deliver to the Secretary of State for promulgation enrolled House Bill 214, with a certified copy of the proceedings of this House on the said bill, and to take the receipt of the Secretary of State for the same; and Mr. Shields called the previous question on the whole subject matter.

This motion was adopted on same day (p. 632).

Thus were concluded the proceedings of the two houses of the General Assembly on House Bill 214.

The following is the House calendar of House Bill 214 (pp. 62, 63).

214. Shattuck:

An act providing for the submission to the electors of the State for adoption or rejection an amendment to the Constitution of the State by inserting therein " an article on levees, schools, charities, pensions, drainage and lotteries."

Read first time by title, June 9; read by title, referred to special committee under resolution adopted by House, June 6, June 10; reported favorably and read in full, June 17; read second time in full, considered in Committee of the Whole, reported with amendment amended; ordered engrossed and passed to third reading, June 19; read third time in full, printed in the journal; pending consideration, House adjourned, June 20; read by title, made special order for Tuesday, June 24, at 2 P, M., June 21; read third time by title, considered in the Committee of the Whole, reported with amendment, amended, read in full, roll called on final passage—yeas 66, nays 29; finally passed, title adopted, printed in journal, ordered to Senate, June 24; received from the Senate, concurred in with amendments, roll called on concurrence of Senate amendments—yeas 68, nays 25; amendments concurred in, enrolled, printed in the journal; signed by the Speaker and Lieutenant Governor and President of the Senate, taken to the Governor and Secretary of State July 1, acknowledged receipt of July 2; received in House from the Governor (during an adjourned session of the House of the 38th day of the session July 3), with a message containing objections, which was read; consideration of same fixed as special order for July 8, 1890, at 2 o'clock P. M., July 7; taken up as special order; read in full; roll called on question, will the House after reconsideration pass the bill —yeas 66, nays 31; passed, the veto of the Governor to the contrary notwithstanding; the bill with the message of the Governor was taken to the Senate chamber

State ex rel. Morris vs. Secretary of State.

immediately after the vote above was recorded; the Senate having adjourned the bill was not delivered to Senate; July 8, received from Senate with notice that Senate refused to consider the bill; taken up by the House, the refusal of the Senate to consider approved by the House; the Clerk of the House directed to deliver bill to Secretary of State for promulgation, with copy of House proceedings on the bill, July 10.

The following is the Senate calendar of House Bill 214 (pp. 79, 80) :

214. Shattuck:

An act providing for the submission to the electors of the State, for adoption or rejection, an amendment to the Constitution of the State by inserting therein "an article on levees, schools, charities, pensions, drainage and lotteries."

June 25, received in Senate; June 26, first reading; June 27, read in full and referred to Committee on Health and Quarantine, Drainage and Charitable Institutions; June 28, reported favorably by majority with amendments; June 30, read in full, committee amendments adopted on call of roll—yeas 23, nays 9, passed to third reading on call of roll—yeas 21, nays 12; July 1, read in full as amended; roll called on final passage—yeas 24, nays 12, title adopted and returned to House with amendments; July 2, received notice of concurrence in amendments; July 9, received in Senate at 10:30 A. M., called up and ordered to lie over on the calendar, motion to lie over reconsidered and subject matter of Governor's veto referred to Judiciary Committee at 8 P. M. with instructions to report in one hour, Senate committee reported, majority report adopted with resolutions thereto attached and ordered returned to House.

These calendars are appended to and embodied in the journals.

It will now be in order to append the 256th Article of the Constitution, as it is the basis of all the legislative proceedings taken in the two houses of the General Assembly. It is as follows, viz:

#### AMENDMENT AND REVISION OF THE CONSTITUTION.

ART. 256. Propositions for the amendment of this Constitution may be made by the General Assembly at any session thereof, and if two-thirds of all the members elected to each house shall concur therein, after such proposed amendments have been read in such respective houses on three separate days, such proposed amendment or amendments, together with the yeas and nays thereon, shall be entered on the journal, and the Secretary of State shall cause the same to be published in two newspapers published in the parish of Orleans and in one published in each other parish of the State in which a newspaper is published, for three months preceding the next election for Representatives, at which time the said amendment or amendments shall be submitted to the electors for their approval or rejection; and if a majority voting on said amendment or amendments shall approve and ratify the same, then such amendment or amendments so approved and ratified shall become a part of the Constitution.

When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately. The result of said election shall be made known by the proclamation of the Governor.

From this synoptical and chronological *resumé* of the proceedings

taken in the Senate and House of Representatives, respectively, on House Bill 214, as shown by the official journals thereof, and the calendar of said two houses, it appears that same was *read in full in House of Representatives*, wherein it originated, on the 17th of June, on the 19th of June, on the 20th of June, on June 25 (calendar day, but legislative day June 24), July 1 (legislative day, but calendar day July 2), July 8, 1890, *i. e.*, on six different and separate days; and it also appears that the bill was *spread in full on the journal of the House* on the 20th of June, on the 24th of June (legislative day, or 25th of June, calendar day), July 1, 1890, together *with the Senate amendments in full, separate and apart from the enrolled bill, i. e.*, three different times, and the Senate amendments once, separately.

It further appears that the bill *was read in full in the Senate* on June 27, on June 30, and July 1, 1890, *i. e.*, on three different days; and it also appears that it *was spread in full on the journal of the Senate* on the 1st of July, 1890, with the Senate amendments entered separately. It also appears that the yeas and nays were taken in the House and Senate twice on the final passage of the bill and amendments, at different stages, and that same were entered at length on the journals of the two houses of the General Assembly.

We have taken each and every one of the proof sheets that were introduced in evidence on the part of the respondent, and the following is the result of a careful comparison made of the journals, in connection therewith.

The two correspond perfectly, so far as the proceedings of the House of Representatives are concerned, with one solitary exception, and that is, the language of the *proof sheet*, which exhibits the minutes of the proceedings of the legislative day, June 24, 1890, is: "The amendments were adopted and *the bill was read in full and spread upon the journal of the day's proceedings.*"

On the journal of that day's proceedings the bill is spread in full, but it does not appear on the proof sheet of that day's proceedings.

But a comparison made of the Senate journals with *such* of the proof sheets as are found of corresponding dates shows there are two or three minor discrepancies. The proof sheet which purports to be of the proceedings of June 27, 1890, is only a fragment thereof, and has neither date or caption, and is therefore unreliable.

There is no proof sheet of the proceedings of the 30th of June, 1890, in evidence.

The proof sheet of the proceedings of the 30th of June shows no reading of the bill *in full*. This was corrected at a subsequent date during the session, and therefore the statement in the journal which shows that the bill was read in full is correct. The proof sheet shows that the bill was *spread in full* on the minutes of June 30, 1890, whereas the journal shows that it was *spread in full* on the 1st of July, 1890. This is one of the corrections and alterations of which the respondent complains—of which we will speak more at length when that point is reached in its order of argument. In other respects the entry on the proof sheet of the proceedings of July 1, 1890, are identical with that in the journal of corresponding date.

When the bill was returned to the House of Representatives on the 1st of July, 1890, the minute entry in the proof sheet of that day's proceedings corresponds with that of the journal entry, with the exception of an omission in the proof sheet, of the bill having been entered on the journal, though the Senate *amendments are spread in full* and the statement is made that it was read by title; while on the journal it is stated that the bill was *read in full*, and it is *spread in full* on the journal of that day's proceedings. This conflict presents another one of the *strenuously contested* points in the case.

In the proof sheet of the proceedings of the 8th of July, 1890, in the House of Representatives, appertaining to the executive veto, the entry is identically the same as that in the journal of corresponding date, viz : that '' House Bill 214 was *read in full* and passed over the Governor's veto.

The result of this lengthy and painstaking investigation of the transcript, journals and proof sheets, is that we find but two discrepancies—or rather alleged discrepancies—between the proof sheets and journals, and those are (1) the Senate journal of July 1, 1890, shows that the bill *was spread in full* thereon, whereas, the proof sheet does not, and (2) the House journal of proceedings of the same date shows that the bill *was spread in full* thereon, whereas, the proof sheet does not.

Recurring to the respondent's return, paragraph 4, we find the charge distinctly made, that in the journal of the House of Representatives '' alterations and unauthorized changes have been made '' by inserting and '' spreading at length said House Bill 214 on July 1,,

1890, when in fact said bill was read only by title;   *   *   *   and also in the Senate journal on said 1st day of July, 1890, as duly printed and published on the 2d of July, 1890, unauthorized changes and alterations were made, as willfully appear from said original journal," etc.

Having finished the proposed synoptical statement of the proceedings of the two houses of the General Assembly, and made a comparison between it and the proof sheets which the respondent's counsel filed in evidence, and demonstrated what are the only contested points in issue, we will now examine the proof adduced in respect to the real and actual proceedings of the General Assembly, and consider the respondent's charges, and the relator's defences thereto, and ascertain whether the alterations and charges were authorized or unauthorized.

## IV.

(a) The following we find to be the substantial facts in relation to the alleged alteration of the *corrected journal matter*, appertaining to an alleged unauthorized insertion in and entry of House Bill 214, in the printed journal of the Senate proceedings of date July 1, 1890, the same being first in the order of their occurrence.

The statement of the Secretary is that he is authorized, under Rule 56 of the Senate, to correct the minutes, and that he makes corrections wherever errors are found, without any special directions of the Senate.

Rule 56 of the Senate provides that " the Secretary shall read in full the journal daily from the sheets on which he takes his minutes; and, after having so read and *corrected, and not before*, the said minutes shall be examined by the President; and, if necessary, amended and corrected under the sanction of the Senate; and copies furnished to the printer, authenticated by the signature of the Secretary.

" The Secretary shall consider himself *responsible to the Senate for the accuracy of the journal.*"

Being shown the entry in the printed volume indicating the Senate proceedings of July 1, 1890, in reference to entering on the journal of the proposed amendment, at p. 324, and having his attention directed to the apparent contradiction thereof, to be found in the proof sheet of same date, the following occurred, viz:

State ex rel. Morris vs. Secretary of State.

" Q. What is the truth; was it read in full as reported at page 324 or not?

" A. It was.

" Q. By whom?

" A. By myself.

" Q. And *when* did you correct the omission, or authorize the printer to spread it on the minutes?

" A. On the next day, or second day afterward. In other words, as the proof sheets were returned from the printer, I noticed the error, and requested him to make the correction."

" Q. It was, then, before the legislative session adjourned?

" A. Yes, sir; it was directed by me to be done on the 3d—on the 2d or 3d of July, and it appeared in the *Capitolian-Advocate* on the 3d or 4th—probably the 4th of July—I don't remember exactly. Record, p. 60.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

" Q. Did you at any time make any other corrections in the journal, that you remember of ?

" A. In that matter?

" Q. Any other matter appertaining to this bill?

" A. I remember of no other corrections that were made affecting this bill.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

" Q. And the omission to include it in the \* \* proof sheet of the 1st of July, 1890, was an error which you corrected afterward?

" A. Yes, sir; I made the correction, under Rule 56 of the Senate."

The Secretary explains that immediately after the passage of House Bill 214 in the Senate—*i. e.*, within fifteen minutes—he returned it to the House of Representatives. That, in the meantime, he did not spread the bill upon the Senate journal—could not have done so, because it had not *then* been made out. The journal clerk had not even commenced to prepare the minutes of that day's session for the printer.

He says: "When I discovered the error, I got a copy of the bill and had it sent to the printer. \* \* I obtained a copy from the Clerk of the House of Representatives, and sent it to the printer on the 2d or 3d of July, 1890. \* \* I discovered when the proof sheet of this day's proceedings (the 1st of July, 1890) was furnished by

the printer, that the *bill was not spread in full*. I thereupon got a copy of the bill and gave it to the printer  *   *   and directed him to spread it on the minutes."

The foreman of the *Advocate* and the managing editor state that they have repeatedly had corrections made in the journals, from time to time, when clerical errors had taken place; and such errors " have been corrected, when practicable, in the book form itself." ·

They state that, on being requested by the officers of the two houses, under whose directions they operated, they customarily made such corrections as they might officially suggest.

This, the editor said, he had "previously done under similar circumstances." He states that he had been connected with the public printing office ever since 1880. In speaking of the final completion of the journal, he says:

" We (staff and printers) consider that they are not complete until after they have been *finally approved by the officers of the two houses, and such corrections as they customarily (suggest)* have been made."

Again, he says: " I know that the custom has been for the two officers (Clerk and Secretary) to return to Baton Rouge—for, as you know, *neither house completes its journal*—and then the two officers *  *  make up their corrections, and in that (way) things are put in proper shape."

On this state of facts, was the Secretary justified in instructing the printer to enter the amendment on the journal of the Senate?

Senate Rule 56 was evidently framed with special reference to the provisions of Article 28 of the Constitution, which declares that " each house shall keep a journal of its proceedings, and cause the same to be *published immediately after the close of the session;*" and that "the original journal shall be preserved, after publication, in the office of the Secretary of State, but there shall be required no other record thereof."

It also conforms to the provisions of Section 10 of the printing law, which declares that " within two days after the journal of each house shall have been approved the State printer shall publish the same, as so approved, once in the official journal of the State, and the same matter so published shall be made up into book form."

And as Article 256 of the Constitution directs that a proposed

constitutional amendment shall be entered on the journal, reference was evidently made to the same journal that the Constitution declares shall be " published immediately after the close of the session;" the same journal that it declares shall be " preserved, after publication, in the office of the Secretary of State;" the same journal which it says shall constitute the only record of legislative proceedings; the same journal which the State printer shall publish in the official gazette and make up in book form.

It is manifest that corrections which are necessary ought to be made, if practicable, *before* publication, and that it is only possible for a proposed constitutional amendment to be entered on the journal *after* it has been completed.

Rule 56 provides that " the Secretary shall read the minutes daily," and after having so read and *corrected*, and not before, the said minutes shall be examined by the President." And if necessary same may be again " corrected and amended under the sanction of the Senate." When all necessary corrections have been made, copies shall " be furnished to the printer authenticate dby the signature of the Secretary."

Not only so, but as if to put his authority beyond question, the rule declares that the Secretary shall consider himself *responsible to the Senate* for the accuracy of the journal."

Then by whom are the minutes to be corrected and given proper shape for publication in journal, if not by the Secretary?

It was at this particular stage that the Secretary made the discovery, as he supposed, that the printer had erroneously failed to incorporate House Bill 214 into the proof sheet of the Senate proceedings of the 1st of July, 1890; and, thereafter, furnished him a copy thereof, and caused him to insert same in the *Capitolian-Advocate* of the 3d or 4th of that month.

The Constitution does not appear to require an amendment to be published on the proof sheets, but only to be entered on the journal; and, therefore, the Secretary seems only to have made a *timely* suggestion to the printer, which he carried out, and entered in the journal of that day's proceedings House Bill 214, as soon as it was *first* published in the official newspaper and prior to the adjournment of the General Assembly.

This alteration was made within the two days limit allowed by the printing law between the date at which corrections are to be

640 SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

made and a corrected copy of the minutes are put to press in the State gazette. It was a matter of detail, with the performance of which the Secretary was entrusted under the rules of the Senate.

It was a matter that appertained to the "accuracy of the journal," for which he was responsible to the Senate.

Article 256 of the Constitution does not seem to contemplate that, in respect to entering an amendment on the journal, any *action* on the part of the Senate is required. It says " propositions for amendments  *  *  *  may be made by the General Assembly  *  *  * if two-thirds of all the members elected  *  *  *  shall *concur* therein after such proposed amendments have been read," thus implying *action* by the Senate.

Then follows this language, viz: " Such proposed amendments  *  *  *  together with the yeas and nays thereon *shall be entered* on the journal," implying the performance of a mere clerical duty.

It thus appears that there are two requirements made of the Senate—first, the *reading* in open session, on the three several days, of a proposed constitutional amendment, and second, the expression of its approval thereof by a two-thirds vote of its members concurring therein.

After these two requirements have been fulfilled there are two constitutional directions that are to be performed—first, the proposed amendment must be *entered on the journal*, and second, the yeas and nays must also be entered thereon.

It is worthy of note that the constitutional requirements of the Senate, that an amendment shall be *concurred in* by a vote of two-thirds of its members, is a wholly different thing from the constitutional direction that the yeas and nays shall be *entered* upon the journal; also, that the requirement that an amendment shall be *read* is just as distinct from the direction that it shall be *entered* upon the journal.

The *voting* and the *reading* form parts of the *proceedings;* but the *entering on the journal of an amendment and the yeas and nays thereon* can not be performed until after the *proceedings* have been completed, corrected, journalized and put to type.

Now, it is not contended that the yeas and nays were not entered on the Senate journal. It is not claimed that the Senate authorized the Secretary to enter the yeas and nays on the journal. The fact that the yeas and nays were thus entered on the journal is not mat-

ter of complaint by the respondent. Yet it is a matter of serious complaint that the proposed amendment was thus entered in the journal, without previous authority obtained from the Senate, by the Secretary, notwithstanding the constitutional precept is that " an *amendment together with the yeas and nays thereon shall be entered on the journal.*"

The authority for the Secretary to thus enter the amendment is questioned, whereas his authority to enter the yeas and nays thereon is unquestioned and unchallenged.

The failure of the Secretary to enter one would have resulted just as fatally to the proposed amendment as a failure to enter the other; and the tacit admission of the correctness of one entry leaves the necessary inference of the correctness of the other.

· The fact of the Secretary having procured for the printer a copy of the amendment from the Clerk of the House of Representatives, after the Senate had taken action on it, and had returned the bill thereto, is of no possible consequence. For, immediately, after its final passage in the Senate—within fifteen minutes, the Secretary states—the original bill was returned to the House. It would have been quite impracticable for the original bill to have been withdrawn from the files of the Senate and surrendered to the printer. A certified copy from the Clerk of the House, wherein the bill originated, and was at the time, pending consideration of the Senate amendments, served quite as well for the publication as a copy certified to by the Secretary of the Senate.

In treating of " the mode of proof of public documents," and " acts of State," as he denominates the published statutes and journals of legislative proceedings, Greenleaf says: "*Acts of State* may be proved by the production of the original printed document from *a press authorized* by government." 1 Greenleaf, Sec. 479.

" In most, if not all, of the United States, the printed copies of the laws and resolves of the Legislature, published by its authority, are competent evidence, either by statute or judicial decision; and it is sufficient *prima facie* that the book purports to have been so printed. ⁎ ⁎ *Confidential persons are selected to compare the copies with the original rolls and superintend the printing.* The very object of this provision is to furnish the people with authentic copies; and from [their very nature, printed copies of this kind ⁎ ⁎ are as much to be depended upon as the exemplification, verified by an

officer, who is keeper of the record." Sec. 480. Watkins vs. Holman, 16 Peters 25; Pease vs. Peck, 18 Howard 505.

"It is deemed *essential to the character* of these books that the entries in them be made *promptly*, or at least without such long delay as to impair their credibility, and that they be made by the person whose duty it was to make them, and in the mode required by law' if any has been prescribed. * * * But (the books) "must be accompanied by proof that they came from the *proper repository.*" Sec. 485.

With reference to the admissibility *and effect of such public documents in evidence* that author announces the rule to be this: ·

"And here it may be generally observed that, to render such documents, when properly authenticated, admissible in evidence, their contents must be pertinent to the issue. It is, also, necessary that the document *be made by the person whose duty it was to make it, and that the matter it contains be such as belonged to his province, or came within his official cognizance and observation.* Documents possessing these requirements are, in general, admissible to prove *prima facie,* or conclusively, the facts they recite." Sec. 491.

In our opinion the author may be relied upon as having concisely summarized the law on this subject, and it is clear to our minds, from due consideration of the subject, that full faith and credit may be given to the Senate journal.

Yet there is still another consideration which exercises a controlling influence on this entire question, and which is more potent than any other, and it is this: It appears that on the 9th of July, 1890, after House Bill 214 had been passed over the Governor's veto by a two-thirds vote of all the members elected to the House of Representatives, and the same had been transmitted to the Senate again, it was therein referred to the Senate Judiciary Committee for a report, and in obedience thereto they reported a resolution in which it is formally declared "that said bill having been passed by the votes of two-thirds of the members elected *in both houses, and spread on the journals thereof,* it became the duty of the Secretary of State to submit the same," etc.

In our opinion this declaration is a *complete* and *explicit* ratification of the Secretary's action, if any was needed, to validate his act in entering the amendment on the journal under the circumstances herein related. This action was *advisedly* and *deliberately* taken, and

with direct reference to the concurrence of two-thirds of the members of each of the two houses of the General Assembly thereon and the entry of the amendment on the journals thereof. Had they not been both *advised and well satisfied* on that score, their action would have been *rash,* and operated the utter *annihilation* of the proposed amendment, while their *deliberate purpose* was to preserve it and give it legal effect.

Hence, we deem it our duty to give effect to this ratification of the Secretary's act—if there were a doubt of its legality—and which clearly shows that the proposed amendment was entered upon the Senate journal within the terms and meaning of Article 256 of the Constitution.

(*b*) With regard to the alleged alteration of the journal of the House of Representatives in respect to entering the proposed amendment thereon *after the adjournment* of the General Assembly, there are some additional facts that should be stated in this connection, and they are as follows, viz:

The Clerk of the House of Representatives states that "*he made no corrections after the adjournment of the session,*" but (after the adjournment of the session) he went to Baton Rouge "to see that corrections which *he had ordered made before* were made.

"That was the cause of his visit.

"Q. Do you remember calling on Mr. Williams, the printer, about making any corrections during the session connected with this bill?

"A. Yes, sir.

"Q. State what they are?

"A. I remember several cases, but I remember one, especially, to which my attention was called this morning, if you wish me to state that.

"Q. Yes, I do.

"A. I called the attention of the business manager of the newspaper to the fact that House Bill 214 was not printed in the proof sheets or slips and furnished him a copy of the bill, calling his attention directly to where it should go in, and made a memorandum of it as a guide.

"That was after the publication of the proceedings of the 2d of July, I think "—*i. e.,* the proceedings of the daily session of the 1st of July, 1890.

"On Friday night after that, which was the night of the 4th of

July, * * * I told Mr. Landry to go to the printing office and find out if the correction had been set up in proper shape, and he returned * * and informed me that it had been set up and would appear in the next day's issue of the *Advocate*.

, " I went to the printing office myself and asked Mr. Williams if he had made that correction, and he told me that he had not, at that time, made it, but he would see to it that it was made. * * I got the paper on the next morning and found that it was not in it, and I returned to the printing office the next morning and *insisted* that it should go into my book form, and I think that I said to him at that time that I claimed that right, as it was his fault that it was not put into book form.

" Q. That was made during the session?

" A. Yes, sir; the correction was handed to Mr. Reddy during the session of the House—in open session. I remember that circumstance. I remember that I sent for him, and that he came to my desk in the House, and that I left my desk with him and explained to him just where the correction should be made."

He states positively that he called on Mr. Williams, Mr. Reddy and Mr. Jones—all of the *Advocate* staff—to make the correction he desired and that it was not done.

Mr. Reddy was asked:

" Q. Do you not recollect a correction made in the form, affecting proceedings of the House, of July 1, 1890, bearing special reference to an omission in your proof sheets of the insertion of House Bill 214?

" A. Well, I recollect that that change was made, and that it was made after that day. It was after July 1.

" Q. About when?

" A. About when we did the work?

" Q. When did you make the change?

" A. We began to make the change as soon as we were ordered to do so by Mr. Trezevant, in order that the work might be turned over as soon as possible to the Secretary of State.

" Q. It is in evidence that Mr. Trezevant called your attention to it on July 1st, and sent for you to come to the House?

" A. I can not say.

" Q. I tell you that, for your information, that the testimony of Mr. Trezevant says July 1.

" A. *I can verify the fact that I was called on,* but I can not give you the date.

" Q. How long after you were called upon did you give directions to make alterations?

" A. I went back to the office and gave Mr. Williams instructions to begin *at once* on the alterations. *Our type was tied up, and the alterations were not made. We could not get type to go along with the work.* (Italics ours.)

*       *       *       -       *       *       *       *

" Q. You are positive the work was done after the adjournment of both houses?

" A. Yes, sir; I am quite positive that that work was done after the adjournment of both houses.

" Q. But the order was given to you during the session of the Legislature?

" A. Yes, sir; on the desk of Mr. Trezevant. He called me up, and marked on the proof sheet where it was to go in, and he gave me to understand that it was on account of some error of *somebody in the office.* I investigated the matter, and my mind is still in doubt as to *who is* really to blame for the mistake; but the order was given in the session, upon the desk of Mr. Trezevant, in the House of Representatives."

When Mr. Jones, editor of the *Advocate,* was recalled, the Attorney General, in the course of his cross-examination, asked him:

" Q. You have heard the testimony of Mr. Trezevant. You asked me a while ago for permission to consult him, which I declined. You have now heard it; do you wish to add anything?

" A. I *corroborate it* so far as my personal knowledge is concerned.

" Q. You corroborate it so far as your personal connection with it is concerned?

" A. Yes, sir."

He then proceeded to correct his former statement in reference to having satisfied himself that the omission of House Bill 214 was not the fault of a printer, and says that his said statement is correct *only in so far as the Senate journal is concerned, and not in so far as the House journal is concerned.*

This lengthy quotation from the testimony of witnesses was deemed necessary for the double purpose of proving (1) that the Clerk of the House of Representatives not only *discovered* the omis

sion of the proposed amendment from the proof sheets of the daily session of the House, as of the 1st of July, 1890, as soon as the proof sheets were exhibited to him on the day following, but he demanded—not once, but several times; not of one of the staff officers of the State gazette, but of several of them—to insert it in the journal, but without avail; and (2) that the fault and failure to make a *proper and timely insertion thereof was confessedly that of the printer and his associates.* .

Had the correction been made at the time it was demanded by the Clerk the *status* of the proposed amendment in the House of Representatives would have been, in point of fact, as it is in point of law, just the same as the journal was in the Senate on the 2d of July, 1890.

This being its legal *status*, all that we have said in reference to the alleged alteration of the Senate journal is strictly applicable to the journal of the House of Representatives.

While it is true, as a matter of fact, that the amendment had not been actually entered in the House journal, yet it was so recorded in the House calendar of the proceedings of the 1st of July, 1890. Hence, when, on the 9th of July, 1890, the House of Representatives recalled its vote on the veto message of the Governor and adopted and made its own, the Senate resolution above quoted, it acted on information just as authoritative as the Senate had before it when the resolution was adopted therein.

This argument was necessary only for the purpose of establishing the legality of the entry in the House journal of the *enrolled* House Bill 214; that is, after the Senate amendments had been incorporated therein. Though, in our opinion, that was not strictly necessary, inasmuch as the original text of the bill had been previously inserted in the House journal, and after its final adoption in the Senate with amendments, the said Senate amendments were spread upon the House journal also.

But we are satisfied that, under the circumstances detailed, the Clerk of the House of Representatives had a clear and undoubted right—and it was his duty to see that the proper correction should be made. If he had not that right, there was no one else who could have had the correction made, during the vacation of the General Assembly, notwithstanding it was a proper one to be made.

On the whole, our conclusion is that the charges made by the respondent, that unauthorized alterations and changes had been made

NEW ORLEANS, MAY, 1891. 647

State ex rel. Morris vs. Secretary of State.

in the printed official journals of the Senate and House of Representatives, are not sustained; and that, taking the published official journals as our guide, it appears that all the essential formalities of procedure provided in Article 256 · of the Constitution have been complied with.

### V.

Having disposed of the charges made by the respondent, that alterations and changes were made in the journals of the respective houses, without authority, and whereby said journals were vitiated, and their effect destroyed as evidence of the legislative action of the General Assembly on the proposed constitutional amendment, we are next to consider the remaining grounds that are assigned in the return, of the invalidity of the proposed amendment.

Some of these grounds are assigned as existing in the amendment, *extrinsically*, and others as existing therein *intrinsically*.

We may state, as a preliminary to the discussion of the remaining issues in the return, that the right of the Secretary of State to raise *such issues* for judicial determination, as prerequisite to granting relator relief by *mandamus*, compelling him to *publish* the proposed amendment, is very questionable indeed. But we are indisposed to hamper and circumscribe any remedies the respondent *thinks* himself entitled to, and will undertake the investigation of the issues raised, *only* for the purpose of determining whether the alleged invalidities in the confection of the proposed. amendment, and its alleged illegal and unconstitutional features, are so *glaring and patent* as to furnish the Secretary of State just ground of refusal to publish it.

(*a*) The first proposition to which our attention is attracted is that the proposition for the amendment of the Constitution *never acquired the force and effect of law*, because the same was vetoed by the Governor, and the said bill failed to pass over the veto, as required by the Constitution and laws of the State, *in order to make it operative.*"

It may be at once conceded that the decision of this question must be guided and controlled by the provisions of the *written organic law* on the subject, as they are plain and unambiguous, and constitute "*the measure of power*" with respect to the three co-ordinate branches of the State government.

It may be at once conceded that the proposed amendment "*never*

*acquired the force and effect of law*," and never became " operative " as a *law;* not, however, because the measure represented by House Bill 214 did not receive the sanction and approval of the executive; not because it failed to pass over the veto, as required by the Constitution and laws of this State," as the respondent returns, but because the 256th article of the Constitution declares that a " proposition for the amendment of the Constitution  *  *  * shall be submitted to the electors for *their* approval or. rejection; and if a majority voting on said amendment · *  *  *  shall approve and ratify the same, *then* such amendment  *  *  so *approved and ratified shall constitute a part of the Constitution.*"

The proposed amendment is a " *proposition* " *merely,* until " approved and ratified " by the votes of a majority of the electors of the State, cast at an " election for Representatives;" and when " so approved and ratified," it constitutes—*not a law*—but "a part of the Constitution." It is perfectly manifest, then, that neither the signature of the Governor, approving the measure, nor the passage of the same by a two-thirds vote of the respective houses of the General Assembly, could in any way affect it, in any manner or degree. Neither the one nor the other could give the proposition " the force or effect of *law.*"

This objection of the respondent seems to have been taken under Article 73 of the Constitution appertaining to the " Executive Department," and which declares that " every bill which shall have passed both houses shall be presented to the Governor. If he approves, he shall sign it; if not, he shall return it, with his objections, etc.  *  *  * and if passed by two-thirds of the members, etc. ·  *  *  it shall be a *law.*"

The provisions of Article 75 are of similar import. They are:

" Every order, resolution, or vote, to which the concurrence of both houses may be necessary, except on a question of adjournment, etc.,  *  *  *  shall be presented to the Governor, *and before it shall take effect,* be approved by him, or being disapproved shall be repassed by two-thirds of the members elected to' each house."

Each of these articles relate to the duties of the executive in respect to his approval or disapproval of *ordinary* " acts of State," or resolves of the General Assembly in respect to their becoming operative and effective as *laws without ratification by the electors.*

But Article 256 of the same organic law, under the heading

"Amendment and Revision of the Constitution," confides to the executive but one trust and imposes upon him but one duty. It says:

"The result of said election"—that is, the election at which a proposed constitutional amendment is submitted to the electors for their ratification or rejection—"shall be made known by the proclamation of the Governor."

This delegation of a *single, specific* duty in respect to such proposition would seem under ordinary rules of construction to exclude every other.

The argument of the Attorney General on another branch of this case seems to concede the correctness of this view, as he fails to enumerate the approval of the Governor as one of the *essentials* to the perfection of a proposed amendment. The paragraph referred to is the following, viz:

"Article 256 of the Constitution of 1879, providing for propositions for amendments to the Constitution, requires the following chronological order to be pursued by the General Assembly in making such propositions:

"First, a reading in each house on the three separate days; second, the yeas and nays thereon; third, the entry or spreading on the journal; fourth, publication by the Secretary of State; fifth, a majority vote of the electors; sixth, proclamation of the Governor." Brief, p. 53.

And another of the respondent's attorneys admits that "the *whole power* granted to the General Assembly will be found in Article 256 of the Constitution." Brief, p. 4.

In this view we concur. While this argument might be enlarged and copious opinions cited from the courts of last resort in other States, we are of the opinion that an extension of this discussion would be of no avail, and citation of authority would not give any additional light on the question under consideration.

Our conclusion is that the signature of the Governor to the proposition for the amendment to the Constitution under discussion is not required by the Constitution, and that his disapproval of it did not affect its validity.

(*b*) The second proposition for discussion is as follows, viz:

"That said House Bill No. 214 is a measure of pure and simple ordinary legislation and a proper subject of executive veto—that it

was introduced as a bill, entitled a bill, acted upon as a bill in both houses, enrolled as a bill, sent to the executive as a bill for his approval, and after veto was taken up and considered and passed over said veto in one house, to-wit, in the Senate. That even if a proposed amendment as alleged by the relator, it was subject to executive veto." Brief of the Attorney General, p. 13.

A simple inspection of proposed constitutional amendment, as found incorporated in this opinion, is sufficient to refute the proposition that it is " a measure of pure and simple ordinary legislation." If it were, the argument would be at an end and the case closed.

The whole case proceeds upon the theory that it is a proposition for the amendment of the Constitution; and if it were not, it would be of no avail to discuss the question of an executive veto of the measure, for *as* an act of ordinary legislation the executive veto applies to it of course.

(c) The next proposition is as follows, viz:

" Respondent further charges that even if the introduction of said House Bill No. 214 as a House bill, its sending by the House to the executive as a bill for approval and the attempt to pass it over his veto as a bill, did not make it the subject matter of a veto, that said bill as passed was the proper subject matter of a veto, even if no power existed in the executive to veto a constitutional amendment, which is denied, because said bill contained provisions, confessedly matters of legislation, subject to veto, and which legislative provisions being incorporated in and interwoven with the bill as a whole, made the bill as a whole the subject matter of executive veto, and the failure to pass the same over the veto has rendered the whole inoperative and without effect."

This proposition, simplified, is that as a proposition for an amendment to the Constitution it contains " provisions confessedly matters of legislation, subject to veto, and which legislative provisions being incorporated and interwoven with the bill as a whole, made the bill as a whole subject matter of executive veto," etc.

This is very much the same question as that contained in the last paragraph, the point of it being that the proposition contains *legislative* provisions, and the *bill as a whole,* on that account, ceases to be a constitutional amendment and degenerates into an ordinary act of egislation, subject to veto by the Governor.

If it does contain legislative provisions *which have the effect* alleged

NEW ORLEANS, MAY, 1891.                  651

State ex rel. Morris vs. Secretary of State.

it ceases *eo instanti* to be a proposed amendment, and a discussion of the veto power of the Governor would be unavailing.

A fair test of whether the proposition contains legislative provisions is to consider whether the alleged legislative matter could stand as an *independent statute* if the amendment were declared invalid, because of not having been legally adopted by the General Assembly. For, if the alleged legislative provisions be only auxiliary to or adjuvatory of corresponding provisions of the proposed amendment, they could not possess the effect of reducing the latter to the grade of a legislative act as a whole.

As the power of proposing constitutional amendments is conferred upon the Legislature, within the limitations and under the restrictions contained in Article 256 of the Constitution, it must be exercised in the mode indicated therein; and everything therein designated to be performed must be performed, and the performance thereof is essential to the validity of the proposed amendment. Koehler and Lange vs. Hill, 14 N. W. Rep. 738; State ex rel. Hudd vs. Timme, 11 N. W. Rep. 785; Westinghousen vs. People, 44 Mich. 265; Prohibitory Amendment Cases, 24 Kansas 700; State ex rel. Stephenson vs. Tufly, 12 Pac. Rep. 836; Collier vs. Frierson, 24 Alabama 100; The State vs. Swift, 69 Indiana 519.

Having ascertained that all proper proceedings have been performed in the enactment of the measure, we are to consider *whether the means were provided for its submission to the electors*, it being the sole, remaining constitutional requirement to be performed.

It will be observed that there is no direction given in said article, except that, on certain enumerated conditions having been fulfilled, the proposition must be submitted to the electors at the next general election for Representatives; and in so doing it became the duty of the Legislature to direct the *time* and mode of making the required publication previous to said election, and the manner in which ballots should be prepared for the use of electors at such election; and to point out the method of compiling the election returns, of making declaration of the result thereof, and of designating the duties of election officers in relation thereto—to the end that the Governor shall make due proclamation thereof, as required by said Article 256.

To provide this election machinery was clearly within the legislative competency, and the incorporation in the proposed amend-

352          SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

ment of such appropriate provisions seems to have been necessary to put it in operation as " a part of the Constitution."

Section 2 relates to the publication of the proposition, and fixes the time.

Section 3 prescribes the form of the ballots to be used by the electors at such election.

Section 4 prescribes the duties of election officers in respect to such election in so far as the amendment is concerned.

Surely these are not matters of ordinary legislation, for they are in terms restricted to *this* amendment. Once it is adopted or rejected, they will cease, necessarily, to have effect. But for it, they would have no existence, as they would have no object to which they could apply.

They merely indicate the *modus operandi* of submitting the proposition, and the ascertainment and declaration of the result of the election.

These sections are substantially the same as the provisions of Article 262 of the Constitution, which are as follows, viz:

ART. 262. Immediately after the adjournment of this Convention, the Governor shall issue his proclamation, directing the several officers of the State authorized by law to hold elections for members of the General Assembly, to open and hold a poll in every parish in the State, at the places designated by law, upon the first Tuesday in the month of December next, 1879, for the purpose of taking the sense of the good people of this State in regard to the adoption or rejection of this Constitution; and it shall be the duty of said officers to receive the votes of all persons entitled to vote under the Constitution of 1868.

Each voter shall express his opinion by depositing in the ballot box a ticket, whereon shall be written or printed, " For the Constitution," or "Against the Constitution," or some such words as will distinctly convey the intention of the voter.

It shall also be the duty of the Governor in his said proclamation to direct the said officers authorized by law to hold elections to open and hold a poll at the above stated time and places, for the election of Governor, Lieutenant Governor, members of the General Assembly, Secretary of State, Attorney General, State Auditor, and Superintendent of Public Education, and of all other officers whose election by the people is provided for in this Constitution; and the names of the persons voted for shall be written or printed on the same ticket, and deposited in the same box as the votes "for" or "against" the Constitution.

And the said election for the adoption or rejection of the Constitution, and for the said officers, shall be conducted and the returns thereof made in conformity with existing laws upon the subject of State elections.

Upon the receipt of said returns, or on the last Monday in December, 1879, if the returns be not sooner received, it shall be the duty of the Governor, the Lieutenant Governor, the Secretary of State, and the Attorney General, in the presence of all such persons as may choose to attend, to compile the votes given at the said polls for ratification and rejection of this Constitution; and if it shall appear from

said returns that a majority of the votes given on the question of adoption and rejection of the Constitution is for ratifying this Constitution, then it shall be the duty of the Governor to make immediate proclamation of that fact, and henceforth this Constitution shall be ordained and established as the Constitution of the State of Louisiana, and the General Assembly elected in 1878 shall thereupon be dissolved. Whether this Constitution be adopted or rejected, it shall be the duty of the Governor to cause to be published in the official paper of the convention the result of the polls, showing the number of votes cast in each parish for and against the said Constitution.

If the Constitution be ratified, it shall be the duty of the Secretary of State to examine and compile the returns, and publish the result of the election of officers herein ordained, and in the manner provided by existing laws.

It will be perceived, upon making a careful analysis of its provisions, that it provides—

1. That certain elective officers shall open polling places whereat the election is to be conducted.

2. That the ballots of electors shall be prepared in a designated form.

3. That the election shall be conducted in a particular manner, and the returns thereof shall be made in a particular manner.

4. That certain officers shall compile and tabulate the election returns.

5. That the Governor shall make immediate proclamation of the result of the election.

It is an historical fact of which we will take notice, that at an election held in conformity with the requirements of that article the Constitution was ratified and became the organic law; and that through that instrumentality it was put in operation. Since it went into effect that article has, for all practical purposes, become "a dead letter." And even so will the provisions of Sections 2, 3 and 4 of the present proposed amendment cease to be operative once it is accepted or rejected by the people.

In proposing a constitutional amendment the Legislature acts *quoad hoc* as a constitutional convention, under the limitations imposed by Article 256; and in the exercise of that power it had an *equal* right to insert in such proposition the means of giving it effect as part of the organic law, as did the framers of the Constitution to insert therein Article 262. State ex rel. Hudd vs. Timme, Secretary of State, 11 Northwestern Reporter (Wisconsin) 785. Compare with like provisions in the Constitution of Maine.

Such provisions are but "temporary adjuncts" of the measure,

and were intended to subserve the temporary purposes of the submission of the proposition to the electors, and once that object was accomplished to, *eo instanti*, cease.    Such auxiliary provisions, when incorporated in a proposition for amending the Constitution, like similar provisions in a proposed enabling act for some specific purpose, only have the effect of *assisting* in its consummation, and they do not repeal, amend, modify, change or displace *general laws* on the same subject matter, in any particular.    Mobley vs. Police Jury, 41 An. 821;  The State vs. Swift, 69 Ind. 513.

In Prohibitory Amendment Cases, 24 Kansas 700, the court had under consideration and interpreted a similar proposition, which had been framed under a constitutional article identical with 256 of our own, one of the principal objections to which was that it contained *no provision* for receiving, counting and canvassing the votes of electors—the exact converse of the proposition we have here.    In the course of their opinion the court made this observation, viz:

" It will be noticed that the joint resolution simply provides that the proposed amendment shall be submitted to the electors at the general election.    It does not otherwise provide for casting, counting or canvassing votes.    It appoints no officers for the purposes of this election.    It casts no duty upon the general election officers."

They then proceed at great length and with marked ability to argue the question and collate all cognate American decisions, and conclude, in general terms, that an election which has been *actually held* under such a proposed amendment comes clearly within the judicial cognizance, and courts of justice are bound to take notice of the ascertained result thereof, stating in their conclusions that " it is the election and not the canvass that makes the change.    *    *    When a majority of the electors voting on the amendment, at an election properly ordered, adopts it, then it becomes a part of the Constitution.    So the Constitution itself says."

The Kansas court thus impliedly recognized the principle we have announced as controlling the question at issue here; and had the test of the amendment under consideration by them been made *prior* to the election, it is reasonably sure that they would have invalidated it, on the ground that it did *not* contain such provisions as are complained of in the proposition we are now considering.    Cooley's Con. Lim., p. 571.

This being in our opinion the true import of the provisions of the

measure, it is not amenable to executive veto on this account, and it is well settled by repeated judicial opinions of ability that such propositions do not require executive approval. Koehler and Lange vs. Hill, 14 N. W. Rep. 738; Hollingsworth vs. Virginia, 3 Dallas 381; The State vs. McBride, 4 Minnesota, 303; State ex rel. Stephenson vs. Tufly, 12 Pac. Rep. 835; The State vs. Swift, 69 Indiana 506.

Mr. Jamison, in his treatise on *constitutional conventions*, formulates the rule governing executive approval of propositions for the amendment of constitutions, as follows, viz:

"In every case in which a legislature intervenes in the business of fundamental legislation, it does so by some vote or resolution; and to determine whether or not, in so doing, it performs an act of legislation, the readiest mode is to examine the result of its deliberations in detail. If it have the characteristics of a law; if it appear to have been passed *by the law-making power, within the scope of its authority as such, and to furnish a rule of action to individuals*, it must be classed with acts of legislation" (p. 576).

Submitting the proposed amendment to this test, and it is clearly exempt from the charge preferred, because it was passed by the Legislature within the scope of Article 256 of the Constitution, and for the purposes therein stated; and it was not intended " to furnish a rule of action for individuals." Its clear and evident purpose was to provide the means of submitting the amendment to the people.

The same author says, in treating of the necessity of such proposition being submitted to the Governor for his approval:

"That whenever the propositions are coupled with provisions which impart to the legislative act, in whole or in part, *the force of law* * * * they ought to receive the approval and the signature of the Governor; but that when they bear only the character of *recommendations* they ought not to be submitted to the executive" (pp. 586, 587). (Italics ours.)

This view is exactly in keeping with other authorities, and with our conclusions as already announced.

(b) But conceding the absence of any duty being imposed under Article 256 of the Constitution on the Governor, in respect to his approving or disapproving proposed amendments; and even conceding the absence therefrom of any matter of ordinary legislation—yet the argument of respondent's counsel is pressed to the extremity of insisting that, because the House of Representatives by a two-

656 SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

thirds majority voted down the executive veto, and because it was not voted down by a like two-thirds vote of the Senate, the said veto became efficacious—on the theory that " the *final action* of the two houses " was not taken by a two-thirds vote; the Senate not possessing the power to *decline to* consider the veto by a simple majority vote; and the House of Representatives not possessing the power to *recede* from its former action by a simple majority vote.

If this be true, we have a most remarkable legislative dilemma presented us, viz:

1. That the Governor's veto was not defeated, because there was not a two-thirds majority vote against it in the Senate.

2. The Senate was without power to decline to take action on the veto with less than a vote of two-thirds of the members thereof concurring.

3. The House of Representatives having voted down the veto by a two-thirds majority vote it could not thereafter *recede* from that action, and concur in the action of the Senate, with less than two-thirds of the members thereof concurring.

In other words there was *no escape* from this situation otherwise than by a two-thirds vote of both houses; and, hence, the conclusion of respondent's counsel that there was never any *final action* of either house on the *amendment* by a two-thirds majority vote.

In the first place the Iowa court has, in a precisely parallel case, decided in the most unqualified terms that this proposition is erroneous.

Say the court:

" Suppose the Governor had vetoed the joint resolution and returned it with his objections to the house in which it originated, and being put upon its passage *it had failed to receive a two-thirds majority of one or both houses*, as provided in the Constitution, *would this have been fatal to the amendment? No one will contend so.*" (Italics ours.) Koehler & Lange vs. Hill, 14 Northwestern Reporter 745.

In State ex rel. Stepenson vs. Tufly, 12 Pacific Reporter 835 (Nevada), the court, in interpreting the *modus operandi* of submitting proposed amendments, under constitutional provisions almost identical with our own, after making an enumeration of the essentials, *not including approval by the Governor*, said:

" These provisions were intended to secure care and deliberation on the part of the Legislature, and *they are exclusive and controlling.*"

Those decisions are undoubtedly correct in principle, and their *dicta* are in keeping with the provisions of Article 256 of our Constitution. It only requires, as an *ultimatum*, that a proposed amendment should have received the affirmative votes of two-thirds of the members elected to *each* house, and that the yeas and nays be entered on the journals thereof. The official journals show that the requirements were fulfilled and completed on the 1st of July, 1890. That, thereafter, the enrolled bill was duly signed by the Speaker of the House and President of the Senate.

These are among the *unquestioned facts* of this case. The respondent's return does not challenge their correctness.

It is manifest, then, that the proposed amendment had, on the 1st of July, 1890, arrived at a stage of legislative perfection when there was demanded the performance of no further constitutional *action* thereon; and that all subsequent action related *exclusively* to the executive veto.

The journals show that the veto message of the Governor was submitted to and voted down by the House of Representatives on the 8th of July, 1890; and on the following day same was transmitted to the Senate, and in that body it was refused consideration by a majority vote.

It was not the *amendment*, but the *veto* message, that was acted upon; and the result was that the veto was left in force—if it possessed any—by reason of *the Senate's declination to take any action thereon.*

It could have no other effect. And we are at a loss to understand on what reason, or authority, contention to the contrary is founded; for surely the Senate was endowed with power to decline altogether to act on the veto. By taking no action, or by the action that was taken on the part of the Senate on the *veto*, its final two-thirds vote on the 1st of July, 1890, upon the *amendment*, was wholly unaffected; and this being the result of the majority vote in the Senate, on the 9th of July, 1890, it is of no consequence to inquire into or decide what was the effect of concurrence therein by the House of Representatives, by a majority vote.

The only thing the two houses could have done, to defeat any efficacy the veto had, was to have voted it down by a two-thirds majority; and, failing in this, the *status quo* remained undisturbed.

But the course pursued by the Senate has the highest sanction,

42

that of the Senate of the United States, that body having declined to entertain a motion to submit to the President, for his approval, a proposal for the amendment to the Constitution, in 1803, respecting the mode of electing President and Vice President. Jamison's Con. Con., p. 589. And the same course was pursued by the United States Senate in 1865, in relation to the thirteenth amendment: *Ibid.*, p. 589.

But suppose the respondent's proposition be admitted, for the purposes of argument, and the result would be that the alleged "final action" of the two houses, respectively, acting by *a bare majority*, had the effect of revoking their previous action by a two-thirds vote —the very thing it is contended neither house could do. For if the Senate could not, by a *majority* vote, decline to consider the *veto* at all, by how much the less could that body, by a *majority vote on the veto*, rescind their former *two-thirds vote on the amendment?* And if the House of Representatives could not, by a *majority* vote, *recede from its two-thirds vote on the veto*, by what process *said majority vote can be made to defeat its previous two-thirds vote on the amendment* is difficult to conceive.

This is *reductio ad absurdem.*

· There is a further suggestion made, as one which exercises some influence over the question of the Governor's approval of the proposed amendment, and that is that it appears to have been originally the intention of the General Assembly to have passed it over the executive veto in case of his disapproval, and that the sudden death of one Senator, just prior to the submission in the Senate of the veto message, who had theretofore favored the submission of the amendment, caused a change of programme.

To this suggestion, it is sufficient to say that an attentive examination of the transcript discloses no evidence on that subject, and no mention is made of it in answer or argument, and it is entitled to no consideration. ·

Not one of the provisions of the measure can be properly considered as coming within the purview of respondent's objection.

(d) The next proposition for our consideration is "that the said bill alleged on in relator's petition does not constitute an amendment validly submitted to the electors of this State."     *     *     *     *

"Because, even if the matters and things contained in said House

NEW ORLEANS, MAY, 1891. 659

State ex rel. Morris vs. Secretary of State.

Bill No. 214, as alleged in relator's petition, could validly be the subject matter of a constitutional amendment; said matters and things as embraced in said House Bill No. 214, even if an amendment, which is denied, constitutes more than one amendment, and the said House Bill No. 214 submits the same, if the same was validly submitted, which is denied, as *one amendment* in violation of the provisions of Article 256 of the Constitution, and that the form of said submission is deceptive and illegal." Brief, p. 14.

Concisely stated, the proposition contained in the amendment is, to incorporate into the Constitution an "*article on levees, schools, charities, pensions, drainage, and lotteries,*" and which is given the character of a contract, which stipulates that "*in consideration of the sum of one million two hundred and fifty thousand dollars* \* \* \* John A. Morris, his heirs, agents and assigns, are hereby authorized and empowered for the *term of twenty-five years ensuing the first day of January, 1894,* to prepare schemes of lotteries, to sell lottery tickets, and to draw and conduct lotteries in this State.''

Following the contracting clause is the stipulation that the money "shall be paid to the Treasurer" in instalments. Then follow other provisions stipulating how the funds shall be applied. And they require that of the total sum there shall be paid in quarterly instalments—

1. "To the public schools, $350,000 annually."
2. "To levees, $350,000 annually."
3. "To charities, $150,000 annually."
4. "To pensions, $50,000 annually."
5. "To the city of New Orleans, for drainage and other sanitary purposes, $100,000 annually."
6. "To the general fund, $250,000 annually."

Then follow other provisions in regard to these several funds, one of the most pertinent of which is that "the several sums of money above specified shall be devoted to the objects and purposes hereinbefore stated, and the General Assembly is hereby directed to carry into effect this provision by appropriate legislation."

Disencumbered of its verbiage, the foregoing is a fair analysis of the measure proposed. The question for solution is, does this proposition constitute and contain the substance of more than one

amendment, and violate, either in terms or by fair implication, the following provision of Article 256 of the Constitution, viz:

When more than one amendment shall be submitted at the same time *they shall be so submitted as to enable the electors to vote on each amendment separately.*

In determining whether the proposed amendment is amenable to the constitutional objection urged, relator's counsel makes the following admission, viz:

" But I concede that the test to be applied to ascertain the oneness of the amendment is to be found in the Article 29 of the Constitution, which provides that every law enacted by the General Assembly shall express but one object, and that shall be expressed in the title, and the oneness of a law, under that article, is tested by the oneness of the object which the law has in view; and that is the test to be applied to the oneness of an amendment. The decisions are that when a law has but one general object, which is indicated by its title, every means or end necessary to accomplish the object is embraced in the title. (Cooley Const. Limit., p. 172.) The generality of the title is no objection to the law so long as-it is not made to cover incongruous legislation. The title of the act need not be a synopsis of its contents." Brief, p. 8.

Article 29 reads as follows, viz:

Every law enacted by the General Assembly shall embrace but one object, and that be expressed in the title.

We have been unable to find, and have been cited to but one case in which this question has been treated, and that is State vs. Temme, 11 N. W. Reporter 785 (Wisconsin), in which the court say:

" We think amendments to the Constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have *different objects* and purposes in view."

That decision is in strict keeping with the provisions of Article 29 above quoted.

Keeping in view the analysis of the proposed amendment *supra*, and we take it to be clear that there is but *one object* mentioned therein, and that is the extension of relator's lottery contract for a term of twenty-five years. All other provisions and stipulations therein contained relate to the *consideration* the relator contracted to pay therefor, and the *destination, in general terms,* of the sums to be by him paid into the State treasury.

In order to fortify this argument it is only necessary to refer to the provisions of Article 167 of the Constitution, under which the charter of the Louisiana State Lottery Company, as now existing, was "recognized as a contract binding on the State for the period therein specified," and in which it is provided "that all charters (of lotteries) shall cease and expire on the 1st day of January, 1895." It is undoubtedly the extension of this identical franchise, in the name of the relator, that is intended to be accomplished by the proposed amendment.

The following is the full text of

ART. 167. The General Assembly shall have authority to grant lottery charters or privileges; provided, each charter or privilege shall pay not less than forty thousand dollars per annum in money into the treasury of the State; and provided further, that all charters shall cease and expire on the first of January, 1895, from which time all lotteries are prohibited in the State.

The forty thousand dollars per annum now provided by law to be paid by the Louisiana State Lottery Company, according to the provisions of its charter, granted in the year 1868, shall belong to the Charity Hospital of New Orleans, and the charter of said company is recognized as a contract binding on the State for the period therein specified, except its monopoly clause, which is hereby abrogated, and all laws contrary to the provisions of this article are declared null and void; provided, said company shall file a written renunciation of all its monopoly features in the office of the Secretary of State within sixty days after the ratification of this Constitution.

Of the additional sums raised by licenses on lotteries, the hospital at Shreveport shall receive ten thousand dollars annually, and the remaining sum shall be divided each year among the several parishes in the State for the benefit of their schools.

The proposed amendment extends the original franchise, in effect, twenty-five years. The amount to be paid for the lottery privileges therein enumerated is raised from $40,000 *per annum* to the sum of $1,250,000 *per annum*. Instead of the sums thus realized being destined to the Charity Hospital in the city of New Orleans and to "the hospital at Shreveport," they are destined to the several different purposes named. In the article cited, and in the proposed amendment, alike, the entire fund is to be paid into the hands of the State Treasurer. In our opinion the parallel between the two is complete.

But in counsel's brief, p. 23, we find an analysis of the amendment quite similar to the one we have submitted, and to which he appends this statement, viz:

"Do these provisions embrace more than one object? We

submit they do—that the duplicity is clear as to the following matter:

" (a) The commingling of raising revenue with several distinct objects of appropriation.

" (b) The commingling of State appropriation with a local municipal appropriation.

" (c) The appropriation of all but one of the sums for twenty-five years."

But this is altogether a different test from the one taken under Article 29 of the Constitution. This one is taken under the provisions of Article 53 of the Constitution, which provides that:

" The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the government, interest on the public debt, public school and public charities; and such bill shall be so itemized as to show for what account each and every appropriation shall be made. All other appropriations shall be made by separate bills, each embracing but one object."

These two articles are not in *pari materia*. Article 29 relates to the character of laws which the Legislature may enact; and Article 53 treats of the limitation on the legislative power in respect of making appropriations.

While unrestrained, otherwise than by Article 29, there was practically no limit upon the power of the Legislature in the making of *appropriations*, of any and every kind, in one " general appropriation bill "—appropriations being considered as having but *one* object—Article 53 still further restrained the General Assembly in this respect, and required that all appropriations, other than those specially excepted, " shall be made by separate bills, each embracing one object "—*i. e.*, one object of appropriation.

Hence it is clear that this latter test is inapplicable, and can not be accepted as the true and correct one.

But even if it were so accepted, it is our opinion that there is no " commingling of raising revenue with several distinct objects of appropriation " that did not exist in Article 167 of the Constitution; and we can not perceive what greater objection there can be in principle in commingling " State appropriations with a local municipal appropriation," under the proposed amendment, than there was and is under Article 167; for, surely, the destination of the fund to be paid annually to the State Treasurer, to the Charity Hospital

of New Orleans, to the hospital at Shreveport, and to the several parishes of the State, is just as obnoxious to Article 53 as the destination of the fund to be paid to the State Treasurer annually for the drainage and sanitation of the city of New Orleans, under the proposed amendment, is. In fine, it is to our minds difficult to conceive in what way the matters outlined as contained in the measure could be separated into two or more amendments.

This objection is not well taken.

(e) On the general question of the writ of *mandamus* going to an executive officer of the State government, for the performance of a purely ministerial duty imposed upon him by statutory enactment or constitutional provision, there can be no question, in the present state of our jurisprudence.

For a full and careful analysis of all the decisions and argument on that question, it will be sufficient to refer to State ex rel. McEnery vs. Governor, 42 An. 209, and State ex rel. Hope & Co. vs. Board, 42 An. 647, and the various authorities therein cited.

After having made a most careful and painstaking examination of all the matters and things set out in the respondent's return, as reasons why he ought not to cause said proposed amendment to be published, as the 256th Article of the Constitution requires, and having given full and fair consideration to the arguments of counsel—we have reached the deliberate conclusion that the duty of the repondent, in the premises, is fully made out, and that the judgment appealed from is erroneous and must be reversed, and the writ of *mandamus* prayed for made peremptory.

It is therefore ordered and decreed that the judgment appealed from be annulled, avoided and reversed. And proceeding to render such a judgment as should have been rendered in the court below:

It is ordered, adjudged and decreed that the writ of *mandamus* be made peremptory, and that L. F. Mason, Secretary of State for the State of Louisiana, be and he is required to cause the proposed constitutional amendment herein considered and finally determined, to be published in two newspapers published in the parish of Orleans, and in one paper in each other parish of the State in which a newspaper is published, for three months preceding the next election for representatives; and it is further ordered that the respondent begin to make said publications immediately on the expiration of five months

after this decree becomes final. It is finally ordered and decreed that the respondent be taxed with all costs of both courts.

## CONCURRING OPINION.

MCENERY, J. It is urged that a mandamus does not lie because the Secretary of. State is vested with a certain discretion; that he is vested with discretion to look into the journals of the two houses for information to see whether or not the forms of law have been observed in the enactment of a bill, or the passage of a resolution; that in this matter he is vested with discretion to determine the validity of the law which he is required to promulgate.

The mere statement of this proposition carries with it its own refutation. The Secretary of State can not go behind the official signatures which attest the verity of the bill or the resolution.

To permit him to do so would be vesting in him both executive and judicial functions. In the first it would give him the power to veto a bill, which is an executive function; and in the latter, a judicial power vested exclusively in the judiciary, both of which powers claimed by the Secretary of State are clearly in violation of Articles 14 and 15 of the Constitution of the State.

The duties of an officer who is to execute the law are clearly defined in the case of the Governor vs. Shakspeare, Mayor, 41 An. 165.

The duty of the Secretary of State, therefore, is to promulgate the laws without reference to their constitutionality; whether they have been legally enacted or not is a judicial question.

It is the province of the judiciary to interpret the law in every controversy of right, which is brought before it, and it may hold a law invalid in certain cases because in conflict with the Constitution, which is also a law, and to which every enactment of the Legislature must yield.

But the refusal of the Secretary of State to promulgate a law because in his opinion it is unconstitutional, and referring this question to the courts, is imposing upon the judiciary a decision upon the validity of a law before it has involved a wrong to any, thus giving to the judiciary, if it should sustain his pretensions, an absolute veto upon the Legislature.

It would have no parallel, except, perhaps, in the tribunal veto in .Rome, the *ultima jus tribunorum* of the Republic.

The judiciary must always resist such arbitrary action and usurpa-

tion. It is not, however, vested with superior functions to this end, and its resistance is simply that which belongs to every power defined in the Constitution, by keeping within the limits of its sphere as pointed out and defined in the Constitution.

The judiciary has no power of origination, but only of judgment and comparison. It has no power to declare what the law shall be, because it can not make its opinion constructive of the political order. But it can determine what is the statute law, and can interpret and apply the Constitution as law, and also the laws of the Legislature. This is its function as designated in the Constitution, and no other department can encroach upon it, any more than the judiciary department can encroach upon the functions of the other departments of the government.

This whole controversy might stop here, for it does not concern the Secretary, whether the formalities required for the submission of the amendment were or were not strictly complied with.

He alleges, however, that the amendment submitted by the Legislature failed to receive the Governor's approval, and that he vetoed it, thus destroying it. If it be the organic law that the Governor's signature was not required, then the reasons above stated apply to the Secretary's official duties and he can not go behind the official signatures of the presiding officers of the two houses.

The veto of an executive officer can only be exercised when his assent is necessary to perfect a law.

A proposition to amend the Constitution is not a law and can not become a law until adopted by the vote of the people. The people in their sovereign capacity, acting by units or individuals, amend their constitution just as they did when they adopted it. If the Legislature had been authorized and empowered by the people in the organic law to amend the Constitution, then as a part of the law-making power of the government, the Governor would necessarily be empowered to approve or to veto the proposed amendment. But the people have reserved to themselves the right of adopting or rejecting a proposed amendment to the Constitution.

The sovereignty of the people has its first formal expression in the convention called to form a constitution for their government. The convention represents the constructive power and intendment of the people in the formation of the constitution. It is the assertion of the will of the people in the ordination and institution of govern-

ment. The power existent in it is not withdrawn, but continually exists in it and never expires. It is the people who ordain and establish the constitution, and they act in it and through it.

The convention then which formed the Constitution of 1879 still exists in it. Therefore the people in their sovereign capacity are existent in said Constitution, and the Legislature acting as their agent, proposing amendments to the Constitution, does so, just as the convention would do if in session—as the sovereign people would do, recognizing no other authority than themselves. Jamison on Constitutional Conventions, p. 622.

Article 256 of the Constitution is as follows:    *    *    *   " Proposition for the amendment of this Constitution may be made by the General Assembly at any session thereof, and if two-thirds of the members elected to each house shall concur therein after such proposed amendments have been read in such respective houses three times on three separate days, such proposed amendment or amendments, together with the yeas and nays thereon, shall be entered on the journal, and the Secretary of State shall cause the same to be published in two newspapers published in the city of New Orleans, and in one paper in each other parish of the State in which a newspaper is published, for three months preceding the next election for representatives, at which the said amendment or amendments shall be submitted to the electors for their approval or rejection; and if a majority voting for said amendment or amendments shall approve and ratify the same, then such amendment or amendments so approved and ratified shall become a part of the Constitution. When more than one amendment shall be submitted at the same time they shall be so submitted as to enable the electors to vote on each amendment separately. The result of said election shall be made known by the proclamation of the Governor."

This article is plain and unambiguous in its meaning. It could not be plainer if it said in positive terms that the Governor should not veto the proposed amendment.

But one duty devolves upon the Governor—that is to cause to be promulgated the amendment when adopted by the people.

If there were any doubts as to the right of the Governor to veto a proposed amendment, the court should feel bound to construe the article as favoring a submission.

The constitution of a people has a two-fold character. There is a

real and a formal constitution. The one is the development of a people in history as a state or sovereign community; the other the ordained or written constitution, which is the *formula* which the people in their sovereign state prescribe for their order and government. The latter presupposes the existence of the former. The Nation, Chap. IX; Brownson's American Republic, p. 218; Hurd's Law of Freedom, Vol. 1, p. 296; Jamison's Constitutional Convention, p. 67; Generative Principles of Political Construction, De Maistre.

The formal constitution must correspond with the real. The people must find in the written constitution the reflection of their spirit, and its purpose must not be fettered or perverted by it. If it fails in this, it has elements of weakness or of peril. The neglect of this distinction between the unwritten and written constitution, and the consequent identification of the people with the formal organization, becomes the most dangerous of political falsehoods. It may so happen that the written constitution may not be in accord with the spirit of the people. They may have outgrown it—advanced beyond what they expected when it was framed.

The supreme object of the written constitution is to care for the preservation of the people. The advance of the people may be such that the constitution, without amendment to keep up with the progression, "may become itself only the mask which hides from an age its degeneracy, or the mausoleum which conceals its decay." Such a constitution could not enslave the present to the past.

Therefore the people may amend or alter the Constitution which they have framed.

The people, when they were in convention to organize the government, could not regard its course and order as perfect. With entire subjection to the Constitution, there must be in it always the expression of a higher development—the means provided for the progressive element among the people, to have some relation to the permanent organization—the manner in which the old is to be built into the new, the change which comes to be ingrooved into that which flies—not the isolation of the old from the new, but wrought out of the old into the new.

The Constitution defines the order of the people, but it can not mould the events in their history. It can not become the substitute

for the laws and .statutes which, in their immediate enactment, became the embodiment of 'a living will.

The Constitution which the convention has framed and which has been adopted, is in its very nature the supreme law, but in its provisions to make its amendments as well nigh impossible, and then to assume that it shall be exclusively and exhaustively definitive of the action of the people in all events, is a denial of the organic and moral being of the people. The prescription of the action of the people in all events and under all circumstances is not within the scope of the Constitution, and it would not be possible. It is not requisite to its stability or to the firm order of the government. The Constitution which sought to predetermine the future and to forestall the conduct of affairs in the infinite changes of time and circumstance, would presume that a people were already beyond the conditions of history. President Washington in his farewell to the people, which, for its wisdom, has no parallel in modern political literature, asserts as a fundamental right, "the right of the people to make and to alter their Constitution of government." .

Schleurmacher says: "A Constitution which has no place for amendment is absolutely immoral, for it sets itself forth as absolutely perfect; it is far more immoral than the unlimited power of the monarch."

It places the sceptre over a free people in the hands of dead men, and the only office left to the people is to build thrones out of the stones of their sepulchres. If there be, therefore, in the Constitution a provision for its amendment, and it is involved in doubt as to the means of carrying it out, it is the unquestionable duty of the court to so construe it as to make it effective, so that the proposition to amend can reach the political people. As has been above stated, the controversy in this case might cease with the inquiry into the duties of the Secretary of State, in relation to the promulgation of the laws. He has, also as stated above, no right to look into the journals of the two houses of the Legislature to find reasons for not promulgating an act, but is bound to act on the official signatures attesting the verity of the law.

There have been, however, very grave charges made against the Secretary of the Senate and Clerk of the House. They are charged directly with altering the journal of their respective houses; of adding to them matters that never took place in either house. These

charges, if true, are sufficient not only to destroy public confidence in these officers, but to impair confidence in the Legislature of the State. If such a thing was done as the falsifying of the journal, to make it appear that a law was enacted or a resolution adopted, or a proposition to amend the Constitution submitted, that never received the sanction of the two houses, certainly such a fact would reflect severely upon the legislative body, and would be almost conclusive evidence of incompetency or corruption. In the case at bar it would place the Speaker of the House of Representatives and the Lieutenant Governor of the State, and the members of the two houses who were present when the enrolled amendments were presented for the signatures of the presiding officers of each house, in the attitude, in the one case, of certifying to that which was false, and in the case of the members, of sanctioning and approving such false declarations.

I will premise what I have to say on this question by the statement of the law in relation to the evidence of the acts of the two houses. The journal of either house is evidence of the action of that house upon all matters before it. 7 Cowan, 613, Cowp. 17. It is a public record of which the courts will take judicial notice. 5 W. Va. 85, 17 An. R. 28; 16 same, 647; 94 U. S. 260.

If it should appear therefrom that any act did not receive the requisite vote, or that the act was not constitutionally adopted, the courts may adjudge the act void. Cooley Cons. Lim. 164. Every reasonable presumption is made in favor of a legislative body. It will not be presumed from the mere silence of the journals that either house disregarded a constitutional requirement in the passage of an act, unless in cases where the Constitution has required the journals to show the action that has been taken. 25 Ill. 181, 11 Ind. 424.

The journal of each is conclusive evidence of what is contained therein.

Omissions can not be supplied, nor can what is properly in the journal be taken therefrom. Article 28 of the Constitution is as follows:

" Each house shall keep a journal of its proceedings and cause the same to be published immediately after the close of the session. When practicable, the minutes of each day's session shall be printed and placed in the hands of members on the following day. The original journal shall be preserved after publication, in the office of

the Secretary of State, but there shall be required no other record thereof.''

Each house under the above article has the control of the making of its journal.

### SENATE JOURNAL.

Rule 56 of the Senate says:

'' The Secretary shall read the journal daily from the sheets on which he takes his minutes, and after being so read and corrected, and not before, the said minutes shall be examined by the president, and, if necessary, corrected and amended under the sanction of the Senate, and copies furnished to the printer, authenticated by the signature of the Secretary. The Secretary shall consider himself responsible to the Senate for the accuracy of the journal.''

The minutes are brief memoranda of what has taken place in the Senate. The Secretary then in full prepares the matter for the journal. He is, according to the rule above quoted, responsible for the accuracy of the journal. To him is delegated the power to make up the journal from the approved minutes, which he has to present to the printer, authenticated by his signature alone.

It is a fact proved conclusively in the record, that, in the matter handed to the printer, the proposed amendment was included as a part of the journal. It then became a part of it, and could not be destroyed or eliminated from the journal by any omission of the printer. If he omitted it in the slips prepared for the convenience of the members of the Senate, it was unquestionably his duty to see that it went into the journal before final publication. The rule quoted makes this his imperative duty.

It is not required by Article 256 of the Constitution that the amendment should be read in full in each house. It was read three times by title, in accordance with said article. It was, however, read in full in the Senate. The Senate's order to correct the journal is of itself a complete record of this fact. It stands in place of the Secretary's omission.

### HOUSE JOURNAL.

Rule 64 of the House—the '' proceedings of the House, when not acting in committee of the whole, shall be entered on the journal as concisely as possible, care being taken to detail a true and accurate account of the proceedings.''

Rule 67 provides: "The chief clerk shall read the journal from the sheets on which the minutes are written, and, after being so read and corrected, the said minutes shall be recorded in the journal and copies in the English language, authenticated by the signature of the chief clerk, shall be prepared for delivery at his desk to the printer by 10 o'clock on the day following that on which it shall have been read."

Rule 68 makes the clerk responsible for the correctness of the journal. To him, as in the case of the Senate Secretary, the authority is delegated to make up the journal from the approved minutes.

It is in proof that the journal was so made up, showing, in accordance with Article 256, the proposed amendment was entered on the journal.

It was also his imperative duty to see if the printer omitted to enter it on his slips prepared for convenience of the members of the House, that it formed a part of the journal before final publication. The matter indicated in the approved minutes comprise the matter of the journal of each house. The sheets and the printed slips and all other matter relating to the making up of the journal, after its final publication became worthless.

The proposed amendment, however, was read in full more than three times in the House. The "original journal" is the book publication preserved in the office of the Secretary of State.

This is conclusive evidence of what is therein contained. It shows that the requirements of Article 256 have been complied with. It was, therefore, unnecessary to review the evidence in the record, as it could not affect this original journal of the two houses. But we have done so because of the grave and serious charges against the Clerk of the House and the Secretary of the Senate. These officers have made, so far as the proposed amendment is concerned, in accordance with the rules of the two houses, an accurate journal of each house.

It is also urged by the Secretary of State that the proposed amendment violates Article 256 of the Constitution, because there is more than one amendment contained in the matter submitted. It is plain that the article of the Constitution refers to the amendment of more than one article of the Constitution. The amendment of but one article of the Constitution is proposed. But this is a matter

672          SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

which the Secretary of State can not urge for the reasons heretofore stated.

The reasons advanced by the respondent Secretary that the proposed amendment contains matter of legislation which required the Governor's approval is untenable. If the article was of such a nature as to require legislation to make it operative, and this legislation was incorporated into it on condition of its adoption, there might be some force in the position assumed by the Secretary. But on this point I am of the opinion that under the well recognized jurisprudence of this State, the part, if separable, which requires the signature or approval of the Governor, because it is legislative could be eliminated, and that part—the proposed amendment—could be maintained as constitutional.

The proposed amendment is either legislative or a proposition to amend the Constitution. It can not be both. The articles of the Constitution relating to legislation and to propositions to amend the Constitution forbid any such construction. From what has been said in the first part of this opinion in reference to the capacity in which the Legislature acts when proposing amendments to the Constitution, it is clear to my mind that the Legislature, having entire control of the matter, just as the convention had when it submitted the Constitution to the people for adoption, can direct in what manner the proposition may be submitted, provided the Constitution is silent on this point.

There is no legislation, however, connected with the proposed amendment under consideration. There is no law proposed. It is a mere regulation of the manner in which the proposition to amend may reach the voters. It passes away with the adoption or rejection of the amendment. The alleged legislation formed no part of the amendment. It can not be submitted to the electors for their approval or rejection, and, therefore, in no contigency can it form a part of the Constitution of the State.

If the legislation complained of required the Governor's signature to become law, and it failed to receive it, this was an end of it. But as it could under no circumstances form a part of the Constitution, therefore the amendment stands unaffected by the failure of the Governor to approve the legislation accompanying the amendment.

If the views urged by the defendant are adopted, then will it become impossible to amend the Constitution, in accordance with

Article 256. Nearly every amendment is accompanied by legislation.

The submission of an amendment would, therefore, require executive approval, or it could not be submitted after the Governor had vetoed the accompanying legislation, although it should be in a separate bill.

It is urged that there was no final vote by the General Assembly on the question of the submission of the amendment. It is not denied, for the journals show this fact, that two-thirds of the members elected to each house voted for it on its final passage, and the yeas and nays recorded in the journals, as required by Article 256 of the Constitution.

But it is said the *intention* of the Legislature was that the Governor should approve the proposed constitutional amendment, that it was put in the shape of a bill, was sent to the executive office, vetoed by the Governor and returned to the House, with his veto, in which it originated, thus showing that it was treated and acted upon as a bill and failed to pass over the Governor's veto.

It is conceded that a proposal to amend the Constitution does not require executive approval. How, then, can the intention of the members of the Legislature defeat it? It was in the form of a bill, yet it was a proposal to amend the Constitution. The journals of both houses, the briefs and argments of counsel, all show this. It was sent to the Governor's office and receipted for as a bill. But this did not change its nature. It was still a proposal to amend the Constitution, having received the required vote, and having passed through all the formal stages of its existence, as required by Article 256 of the Constitution.

We sometimes look into the reasons for the passage of a law to find out the intention of the Legislature in enacting it, in order to properly interpret it where it is ambiguous; but never where the law is free from ambiguity.

That the Legislature did not intend to enact a law can not be urged as a reason for its nullity. This is too plain for argument. There is nothing, however, in the alleged legislation that requires executive approval. There is nothing in it which, as a rule, principle or method of action, the community is to recognize and enforce, so as to regulate, limit or protect the conduct of its members.

Section 2 requires the Secretary of State to give notice of the pro-

43*

674        SUPREME COURT OF LOUISIANA

State ex rel. Morris vs. Secretary of State.

posal to amend the Constitution within ninety days after the 1st of January, 1891. The Constitution requires the same length of time in giving the notice preceding the election. It does not say *immediately* preceding.

It seems to be eminently fit and proper, in the absence of any particular time, that the Legislature should designate, in the submission of the amendment, the day on which it should be first published, in order that it reach the voter with certainty.

Section 3 prescribes the duties of the several officers who conduct the election. These are already prescribed by law, and the section is declaratory of what the law is.

In the absence of executive proclamation, it will not be denied that these officials, in pursuance of law, would have the right to give the requisite notices. The people also have the undoubted right, on failure of the proper officers to give the required notice, to vote on the day fixed by law for the election.

I think the various pretexts set up by defendant are the merest technicalities. If they are to be approved, there is a virtual denial of the sovereignty of the people. The people might at once abdicate their boasted power and bestow it upon a chosen few.* In the instant case it would be bestowing it upon several, each independent of the other, and, in their respective spheres of action, each supreme.

The General Assembly may enact a law, but it is in the power of the Secretary of the Senate and Clerk of the House to defeat it.

These officers may do their duty, yet the public printer may defeat the law.

He may do his duty. A law may have gone through all the regular stages of its passage, and finally reach the Secretary of State. He at once becomes the supreme arbiter. In him are centered all the functions of the executive and judiciary departments. He can veto a bill that has passed executive scrutiny. He can usurp the functions of the judge, and declare the law unconstitutional, which he is required to promulgate. If this is to be tolerated, what kind of government have we ? It is not republican—it is a nondescript. There is nothing like it in the history of the world.

That portion of the alleged legislation relating to the form of the ballot does not change existing laws. There is no law requiring any

particular form for the ballot to be cast on the submission of the amendment.

It was, therefore, in the absence of such legislation, competent for the Legislature to instruct in what form the ballot should be cast for a proposal to amend the Constitution.   Section 4 of Act 101 of 1882, requiring a printed ticket, has exclusive reference to candidates for office. It says: "That all the names of persons voted for shall be printed on one ticket or ballot of white paper, of uniform size and quality, to be furnished by the Secretary of State at a charge of five per centum over and above the actual cost of said paper, and the names of persons voted for and the offices for which they are voted shall be accurately specified." Manifestly this can not apply to the ticket to be voted for on the submission of the proposed amendment.

"The prohibitory amendment cases," reported in 24 Kansas, p. 700, and decided by Judge Brewer, now one of the Associate Justices of the Supreme Court of the United States, are instructive in the consideration of the instant case.   The provisions for amending the Constitution of Kansas are *identical* with Article 256 of our Constitution.   Article 256 was evidently taken from the Constitution of Kansas, and must, therefore, be interpreted by the construction placed upon it by the courts of that State.

The proposed amendment to the Constitution of Kansas did not appear upon the journal of either house of the Legislature of Kansas. It was held by the court that the failure to spread the amendment on the journals was not one of the essentials to its validity.   The court said: " The two important vital elements in any constitutional amendment are the attest of two-thirds of the Legislature and a majority of the popular vote.   Beyond this other provisions are mere forms.   They may not be disregarded, because by them certainty as to the essentials is secured.   But they are not themselves the essentials."   *   *   *

" The records of the proceedings of the two houses are made not by the houses themselves, but by clerical officers.   True, they are under the control of the respective houses, but in fact, the records are made by clerks.   May they defeat the legislative will?   The Constitution does not make amendments dependent upon their approval or their action.   To insure certainty and guard against mistake, journal evidence of the amendment and votes is prescribed,

676          SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.
but this is mere matter of evidence and not the substantial condition of constitutional change. In Leavenworth City vs. Higginbotham, 17 Kas. 62, a law was upheld, although the signature of the presiding officer of the Senate was never affixed to it as the Constitution prescribes, and although the yeas and nays were not entered on the journal of the Senate on its concurrence in certain slight amendments made by the House. See also *Davison, of Hasad County,* 15 Kas. 194."

The second issue made in this case was that, in the submission of the amendment, "no provision was made for receiving, counting or canvassing votes; that, therefore, the action of the election board, county commissioners and State canvassers was without warrant of law and void, and that the court has and can have no legal evidence that a majority of these votes cast upon this amendment was in favor of it; and finally that two amendments having been submitted, an examination of the votes by precincts shows that a majority of all the voters on the two amendments was not cast in favor of this."

In the opinion of the court it was said: "It must be conceded that this proposition has great force," and a large part of the abel argument of the learned judge was directed to demonstrate the validity of the amendment, notwithstanding the absence from it of any provisions as to the manner in which it was to be submitted. In the case at bar these omissions as to the mode of submission have been supplied, and yet this is made the reason for the invalidity of the proposed amendment. In our election law there is no provision made as to the manner in which a proposal to an amendment to the Constitution shall be voted for, in what manner the ballot shall be arranged. If these matters had been omitted, it is more than likely that this defect would have been urged with as much vigor as their insertion in the amendment has provoked.

The question of prohibition in Kansas excited the people of Kansas to the degree that the present proposed amendment to our Constitution has agitated the people of Louisiana.

With a quotation from the opinion of Justice Brewer in the case referred to, which is appropriate to the case under investigation, I will conclude:

" On the one hand we have been told that this is a crowning effort of a brave and earnest people to free itself from the curse of intoxi-

cation; on the other, that it is a departure from the wisdom and experience of the past, a radical change of policy, trespassing upon personal liberty and rights of property.

" But questions of policy are not questions for the courts.   They are wrought out and fought out in the Legislature and before the people.   Here the single question is one of power.   We make no laws; we change no constitutions; we inaugurate no policy.   When the Legislature enacts a law, the only question which we can decide is whether the limitations of the Constitution have been infringed upon.   When a constitutional amendment has been submitted, the single inquiry for us is whether it has received the sanction of popu- lar approval in the manner prescribed by the fundamental law.   So that whatever may be the individual opinion of the justices of this court as to the wisdom or folly of any law or constitutional amend- ment, and notwithstanding the right which, as individual citizens, we may exercise with all other citizens in expressing through the ballot box our personal approval or disapproval of proposed consti- tutional changes—as a court, our single inquiry is, have constitu- tional requirements been observed and limits of power been regarded?   We have no veto.   The judge who casts his individual opinions of wisdom or policy into the discussions of questions of constitutional limitations and powers, simply usurps a prerogative never committed to him in the wise distribution of duties made by the people in their fundamental law."

I concur in the opinion and decree, and assign these reasons therefor.

## CONCURRING OPINION.

BERMUDEZ, C. J.   There can be no doubt that many of the issues presented in this memorable litigation involve constitutional ques- tions of a high character, touching which honest minds may plausibly differ.

They have commanded and received the most patient and impar- tial consideration of the Justices who compose this court, but who, notwithstanding the most earnest desire which actuated them, to reach a correct and similar conclusion, have been unable to agree upon a unanimous solution.

Apparently the questions to be determined seem very plain.   Re- duced to their simplest expression, they are merely:

Whether or not the Secretary of State shall be compelled, by the

678            SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

process of this court, to publish, during the time and in the manner prescribed by the organic law, *that* legislative action which is represented to him as a proposed amendment of the Constitution, by the General Assembly, with the view that the same be submitted to the people at the next general election of Representatives; yet the subject bristles with difficulties.

The elaborate views delivered establish that the forms through which the *project* is required to pass, have substantially been observed, and that it is the ministerial duty of the Secretary of State to give it the demanded publicity, in order that it may be known and voted upon, *for* or *against*, by the qualified electors in the State at the following general election.

It would serve no useful purpose *here* to enumerate and discuss the numerous objections set up to resist the publication asked.

It suffices to say that the record establishes *prima facie,* at least, without stronger counter proof, that the proposed amendment was offered, read, spread on the journals, voted upon in both houses of the Legislature, in point of time and manner, and was published in the official papers according to custom and rule, as the Constitution requires; that there existed no necessity to transmit it to the executive for approval, and that the *veto* put to it was an idle and vain ceremony; that the vote cast thereafter, to, pass the amendment over the Governor's veto, was superfluous, and did not, *failing,* do away with the previous final action upon it, which had to stand and stood, *as* it never was recalled; that it is immaterial in what form the proposed amendment was drafted, whether with or without a title; that it had but one object, which needed not to be expressed in a title; that, if it be assailable on any technical ground, no sufficient reason has been adduced and proof furnished, to blot it out of existence; that practically it is nothing but the mere proposal of an agent to a principal, which the latter by ratification or repudiation may bring into life or absolutely annihilate.

The proposed amendment is tendered by two-thirds of all the members elect of both houses of the General Assembly, in whose judgment it is in suitable shape and has passed after a reasonably full observance of all constitutional strict exigencies.

It would seem that the importance of the subject has been somewhat unnecessarily magnified, as the judgment of this court will *not,*

*proprio vigore*, .engraft and rivet the proposed amendment on the Constitution.

The solitary effect of that judgment will be that the Secretary of State shall publish the proposed amendment during the prescribed period, in the manner required, for subsequent submission to the people.

If, by the terms of the Constitution, the Legislature could, of its own motion, amend the organic law without consulting the people, surely a more rigid compliance with the prescribed forms would have to be exacted; but as the Constitution merely enables the General Assembly to *propose* amendments to the people, the question of irreproachable fulfilment loses its gravity, and substantial, reasonable adherence must be held as satisfactory.

An amendment to the Constitution proposed by the General Assembly goes to the people, as ordinary legislation by that body goes to the executive, for approval or disapproval, with this difference, that the Governor's veto may be passed over, while the adverse action of the people on the proposed amendment is insuperable. The people, being substituted to the Governor, has *alone* the power to veto it, and no other authority, however honestly exercised, can supplant it.

It may not be out of place here to remark that, in vetoing the proposed amendment, the Governor no doubt deemed himself justified in doing so, not only by his own appreciation of the subject matter, but also because of precedents in which similar amendments had been submitted to executive consideration, and because, in the instant case, the amendment had been actually transmitted to him, thus inviting his views in relation to it.

If the veto of the people is put upon the proposed amendment, it will annihilate the measure completely, as absolutely as their approval or ratification of it will quicken and vivify it, and thus make it as much a component part of the organic law as if it had originally been incorporated into it.

It takes my concurrence to have it declared whether the proposed amendment shall or shall not be published, to be submitted to the people.

Realizing the grave responsibility which rests upon me and appreciating the weighty consequences which, for weal or woe, may be entailed, whether the amendment proposed be published or not, I

must yield, after ripened deliberation, to my sense of duty to the people, controlled, as the conclusion is, by the unbiased prompting of my best will, judgment and conscience.

These uniting, dictate that I shall not thwart the important legislative action and muzzle the mouth of the people on a question of such magnitude, so deeply affecting their most vital interest, but that I must let the people adjudge and speak for themselves.

I therefore concur in the decree.

### DISSENTING OPINION.

FENNER, J.    Into the calm precincts of this court, this case brings nothing but cold questions of law and fact, which must be determined according to the same principles and methods which are applied in all other cases. I shall endeavor to express the reasons for my opinion in language clear, concise, and free from legal technicalities, so as to be of easy comprehension by every citizen.

The relator invokes the writ of mandamus to order and compel the Secretary of State to make publication, in conformity to law, of a proposed amendment to the Constitution of the State, which publication is made, by the Constitution itself, a prerequisite to the submission of the amendment to the electors of the State for approval or rejection.

The contention as to whether this is, or is not, a ministerial duty proper to be enforced by mandamus, may be dismissed with the self-evident remark that, if it is a duty at all, it is a ministerial duty.

It would be preposterous to hold that the Secretary of State could interpose his mere will or alleged discretion as a barrier which would prevent constitutional amendments, duly proposed by the General Assembly, from reaching the people for their approval or rejection. This would place it in his power practically to nullify the constitutional provision and the legislative action in pursuance thereof.

While such a pretension is set up in the defendant's answer, I must do the learned Attorney General the justice to say that he has substantially waived it before this court.   On the other hand, it is necessarily true that every public officer, when called upon to perform an act, the doing of which is claimed to be a duty imposed on him by law, has the right to determine for himself, primarily, whether the law does or does not impose such duty.   If he determine that the law does not impose the duty required, he may decline

to perform it. But if the duty asserted be one which, if it exist at all, is of a purely ministerial character, as we hold the one here involved to be, the party aggrieved by his refusal is not deprived of redress. He may apply to the judicial power to declare that the duty claimed is imposed by law and to compel the officer to perform. Such are the purpose and function of the extraordinary writ of mandamus, which is the appropriate remedy and is properly invoked by relator if the allegations of his petition be true.

The case, therefore, presents for our determination the clear and well-defined issue, whether or not, under the law, it is the duty of respondent to make the required publication.

Suggestion is made and even insisted on, that because, in declining to comply with the demand of relator when made before suit, the respondent assigned only one ground for his refusal, he is thereby estopped from setting up any other grounds in his answer to the mandamus. No such estoppel can apply. The question involved is, duty *vel non?* It is a matter of public concern. The duty arises from the law and from compliance with the conditions prescribed thereby. It can not be affected by the acts or omissions of respondent.

It is the duty of relator to show every fact essential to give rise to the duty. It is the right of respondent to propound and prove every defence of law or fact which negatives the duty.

Under the very language of the Constitution, the duty of the Secretary of State to publish a proposed constitutional amendment is purely conditional.

Article 256 of the Constitution is as follows: " Propositions for the amendment of this Constitution may be made by the General Assembly at any session thereof, and if two-thirds of all the members elected to each house shall concur therein, *after* such proposed amendments have been read in such respective houses on three separate days, such proposed amendment or amendments, together with the yeas and nays thereon, shall be entered on the journal, and the Secretary of State shall cause the same to be published   *   *   for three months preceding the next election for Representatives, at which time the amendment or amendments shall be submitted to the electors for their approval or rejection," etc.

Thus, under the express terms of the Constitution, the duty of the Secretary of State to publish only arises if the following named conditions precedent have been complied with, viz:

1. The proposition for amendment must be made by the General Assembly.

2. The amendment must be read in each house on three separate days.

3. The amendment must be concurred in by two-thirds of all the members elected to each house.

4. The amendment, together with the yeas and nays thereon, must be entered on the journal.

The relator asserts, and the respondent denies, that all these conditions have been fulfilled.

This presents the gist of the controversy. If the conditions have been fulfilled, the duty of the respondent has arisen and he must perform it. If all or any of the conditions have not been complied with, the duty has not arisen and relator's demand must be rejected.

I can not stop to discuss the proposition that the Secretary of State is bound to perform the act required of him, whether the conditions have been complied with or not. No such issue is presented in this case. The relator bases his demand exclusively on the ground that all these conditions have been scrupulously fulfilled; the respondent bases his defence exclusively on the denial that they have been fulfilled. This is the sole issue presented for our determination. It is our clear duty to decide it. If the conditions have not been complied with, the publication and the election itself would be vain and nugatory; and even after the election, on proof of such non-compliance, the amendment would be void, and it would be the duty of the judiciary so to pronounce it. This is so conclusively settled by authority that it is only necessary to refer to Judge Cooley's work on Constitutional Limitations, who cites and approves the decisions to that effect. This is no doubt the very reason which prompted the framers of the Constitution to make the duty of publication and submission expressly conditional, in order that such questions might be raised and decided in advance, and that the people might be saved the trouble and expense of a fruitless canvass and election. See State ex rel. Forsyth vs. Judge, 42 An. 1104.

The most general and fundamental question presented for our determination is whether or not propositions to amend the Constitution are, like other legislative acts, subject to executive approval or veto. This question is subdivided into two, which must be separately considered, viz:

1. Whether proposed amendments, necessarily and in all cases, are subject to executive approval before becoming final.

2. Whether this particular proposition, in manner and form as adopted, required, for its finality, submission to the executive and passage over his veto.

1. A very strong argument in favor of the necessity of executive coöperation is made, based on the principle of construing all articles of the Constitution together, and with special reference to Articles 73, 75 and 199. Article 73 declares that " every bill which shall have passed both houses, shall be presented to the Governor," proceeding then to provide the method for his approval or veto, etc.

Article 75 declares: " Every order, resolution or vote, to which the concurrence of both houses is necessary, except on a question of adjournment, or on matters of parliamentary proceedings, or an address for removal from office, shall be presented to the Governor, and before it shall take effect be approved by him; or being disapproved, shall be repassed by two-thirds of the members elected to each house."

It is contended with great force that these provisions are very sweeping in their effect, and made more so by the exceptions introduced into Article 75. Special reference is made to the exception of the address for removal from office under Article 199, which is very similar in character to Article 256 in regard to amendments. The Article 199 is as follows: " For any reasonable cause the Governor shall remove any officer on the address of two-thirds of the members elected to each house of the General Assembly. In every such case the cause or causes for which such removal may be required shall be stated at length in the address and inserted in the journal of each house."

Now, nobody would conceive for a moment that such an address, made by the houses to the Governor, would require his approval before it could be adopted and presented to him. The thing is absurd upon its face. Its omission from the exceptions stated in Article 75 could not have affected the case and its inclusion among said exceptions was purely superfluous. Its insertion was doubtless due to the over-caution of some member, to whose mind the address from office happened to present itself when considering the broad terms of the article, and it was accepted as doing no possible harm. I can not think that the omission of propositions for amendments to

the Constitution from the exceptions stated should have effect to subject them to the general provision of Article 75, because the terms of Article 256 are inconsistent with such subjection.

Article 256 plainly declares that such propositions may be made by the General Assembly, and "if two-thirds of all the members shall concur therein," after reading and entry on the journal, "the Secretary of State shall cause the same to be published," etc. and the amendments "shall be submitted to the electors," etc. No principle of construction could justify us in adding to the conditions expressly stated in the article, which do not include the necessity of the Governor's coöperation.

Canons of construction, after all, are only guides to reach the true meaning when it is obscure or doubtful. When the meaning as expressed is clear and unambiguous, there is no necessity for resorting to them.

Further reference is made to the fact that the several amendments which have been proposed and submitted since the adoption to the Constitution, have in every case been submitted to the Governor for approval, and this is invoked as a legislative and executive interpretation of the Constitution entitled to great weight in judicial construction. But it will be found that every one of the amendments referred to contained, in addition to the proposed amendments themselves, legislative provisions touching the method of submission and regulating the duties of officers, which were to have immediate effect as law, and could not be operative without executive coöperation. As applied to such measures, no doubt the uniform legislative and executive practice is entitled to great and controlling weight, but it does not affect the general proposition now under discussion. My opinion is clear that the Legislature may, by joint resolution containing no legislative matter, validly propose amendments without the necessity of executive sanction.

2. I now reach what I consider to be the pivotal point in the case, and that is whether or not this proposed amendment has been finally concurred in by two-thirds of the members elected to each house.

No one, I take it, will dispute that the concurrence required by the Constitution means a final concurrence—concurrence on a final vote, which has passed beyond reconsideration and can not be recalled.

The process of legislation, as constitutionally conducted, has various stages, expressly prescribed and designed to prevent rash and

hasty action, and to give members time to reflect and discuss and to reconsider their previous votes, if they see reason to change them.

No legislative act can be considered as finally passed, no vote as final and conclusive, until the measure has gone through all the stages during which, under parliamentary law, votes may be retaken and changed. As heretofore indicated, I have no doubt of the power of the two houses of the General Assembly, by a simple joint resolution passed in conformity to the requirements of Article 196, to have validly adopted this proposition for amendment, without the necessity of presenting it to the Governor at all. But they have not chosen to pursue this course.

They have embodied the proposed amendment in the form of an ordinary bill or legislative act, entitled "An act to provide," etc. They have embraced in the bill legislative provisions entirely separate from the amendment, which required the Governor's approval before they could have the force of law.

The following are the provisions referred to:

"Sec. 2. Be it further enacted, That it shall be the duty of the Secretary of State to publish the foregoing proposed amendment, in accordance with the provisions of Article 256 of the Constitution, within ninety days after the first day of January, in the year eighteen hundred and ninety-one.

"Sec. 3. Be it further enacted, That at the next general election all electors who desire to vote for said amendment shall write or print upon their ballots the words, 'for the levees, schools, charities, pensions, drainage and lotteries amendment;' and all electors who desire to vote at said election against said amendment shall write or print upon their ballots the words, 'against the levees, schools, charities, pensions, drainage and lotteries amendment.'

"Sec. 4. Be it further enacted, etc., That all officers charged with elections or the conduct or returns thereof, under the general election laws, shall at the time they give notice of the said general election also give notice of the election herein ordered for the adoption or rejection of the proposed amendment, and shall, without other direction or authority than is herein contained, make due returns of said election in conformity with the general election laws, in so far as they are not inconsistent with, or in conflict with, this act."

It is impossible to deny that these provisions are distinctly legislative in their character. They prescribe rules of conduct for officers

686        SUPREME COURT OF LOUISIANA.

State ex rel. Morris vs. Secretary of State.

of the State, differing in several respects from those imposed by any previously existing legislation.   Thus Section 2 makes it the duty of the Secretary of State to publish the amendment " within ninety days after the 1st day of January in the year 1890."   The Constitution, Article 156, only required him to publish " for three months next preceding the next election for Representatives," which does not take place until 1892.

In the petition of the relator we find the averment that, " under the terms of the second section of said proposed amendment it is made the duty of the Secretary of State to make such publication within ninety days after the first day of January, 1891."   The specific relief asked, and actually granted, in the decree of this court is that he " shall begin such publication within ninety days from the first day of January, 1891."   This is claimed to be a duty imposed by law.   By what law?   By the second section of this act.   If it is not a law the duty is not imposed.   If it is a law, it required Executive coöperation to make it so.

If the elaborate sections referred to mean nothing, and made no change in existing law, why were they so carefully prepared and inserted, and why are they appealed to as the measure and foundation of the duty, performance of which is demanded in this case?

Section 3 prescribes the form of ballot and declares that it may be either *written* or *printed*, whereas the general election law of the State requires the use of printed ballots only.

Section 4 prescribes the giving of a particular notice, and directs the returning officers to make their returns according to " the general election laws, *in so far as they are not inconsistent with the provisions of this act*," which means that they must count and return *written* as well as *printed* ballots, which is contrary to and inconsistent with the general election laws.

All these provisions are to have legal force and effect at once, and are not submitted to, or dependent upon, the vote of the people.

Whence do the two houses of the General Assembly derive the power to adopt such legislation without the coöperation of the Executive?   Certainly no such power is conferred by Article 256 of the Constitution, and it is conclusively negatived by Articles 73 and 75. This subject has been fully treated by Mr. Jamison in his able work on constitutional conventions.   He draws the distinction between that sort of legislative action in such matters which is *ministerial* in

NEW ORLEANS, MAY, 1891.                    687

State ex rel. Morris vs. Secretary of State.

character and that which is *legislative*. To the *ministerial* class, he assigns, "that in which legislatures merely, by resolution, declare the adcption of specific amendments to be expedient, as a preliminary step toward submitting them to a vote of the people." But, he adds: "The general course in these cases is for the Legislature, after the appropriate preliminaries, to require the electors, on a day specified, to cast their votes for or against the amendments, laying down, for the direction of the public officers, as well as of the voters, the specific injunctions needed to secure an adquate and honest expression of the public will. Can a reason be conceived why the intervention of a Legislature in thisbusiness, prescribing rules of conduct, and denouncing, as it commorly does, penalties for acts of disobedience, should not be considered an act of legislation as much as when it takes steps identicalin character, but respecting interests that are temporary and trivial?" Secs. 547, 548.

Recurring to this subject, he says: "The question has been raised, whether or not propositions for specific amendments, made by a Legislature, under the constitutional provisions referred to, ought to be submitted to the Executive for approval. Judging of this question from *a priori* considerations, it seems that the answer should be that whenever the propositions are coupled with provisions which impart to the legislative act, in whole or in part, the force of law, according to the principles above explained, they ought to receive the approval and signature of the Executive; but when they bear only the character of recommendations, they ought not to be submitted to the Executive. The reason for this distinction is simple. By our Constitutions, all acts of the Legislature, before they can become operative *as laws*, must receive the sanction and signature of the executive branch of the government. An act which is not legislative in its nature, and when perfect and operative to the full extent intended by its framers, is yet destitute of all vigor as a law, not coming within the terms of the constitutional provisions, would clearly not be subject to the same conditions." Sec. 556.

He further shows that in the States of Connecticut, Massachusetts, New York, Michigan, Minnesota and Maine, having provisions for amendment similar to or analogous to those of our Constitution, the practice is uniform, that whenever the proposed amendments are embodied in a bill with further provisions of a legislative character,

regulating the manner and proceedings to be followed in submitting them to the people, such bills are presented to the Governor for approval. And in cases where the propositions of amendment are passed alone in one resolution, and the regulations for submission are made in a separate act, the former is not submitted to the Executive, but the latter is submitted. Sec. 561.

To this I may add the uniform and unvarying practice in this State, which has been, as already indicated, without exception, to submit proposed amendments, when coupled with legislative proceedings, to the Executive.

While the opinions of Mr. Jamieson are not cited as binding authority, they are recommended by the solid reasons on which they rest; and it is satisfactory to find that so able a jurist, considering the question dispassionately and free from all excitement or prejudice, confirms the conclusions which I have felt compelled to adopt.

It is claimed, however, that even conceding that the legislative sections of the bill have failed of adoption by reason of the Governor's veto, yet the proposition of amendment, not requiring executive approval, still stands as constitutionally adopted. Whatever merit this contention might have from other points of view, it is a clear begging of the question at present under discussion, which is, whether the amendment has been *finally* concurred in by two-thirds of the members of each house.

I well understand that legislative acts, which have been passed by the General Assembly, may contain provisions, some of which are constitutional, and others unconstitutional; and that, in proper cases, the courts may give effect to the former, and annul the latter. But I am unable to comprehend how any legislative measure, presented as a whole, voted on as a whole, and dealt with throughout as a whole, can possibly reach a position in which it can be said that part of it has passed and another part has not passed. No such anomaly has ever, to my knowledge, been presented or approved.

The bill, in the form adopted, was one requiring executive sanction. It held out to every member of both houses the assurance, as distinct as if it had been written on its face, that before it was finally adopted it should go to the Executive for his approval or veto, and that, if vetoed, it should return to the houses and be passed over his veto.

The whole course pursued indicates this understanding. We

NEW ORLEANS, MAY, 1891. 689

State ex rel. Morris vs. Secretary of State.

gather from the index to the journal of the House a summary of the proceedings had, from which we learn that after the Senate amendment had been concurred in the bill was enrolled, and on July 1 was "signed by the Speaker and Lieutenant Governor, and taken to the Governor and Secretary of State;" that on July 2 its receipt was acknowledged; that on July 7 it was "received in the House from the Governor with a message containing objections, which was read, and consideration of same fixed as special order for July 8, 1890, at 2 o'clock P. M.;" that on July 9 it was taken up as a special order, read in full, roll called on question will the House, *after reconsideration* pass the bill—yeas 66, nays 31—passed, the veto of the Governor to the contrary notwithstanding; the bill, with the message of the Governor, was taken to the Senate Chamber immediately after the vote was recorded."

Turning then to the journal of the Senate, we find that, after the bill and message were received, a vote was passed returning the bill, and message to the calendar.

Subsequently a motion was made to "reconsider the vote by which the House Bill No. 214 and the veto message were returned to the calendar," which was adopted.

Then a motion was adopted to refer to the judiciary committee the bill and message, with *instructions to report whether* "House Bill No. 214 is of such a matter as to require the Governor's approval or disapproval."

That committee reported, by majority, with a resolution denying the power of the Governor to veto such a bill, and directing that the veto be returned to the House, and that a copy of the resolution be sent to the Governor. This resolution was finally adopted by a vote of 22 yeas to 12 nays.

The bill and veto, together with a copy of the resolution, were then transmitted to and received by the House, which thereupon adopted the following resolution by a vote of 61 to 27; 10 absent:

"The Senate having refused to consider the veto message of the Governor, on House Bill No. 214, which bill is an amendment to the Constitution passed by the requisite two-thirds majority of all the members elected to both houses, and as the action of the Senate denying the right or authority of the Governor to veto a constitutional amendment is in entire accordance with the views of this House, I move that it is the sense of this House that we heartily agree and

44

·concur in the action of the Senate, and adopt their reasons as ours, and that the Clerk of the House be instructed to deliver to the Secretary of State, for promulgation, enrolled House Bill No. 214, with a certified copy of the proceedings of this House on the said bill ·and to take the receipt of the Secretary of State for the same."

This was the final step in the legislative consideration of this bill. It will be observed that neither the resolution of the Senate nor that of the House received the vote of two-thirds of the members elected to the respective houses. They can, therefore, form no factor in the question whether or not the bill was finally passed. If the resolutions were necessary to give finality to the passage of the bill, they were unavailing for want of the necessary majority of two-thirds.

If the resolutions were unnecessary, they should be disregarded, and then how would the matter stand?

We would have a constitutional amendment embodied in a bill ·containing, in addition to the amendment, legislative provisions requiring submission to the Executive; sent to the Executive for his ·official action; returned to the house in which it originated with an executive veto; taken up in the House and passed over the veto; sent to the Senate for its action, and no action taken.

Can such a measure be said to be finally passed?

When the veto reached the House the vote was taken on the following question: "Will the House, on *reconsideration*, pass the bill, the veto of the Governor to the contrary notwithstanding?" Does not this assert the right of the House to *reconsider* the bill? If on ·such reconsideration some of those who had formerly voted for the bill had voted to sustain the veto, destroying the requisite two-thirds majority, would not that have been an end to the bill? But if the House had and exercised the right to *reconsider* the bill, how can the same right be denied to the Senate? and how can such right be destroyed or nullified by the action of a mere majority of the Senate, in a matter which could only be finally and effectively acted on by two-thirds?

It seems to me indisputably clear that this amendment has never been finally concurred in by the requisite majority of the two houses; that the votes by which it was adopted were not intended or understood to be final and beyond reconsideration; that it was necessary, in the shape in which the bill was framed, that it should be sub-

mitted to the Governor; that it was the understanding of all that the bill should be so submitted, and that it should be reconsidered and a final vote taken on the passage over his veto.

The correctness of this view is placed beyond dispute by the history of another constitutional amendment proposed at the same session of this General Assembly, viz: House Bill No. 21, entitled "Joint resolution proposing to submit to the electors of the State an amendment to Article 229 of the Constitution relative to public education." In form and substance it is far less suggestive of the necessity of submission to the Executive than Bill No. 214 involved in this case. Yet, after having been passed by the requisite two-thirds of each house, it was sent to the Governor, and was returned by him with his veto on the same day that the veto of Bill No. 214 was received. The only action taken on this veto by either house was a motion passed by the House of Representatives "that further consideration of the Governor's veto message be indefinitely postponed." I do not understand that any one contends that this proposed amendment has been finally passed by the two houses, or should be submitted to the electors. Yet what is the difference in the *status* of Bill 21 and Bill 214? Both were passed in precisely the same manner; both were submitted to the Governor; both were vetoed by the Governor; neither has been passed over the Governor's veto. Yet we are told that one has been finally passed and that the other has not. Why? There is but one possible reason that can be assigned, and that is the resolutions adopted by the House and Senate regarding the veto of Bill No. 214. But that concedes that, after the veto by the Governor, *some* further action by the houses was essential to give finality to its passage. I have shown that the resolutions did not receive the two-thirds vote of either house. How is it possible, I ask, that the action of a mere majority of the houses can give finality to the passage of a measure which the Constitution prescribes can only be passed with the final concurrence of "two-thirds of the members elected to each house?"

I am firmly convinced that this position is unassailable, and that this proposition of amendment has not been finally adopted in accordance with the requirements of the Constitution. The simple, patent, undisguisable fact is, that the friends of the measures intended and undertook to pass it in a form and in conjunction with legislative provisions which required submission to the Governor,

and in case of his veto required passage over his veto before it could be finally adopted. They successfully carried the measure through all the requisite stages, including passage over the veto by the House, until it reached the Senate. There, owing to the illness and death of a member of the majority, they lost the strength to pass the bill over the veto, and the measure failed. It is said that the record furnishes no evidence on this point. If that were so, certainly it would be improper for me to refer to it; but the journals of the two houses are in evidence, and they show the fact conclusively. Senator J. Fisher Smith is recorded as one of the two-thirds who voted originally on the bill. He was absent at all votes taken after the Governor's veto. The following resolution was offered on the 9th of July by Senator Posey:

"I move under and by virtue of Article 33 of the Constitution that the Senate, with the consent of the House, shall proceed at 12 o'clock M., July 10, 1890, to the Mayer Hotel, where our brother Senator J. Fisher Smith lies physically ill, but sound in mind, and in accordance with his request, that the Senate then and there do sit to vote upon His Excellency's veto message on the lottery amendment, which is known as Bill 214 of the House."

This shows his illness on the day when the veto was under consideration; and on the following day his death was announced to the Senate, and appropriate resolutions were passed in his memory.

The recorded votes show that at no stage of the proceedings did the measure receive the two-thirds vote required without counting the vote of Senator Smith. Therefore, the record justifies me in saying that, owing to his illness and death, its supporters lost the power to pass the bill over the Governor's veto, and the bill failed to pass.

The attempt of the mere majority of the houses, in this emergency, to " change its foot," and to give ex post facto finality to the original vote upon the bill, ignores and contradicts all the subsequent proceedings. The sending of the bill to the Governor declared that the bill was not finally passed. The action of the House in receiving the Governor's veto, in returning the bill to the calendar, in reconsidering the bill and passing it over the Governor's veto, declared that the bill was not finally passed. The action of the Senate in returning the bill to the calendar, declared that the bill required further action, and was not finally passed. Every member

NEW ORLEANS, MAY, 1891. 693

State ex rel. Morris vs. Secretary of State.

of the majority is committed by his own votes to these solemn, authentic and official declarations.

Resolutions passed by a mere majority of each house can not effect the final passage of a bill, which could not be passed without a two-thirds vote, and which more than two-thirds of at least one house, by its vote in reconsidering the bill and passing it over the Governor's veto, had solemnly acknowledged and declared was not finally passed.

A *dictum* is quoted from a decision of the Supreme Court of Iowa, in the case of Koehler vs. Hill, in which it is suggested that a veto by the Governor and failure to pass it over the veto would not invalidate the passage of the amendment. This *dictum* is purest *obiter*, and, moreover, a reference to the case shows that the proposition for amendment to which it is applied was a simple joint resolution, containing no legislative provisions, and not one word beyond the proposed amendment itself. As to such a proposition of amendment, I have already expressed my opinion that it did not require the Governor's approval and his veto might well be considered non-effective. The *dictum* is not only *obiter*, but it has not the slightest application to the instant case.

I am, therefore, bound to hold that this amendment has never received the final concurrence of two-thirds of the members elected to each house, and indeed, what is still more radical, that this proposition for amendment " has not been made by the General Assembly " at all. It stands as a mere inchoate proposition, offered and considered by the General Assembly, but never finally adopted.

I agree with the views so eloquently expressed by Mr. Justice McEnery that the right of the people to change their organic law in the mode provided by the Constitution should be jealously guarded and liberally enforced; but I can not ignore the clear mandate placed by the people themselves in their Constitution that no amendment can be submitted or voted on unless it has been first proposed by the General Assembly with the concurrence of two-thirds of the members elected to each house.

I agree with him as to the evil of permitting subordinate officers, by their wilful acts or accidental omissions, to obstruct the course of amendments, duly proposed by the General Assembly, in reaching the people for their sovereign action. This very proceeding illustrates the efficient means by which such unwarranted obstructions

may be swept out of the way; and, when unwarranted, no member of the court would act more vigorously in suppressing them than myself. But the Constitution, not only does not require, but impliedly forbids the Secretary of State to publish propositions of amendment not made by the General Assembly in the mode therein prescribed; and I am bound to uphold him in refusing to violate his duty.

I have not found it necessary to give minute study to the question whether or not the prescribed forms as to reading, recording of yeas and nays, and spreading on the minutes, were observed or are exhibited by the proper journals. The elaborate analysis of the facts connected with those questions given in the majority opinion indicates the care with which they have been considered, and supports the conclusion reached. I approve the philosophic views expressed by Mr. Justice Brewer in the Kansas prohibition cases, and quoted in the majority opinions; and while compliance with these prescribed forms is doubtless essential, it would require proof of non-compliance too clear to admit of division of opinion to justify me in dissenting on such a ground. The ground on which my dissent is based is so radical and fundamental that no one who conceded its correctness could possibly act otherwise.

What I have here so carefully stated has not been written with the slightest desire now to convince any one that I am right and my brethren wrong. I have simply felt that, in such a case, no judge could feel satisfied in dissenting unless he could give strong and substantial reasons for his course, and, in self-justification, I have elt bound to state mine as strongly and forcibly as I could.

I have long ago put behind me all vain conceit of opinion. Every day's experience convinces me more clearly of the humiliating fact that the human mind possesses no infallible touchstone of truth; and that men equally honest and intelligent, whatever their desire to harmonize, will often reach opposite conclusions on the same matters. I concede to others, what I claim for myself, the sovereignty of each man's conscience over his own judgment.

*Justitia patrem et matrem nescit; veritatem solum spectat justitia.*

I dissent.

### DISSENTING OPINION.

BREAUX, J. I will occupy but little time and take but little space in stating the grounds of my dissent. The questions involved have

been so thoroughly discussed in the opinions of the majority and in the dissenting opinion of the senior Associate Justice (with the latter I concur) that I am inclined to record a silent dissent.

The importance of the subject and the thoroughly prepared briefs urge me to write out a few general propositions in support of my opinion. I have written the word brief above, as sickness did not permit me to hear the oral argument. I take part in the decision only for the reason that a desire to have a full bench to pass upon the case was manifested and counsel acceded to the wish expressed at the time the case was orally argued.

I have no dissent to express from the proposition that the articles of the Constitution furnish us with the test to decide the legality of the proposed amendment. A proposition as plain does not need argument or authority in its support.

A vast power is vested in the General Assembly. When limitations to this power can not be found in the Constitution of the United States or in the Constitution of the State, the will and discretion of the Legislature are the only limits. The power being thus extensive, there is safety, surely, in adhering to the words of the Constitution and in not parting from them until repealed by the popular will lawfully expressed.

An amendment presented in compliance with Article 256 can be submitted to a vote without the signature of the Executive, provided it is not objectionable in point of substance and does not contain legislative enactments.

The proposed amendment was not exclusively prepared, acted upon by the Legislature and submitted in accordance with the requirements of Article 256 of the Constitution. This article contains a complete law in itself on the subject. It provides who shall cause the advertisement of the proposed amendment to be made; the time and the newspaper; the submission for approval or rejection, and the proclamation to be made of the result. The General Assembly added to the words of the Constitution, which reads: proposition "for amendment shall be published for three months preceding the next election," etc. Art. 256.

In the *projet* of amendment it is made the duty of the Secretary of State to publish the amendment "within ninety days after the first day of January, 1891."

The words in the Constitution, "preceding the next election,"

fix the time of advertisement. They do not indicate *any* three months prior to the election, nor are they uncertain as to the time.

A preceding event is one which happens immediately previous, as, for instance, the preceding day, or the preceding chapter, is the day or the chapter which goes before.

A preceding proposition is closely followed by another. It is opposed to succeeding. To illustrate: If the Legislature had ordered a notice to be given or an advertisement to succeed the adoption of an amendment, the time would be immediately after the adoption, as preceding requires that it shall be immediately preceding. Under the Constitution the advertisement should be made three months immediately preceding the election.

When laws are adopted to have an advertisement made at another time than that indicated in the Constitution, the proposition to amend is not constitutional and organic in its entirety, but partly legislative, and Article 75 of the Constitution then applies.

The proposed amendment provides by special enactment that special advertisement of its submission shall be made at another time than that ordered in the Constitution.

The constitutional provision fixes the advertisement ninety days preceding the election.

The amendment for submission provides for its advertisement more than twelve months prior to the election. In the enactment of this law the Governor is part of the law-making power.

I find a well considered decision on the subject in the California reports.

Amendments to the Constitution of California, as it is in Louisiana, are proposed by the two houses of the Legislature, but the time for the submission to the voters must be fixed by an act of the Legislature, as the Constitution is silent in that respect.

I quote from the decision: "It will be remarked that the power to propose an amendment is vested in the two houses, and if two-thirds of all the members elected to each of the two houses vote in favor thereof, it shall be the duty of the Legislature to submit such amendments to the people to be voted thereon.

"The proposal of the amendment is not by the Legislature as such in the ordinary enactment of a law, and with the proposal the Governor has nothing to do. * * *But the matter of submitting the proposed amendment to the vote of the people is quite different.*

*That is to be done by the Legislature by a law to that effect, and in the enactment of a law the Governor is a part of the law-making power.*

" *The time when the election is to be held must be fixed by law, and as there is no law fixing such time, it must be fixed by an act of the Legislature, and is therefore subject to executive veto.* Hatch vs. Stoneman, Governor, Pacific Reporter, Vol. 6, No. 11, p. 735.

The propositions to amend are amenable to the additional objection that there are several amendments in the act to be submitted.

The Constitution requires: When more than one amendment shall be submitted at the same time, they shall be submitted in such form as to enable the electors to vote on each separately.

The subjects of amendments of the organic laws gave some concern early in the history of the government. Alexander Hamilton, whose writings have secured for him a place in history among the first of the many wise and distinguised men of those days, gave the subject great attention.

I quote from one of his letters in the *Federalist:* " But every amendment to the Constitution, if once established, *would be a single proposition, and might be brought forward* singly. There would be no necessity for management or compromise in relation to any other point; no giving or taking. The will of the requisite number would at once bring the matter to a decisive issue."

The wisdom of reducing amendments to single propositions has since been considered and measures have been adopted to carry out the theory suggested by its necessity.

In some States the proposed amendment must be adopted by the successive Legislatures, perhaps by two-thirds of one and three-fourths of the next. In some States not more than one amendment can be brought before the same Legislature; in some it is provided that amendments must not be submitted to the people oftener than once in five years, and so on.

In Louisiana the Convention adopted the expedient of enabling the elector to vote on each amendment separately.

The charter of a company is a distinct scheme; an independent proposition; a separate act. In organic law, in legislation, in jurisprudence, it is a distinct subject.

If articles, stipulations and conditions other than those essential to its organization, and not germane thereto, are made a part of the

act of incorporation, it includes more than one proposition, one subject, one project.

In addition to the charter and the privileges it is designed to secure, it is in contemplation to set aside and appropriate the annual revenues it offers, for the term of twenty-five years, to purposes named.

The objects are the most important which require the attention of the government.

The schools, the levees, charities, pensions, drainage.

The amount proposed will no longer be a comparatively insignificant sum for the Charity Hospital (although highly beneficial to that great institution), unfelt and unperceived as a separate question in the movements of appropriations by the Legislature.

In the affairs of the State the House of Representatives has always been the authority in originating bills for raising revenue or appropriating money. This it is proposed to alter in so far as relates to the amount offered.

At least six articles of the Constitution will be amended or repealed. These articles are 14, 35, 43, 53, 54 and 55. I do not commit myself to the averment that different amendments and changes can not be made by one amendment, when they are germane, but I do assert that the propositions are not germane; some of them can not, under the law, be grouped in one amendment, and should be submitted separately. They are dissimilar and not reducible to a condition of oneness. It is not a composite whole, but a number of different subjects involving distinct intent.

I have considered questions of law, and my propositions are advanced to that end.

Statements are not made with reference to policy or to the impolitic in political development. They have no place here, but belong to another department.

Should the proposed amendment be made part of the Constitution and the State maintain the authority of her laws, her welfare and her prosperity, under their wise administration and enforcement, and continue to maintain her deserved position in the great family of States, there will be no cause for regret.

If the reverse should be the result, and the precedent, as a question of law, should become bad and injurious, the sovereignty of the

State will be responsible, embracing in that sovereignty every citizen. No one will escape the responsibility and the sting of reproach.

Therefore, the right and duty of each to discuss measures of law of great importance, and to express his views, particularly when he admits, on the part of those with whom he differs, the sincerity he claims for himself.

I dissent from the opinion of the majority of the court.